## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | } | MDL DOCKET NO. MDL 875 |
| LIABILITY LITIGATION (No. VI) | } | |
| | } | |
| _____ | } | |
| | } | |
| THIS DOCUMENT RELATES TO: | } | |
| ALL ACTIONS | } | |

## CERTAIN DEFENDANTS' MOTION FOR RECONSIDERATION OF THE REMEDY PROVIDED FOR IN THE COURT'S ORDER TO COMPEL DR. SEGARRA, DR. RAO, AND DR. BERNSTEIN

COME NOW Certain Defendants[1] and respectfully submit this Motion for Reconsideration of the Remedy Provided for in the Court's Order to Compel Dr. Segarra, Dr. Rao and Dr. Bernstein as follows:

### Introduction

This Court's February 2009 Order compelling production of certain documents and materials by Drs. Segarra, Rao, and Bernstein finds that the underlying subpoenas at issue are overly broad and limits production to only those documents and materials relating to plaintiffs pending in MDL 875. Defendants respectfully submit that this new limitation on the scope of discovery against screening doctors, which contradicts prior rulings of this Court, risks allowing

---

[1] A.R. Wilfley & Sons, Inc.; Accurate Felt & Gasket Co., Inc.; Allied Glove Corporation (sometimes sued as Nationwide Glove Corporation); Amsted Industries, Inc.; Baldor Electric Company; Bondex International, Inc.; CertainTeed Corporation; Chemtura Corporation; Cooper Alloy Corp.; Crossfield Products Corp.; Eastern Safety Equipment Company, Inc. (sometimes sued as Aearo Company); Flexo Products, Inc.; Gardner Denver, Inc.; General Electric Co.; Georgia-Pacific Corporation; The Gorman-Rupp Company; Gulf Coast Marine Supply Company; Pulsafeeder, Inc.; Viking Pump Company; Warren Rupp, Inc.; Illinois Tool Works Inc.; Ingersoll-Rand Company; Lawrence Pumps, Inc.; Magnetrol International Incorporated; Marine Specialty Company, Inc.; Mueller Steam Specialty; National Service Industries, Inc. f/d/b/a North Bros. Company; Owens-Illinois, Inc. d/b/a O-I; Pecora Corporation; Pneumo Abex, LLC; Rogers Corporation; Aurora Pump Company; BIF; DeZurik, Inc.; Layne & Bowler Pump Group; Marsh Instruments; Standard Equipment Company, Inc.; Terex Corporation; Terex Cranes, Inc.; The American Crane Corporation; Turner Supply Company; Union Carbide Corporation; Amchem Products, Inc.; Warren Pumps, LLC; "Yeoman's Chicago Corporation" (also erroneously served for "Chicago Pump Company" and/or "Morris Machine Works/Morris Pumps"); Yuba Heat Transfer.

widespread fraud to plague the MDL 875 pending claims docket for years to come.  Since the inception of mass tort screenings in the late 1980s, most screening companies and litigation screening doctors have successfully concealed the suspect and/or fraudulent nature of the claims they generated.  The reality of the screening industry's practices remained hidden because they took advantage of the limited access throughout the country to full and complete information that prevented defendants and courts from effectively evaluating the patterns and practice of litigation screening doctors and companies.  Any attempt to unravel suspect screening practices with the limited information provided was like trying to determine the picture in a jigsaw puzzle by looking at only a few pieces.

A comparative handful of screening doctors and companies account for the vast majority of the diagnoses that support asbestos plaintiffs' claims throughout the country.  When these diagnoses are reviewed individually or in small groups the fraudulent methodology that all too often is employed to create or generate these claims cannot be readily identified.  The pervasiveness of this phenomenon has been the subject of extensive comment and analysis.[2]

The tide began to turn when this Court, in conjunction with the efforts of the Silica MDL 1553 court, began to allow full and complete discovery on screening doctors and companies.  Pursuant to the prior discovery Orders of this Court, numerous screening doctors and companies have produced their entire set of litigation records without regard to whether the claimants were

---

[2] *E.g.*, Lester Brickman, *The Use of Litigation Screenings in Mass Torts: A Formula for Fraud?*, 61 SMU L. Rev. 1221, 1315, 1350 (2008) ("The evidence considered in this Article leads to the inevitable conclusion that mass tort litigation screenings almost invariably involve the mass production of medical reports which are manufactured for money and are not the product of good faith medical practice.  These practices flourish because (1) they are very lucrative; (2) the courts insulate the litigation doctors and their records form the extensive discovery that Judge Jack allowed; and (3) bankruptcy courts allow the testimony of professional experts to substitute for proof of causation in estimation proceedings.  Litigation screenings have flourished because of the failures of the civil and criminal justice systems to allow detection of specious, if not fraudulent, claim generation, let alone to sanction this conduct.  Instead, these institutions have effectively granted litigation doctors immunity from prosecution no matter how blatant their practices.  Unless judges and legislatures change practices, rulings, and statutes, the wholesale manufacture of claims in litigation screenings will continue to flourish.").

pending before this Court.  This critical authorization of full discovery has exposed documents and materials that provided the parties and this Court with the information necessary to evaluate the patterns and practices responsible for the creation of the majority of the plaintiffs' cases pending in MDL 875.  It is through this critical discovery that the exposure of the fraud—that has plagued this Court since the inception of this MDL—has finally begun.

This type of discovery is effective because it makes the complete array of litigation records of a particular screening doctor or screening company available such that the methodologies, patterns and practices, inconsistencies and, in some instances, the fraudulent means employed by those individuals, can be evaluated.  The parties and this Court no longer have to rely solely on the testimony of screening doctors and the language contained in a few limited reports to attempt to ascertain whether the methodology employed was reliable, suspect, or at worst, fraudulent.  Individual diagnoses and reports no longer have to be evaluated in isolation on a case-by-case basis.  One report can now be cross referenced with all other reports created that day and all other reports created in conjunction with the same or other doctors, screening company, or law firm.

A "diagnostic" report, for example, can appear on its face to evidence a legitimate physical examination, collection of a work history, evaluation of other sources of exposure, and a differential diagnosis.  However, appearances are often deceiving.  Prior to the February 2009 Order of this Court, that diagnostic report could have been analyzed in conjunction with all other reports created on that same date by that screening doctor in order to assess the reliability and validity of the diagnosis.  Volume and positive rate are, unfortunately, all too often one of the key elements to unlocking the legitimacy or illegitimacy of screening doctors' practices.  If, when examining the entire litigation work day for a particular screening doctor, it turns out that

far too many potential plaintiffs were purportedly seen by the screening doctor that day for any sort of meaningful physical examination or diagnostic practice to have taken place, then the parties and the Court would immediately know that the diagnoses based upon that doctors opinions should be considered suspect and merit further review.   For example, Dr Richard Levine[3] created 236 positive diagnostic reports for claimants on March 23, 2001, assuming a ten-hour work day that volume yields one positive diagnostic report every three minutes on that one day.   Each report created on that date appears, when examined in isolation, to be a legitimate diagnosis.   If Defendants did not have access to a virtually complete set of litigation records authored by Dr. Levine, the high volume and positive rate, and thus the suspect nature of each report, could not be effectively determined and challenged and those plaintiffs would have proceeded with their cases based on those diagnoses.   If the Court's February 2009 modified rule on discovery were in place, Defendants would have only examined records of plaintiffs pending in MDL 875 and the high volume and positive rate for this day and this doctor would never have been detected.   Indeed, each known individual report would have continued to give an appearance of a legitimate diagnostic method leading to reliable results.   However, when his screening materials are examined as a whole, it becomes clear that Dr. Levine actually diagnosed over sixty plaintiffs per day on more than twenty occasions with a very high positive rate. Without the complete spectrum of his litigation records, these patterns would have remained hidden and these plaintiffs' claims would be allowed to continue in the court system.

Nevertheless, Defendants agree that the subpoenas at issue can be interpreted to be overly broad on their face as they could appear to cover all physician records and materials created,

---

[3] For additional information regarding the suspect nature of Dr. Levine's methodology and diagnoses, please see Defendant's Combined Motion and Brief to Exclude Testimony and For Dismissals filed on June 8, 2005. Though Dr. Levine makes a "diagnosis" in his reports, he recanted all of his diagnoses in an affidavit executed in this MDL 875 action.  Exhibit 1, May 1, 2006 Affidavit of Richard Levine.

whether or not they were created for the purpose of screening/litigation work.  In reality, only those documents and materials related to screening/litigation activity are at issue.  To that end, Defendants respectfully request that the Court reconsider the way in which it interpreted Defendants' subpoenas to be overly broad and unduly burdensome and, consequently, adjust the remedy provided for in the Court's February 2009 order.[4] Production under the subpoenas should be limited but only to the production of the screening/litigation records[5] of the doctors at issue – not the records produced in their private clinical practices.  Altering the Court's remedy in this fashion would bring this most recent order in line with all other orders issued by the MDL 875 Court on this issue and would alleviate the overly broad and unduly burdensome nature of the subpoenas on their face.

## I.      Courts Consistently Authorize Full Discovery to Uncover Fraud

### A.      Courts Consistently Authorize Full Discovery in Mass Tort Litigation to Uncover Fraud

The Honorable Charles R. Weiner, Jr. issued an Order on March 23, 1999 that specifically authorizes discovery regarding screenings companies and screening doctors at issue in MDL 875. Exhibit 2, Mar. 23, 1999 Order Authorizing Discovery Concerning Litigation Screenings, Judge Charles R. Weiner, *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL 875 (E.D. Pa.).  Judge Janis Graham Jack continued this type of discovery with her landmark rulings in silica MDL 1553 in which she granted full screening discovery once indicia of fraud appeared in the claims before her.  Specifically, Judge Jack ordered the now discredited screening company N&M, Inc. to produce all screening records in its possession – including all negative

---

[4] The decisions of this Court regarding HIPAA and consulting experts are consistent with prior rulings of this Court and Defendants have no objections to those rulings.

[5] Non-litigation documents are documents created in the context of a doctor-patent relationship, such as a relationship between a treating physician and the physician's patient.

reports, reports relating to both asbestosis and silicosis screenings, and reports of claimants not pending in MDL 1553 or any litigation whatsoever.

Indeed, the productions in MDL 1553 led that court to uncover a continuum of suspect activities, including the "shuffling" of claims from one screening doctor to the next by screening companies in an effort to find a useable, positive diagnosis.  The same screening doctors and companies at issue in Judge Jack's Court are at issue before this MDL.  *In re Silica Prods. Liab. Litig*. No. MDL 1553, 398 F. Supp. 2d 563, 618-20, 624 (S.D. Tex. 2005) ("Shuffling" is the method screening doctors and companies use to ensure they acquire high positive rates on their inventories of clients.  Essentially, clients are shuffled from doctor to doctor until they receive a positive diagnosis.)

It is important to note that the scope of productions ordered by Judge Jack broadened significantly as it became clear that the pending MDL 1553 claims were suspect and that potential fraud was being concealed from the court.  At first, Judge Jack overruled plaintiffs' objections that the subpoenas caused an undue burden, violated HIPAA, or were "inappropriate requests to 'consulting-only' experts."   Exhibit 3, Dec. 2, 2004 Order No. 17, Judge Janis Graham Jack, *In re Silica Prods. Liab. Litig.*, MDL No. 1553 (S.D. Tex.).  The court held, "Plaintiffs have placed their physical condition at issue and Plaintiffs are hereby ordered to produce any and all medical records on which they rely solely for their claims of silica-related injury."  *Id.*

After this initial ruling, Judge Jack expanded the scope of documents to be produced beyond those records relied upon by plaintiffs to file their MDL 1553 lawsuits in Order No. 25

on February 17, 2005.  Exhibit 4, Feb. 17, 2005 Order No. 25, Judge Janis Graham Jack, *In re Silica Prods. Liab. Litig.*, MDL No. 1553 (S.D. Tex.).  Even at that early stage, the court recognized the importance of discovering more than simply the screening records plaintiffs relied upon to file their claims.  Consequently, the court ordered plaintiffs to identify screening companies, produce all x-ray logs, and produce all other documents "relating to the Plaintiffs in this MDL."  *Id.*  The court further required plaintiffs to produce all reports, including both positive and negative reports.  *Id.*

During the MDL 1553 *Daubert* hearing held on February 17, 2005, Heath Mason, owner of the now discredited N&M, Inc., testified that he would provide the MDL 1553 court with all of his company's records.  Exhibit 5, Feb. 17, 2005 *Daubert* Hearing Testimony of N&M, Inc. Owner Heath Mason, *In re Silica Prods. Liab. Litig*. No. MDL 1553, at p. 358 (S.D. Tex.).  He subsequently refused to produce them and Judge Jack entered multiple orders regarding the N&M documents.  This culminated in that court's March 3, 2005 Show Cause Order that ordered N&M to make available "all documents and electronic data pertaining to all screenings by N&M."  In this final N&M order, that court did not limit this production to MDL 1553 claimants, to silica-only diagnoses, or even to the diagnostic records purportedly relied upon by plaintiffs' to file their lawsuits.  Exhibit 6, Mar. 3, 2005 Order, Judge Janis Graham Jack, *In re Silica Prods. Liab. Litig.*, MDL No. 1553 (S.D. Tex.).  Pursuant to this Order, Heath Mason did produce all screening records N&M had in its possession and the court did not limit the scope of that production in any way.

Finally, Judge Jack went on to grant an order that plaintiffs were to produce all <u>asbestos</u> related records though they clearly did not support the plaintiffs' <u>silica</u> MDL 1553 claims.  The court specifically ordered plaintiffs to produce:

all documentation (including but not limited to the diagnosing reports and x-rays) related to Plaintiffs' prior asbestos claims and/or asbestosis diagnoses.

Exhibit 7, Aug. 23, 2005 Order No. 31, Judge Janis Graham Jack, at p. 2, *In re Silica Prods. Liab. Litig.*, MDL No. 1553 (S.D. Tex.).   As the silica litigation proceeded, the court continued to recognize the importance of uncovering all documents relevant to the evaluation of each claimant and the doctors and screeners who created their diagnoses.   This is undoubtedly due to the court's determination that the diagnoses that supported claims pending in MDL 1553 "were driven by neither health nor justice: they were manufactured for money.   [Judge Jack further noted that] [t]he record does not reveal who originally devised this scheme, but it is clear that the lawyers, doctors and screening companies were all willing participants."   *In re Silica Prods. Liab. Litig*. No. MDL 1553, 398 F. Supp. 2d 563, 58 (S.D. Tex. 2005).

Unfortunately, the suspect and fraudulent nature of the diagnoses in MDL 1553 is also commonplace in the diagnoses of claims pending in MDL 875.   That is why Judge James T. Giles consistently authorized full discovery into the litigation records of doctors and screeners responsible for the claimants pending before this Court:

- The Court has consistently ordered that physicians and screeners produce all of their litigation records.  "The Court found that these subpoenaed entities were engaged in the business of screening individual for pneumoconiosis for litigation rather than medical purposes."  Exhibit 8, Holland Bieber MDL 875 Production Order, at ¶ 1.

- The Court has consistently ruled that physicians and screeners do not have to produce their non-litigation records pursuant to the subpoena.  "Certain Defendants have represented to the Court that they are not seeking records from Dr. Springer's and Dr. Richey's private, non-litigation medical practices, and, the Court is not ordering the production of those materials."  Exhibit 9, Dr. Robert Springer, Dr. Harvey M. Richey, and Consultants in Pulmonary & Occupational Medicine, P.A. MDL 875 Production Order, at ¶ 2.

- The Court has consistently ruled that, "Certain Defendants are in substantial need of the materials and are unable without undue hardship to obtain the substantial equivalent of the materials by other means." *Id.* at ¶ 5.

- The Court has consistently ruled that physicians and screeners must produce all litigation documents covered by the subpoena except for their personal tax returns.   "Compliance with this subpoena includes, but is not limited to, making available for copying and inspection by Certain Defendants all documents, materials, and items responsive to the subpoena, with the exception of Dr. Alvin Schonfeld's federal and state tax returns."  Exhibit 10, Dr. Alvin Schonfeld MDL 875 Production Order, at ¶ 3.

- Finally, the Court has consistently ruled that screening doctors and companies must produce all litigation records and that this Court will resolve all confidentiality and/or privacy issues presented by the material produced.   "Although OMR filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, prior thereto, the documents, items, and materials of OMR remained subject to the jurisdiction of this Court pursuant to a subpoena.   Accordingly, this Court hereby enforces the subpoena and will resolve any and all confidentiality and/or privacy issues that may exist regarding those subpoenaed documents."    Exhibit 11, Occupational Medical Resources MDL 875 Production Order, at ¶ 2.  Though the Court provided an opportunity for the parties to object to the production after a preliminary review, no objections were filed with the Court.

The discovery previously authorized by this Court has allowed Defendants to demonstrate to this Court the pattern and practice of numerous screening doctors and companies.  The discovery of these suspect methodologies documents the necessity of exposing the screening information of screenees who may be non-plaintiffs.  Through these discovery orders, Defendants have been able to show, for example, the suspect nature of the records of Dr. George Martindale and the screening company Respiratory Testing Services, Inc.[7]

---

[7] For additional information regarding the suspect nature of Dr. Martindale's methodology and diagnoses, please see Defendant's Combined Motion and Brief to Exclude Testimony and For Dismissals filed on June 8, 2005 and Defendant's Combined Motion and Brief to Exclude Diagnostic Materials Created by Respiratory Testing Service, Inc. and to Dismiss Claims of Plaintiffs Relying on Same filed on April 3, 2007.

Like Judge Jack, as the volume of fraud uncovered in MDL 875 increased, Judge Giles'

position changed markedly regarding the Court's approach to discovery and the presumed nature

of the screened cases pending before the Court.   Though at first Judge Giles asserted that he did

"not presume that there is fraud in mass tort litigation,"[8] only a short time later he stated that the

medical reports generated by asbestos litigation screenings "lack reliability and accountability"

and are "inherent[ly] suspiciou[s]."[9]   Additionally, Judge Giles specifically addressed the

rationale behind authorizing full discovery into the doctors and screeners at issue:

> The interest of this Court . . . consistent with Judge Jack's opinion,
> is beyond the named plaintiffs, but goes to the integrity of the
> screener.   And, therefore, all of the attorneys, plaintiffs and
> defendants, have an integrity of justice interest in resolving OMR's
> status as a screener or potential screener for evidence purposes in
> MDL cases.

Exhibit 14, Apr. 8, 2007 Transcript of Motions Hearing Before Judge James T. Giles, *In re*

*Asbestos Prods. Liab. Litg. (No. VI)*, at p. 9-10 (E.D. Pa.).   His intent that the screening doctors

and companies produce all records, including those of plaintiffs not pending in MDL 875, is

evidenced by his careful efforts to protect any privacy interests of individuals not pending in

MDL 875.   *Id.*   A possible, but unfortunate, reason that plaintiffs' counsel continues to attempt to

thwart complete discovery of litigation doctors and screeners was also addressed by Judge Giles

at an MDL 875 hearing.   There, the Court stated:

> There's an issue here that's a little deeper. . . . [P]otentially it is
> whether or not there was knowing reliance upon a false report in
> the filing of a claims.   That is . . . an issue that has not yet been
> raised . . . but it is lurking.   And, I think it is something I am not
> anxious to reach.

---

[8] Exhibit 12, January 31, 2007 Transcript of Motions Hearing Before Judge James T. Giles, *In re Asbestos Prods. Liab. Litg. (No. VI)*, MDL 875, Vol. 2, p. 20 (E.D. Pa.).

[9] Exhibit 13, Administrative Order No. 12, Judge James T. Giles, *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL 875, at ¶ 7 (May 31, 2007).

Exhibit 15, Jan. 31, 2007 Transcript of Motions Hearing Before Judge James T. Giles, *In re Asbestos Prods. Liab. Litg. (No. VI)*, Vol. 1, p. 40 (E.D. Pa.).

The remedy currently granted in the Court's February 2009 Order is a significant departure from the landscape established by prior orders of MDL 875 and MDL 1553. Defendants respectfully suggest that this is due to the way the subpoenas on their face are drafted such that they can be read (without the proper context) to cover documents from the screening doctors legitimate and/or non-litigation based medical, clinical practice. Defendants agree that these documents will not assist the Court in continuing to uncover suspect and fraudulent claims before it and should be excluded from production. Therefore, Defendants respectfully request that this Court continue to authorize full discovery regarding screening doctors and companies – with respect to only their litigation/screening records and materials – so that that any fraud or suspect activity remaining to be uncovered in this Court can be brought to light and the claims with legitimate diagnoses can proceed unencumbered by suspect and fraudulent claims.

### B. The Eastern District of Pennsylvania Consistently Authorizes Full Discovery in Litigation Where Fraud Is at Issue

In addition to rulings by Judge Giles regarding mass tort claims created by litigation doctors and screeners, Judges in the Eastern District of Pennsylvania have also consistently authorized broad discovery in litigation where fraud is at issue. This Court's order regarding Drs. Segarra, Bernstein, and Rao notes that the Third Circuit has recognized that though the scope of discovery under the Federal Rules may be broad, under appropriate circumstances the court has discretion to limit and circumscribe this scope. *Bayer v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999); *Frank v. Tinicum Metal Co., Inc.*, 11, F.R.D. 83, 85 (E.D. Pa. 1950). However, the circumstances presented by the suspect and fraudulent diagnoses pervasive in

MDL 875, and in other analogous litigation where fraud is at issue, are materially different from the circumstances presented in typical discovery.

For example, in *Small v. Provident Life and Accident Ins. Co*, the Eastern District of Pennsylvania addressed the validity of the scope of the plaintiff's subpoena that required the defendant-doctor to produce:

> "<u>any and all</u>" medical records, billing records, reports, statements, and scheduling books pertaining to or in connection with any forensic independent medical evaluations performed by Dr. Bromberg [the physician whose alleged bad faith was at issue] or his associates <u>in connection with any civil litigation</u> or on behalf of any insurance company, agency or law firm.

1999 WL 1128945, at *1 (E.D. Pa. 1999) (emphasis added), *cited in* Exhibit 9, Dr. Robert Springer, Dr. Harvey M. Richey, and Consultants in Pulmonary & Occupational Medicine, P.A. MDL 875 Production Order, at ¶ 6.

In *Small*, the plaintiff alleged that the defendant-doctor had a pattern and practice of incorrectly making unfavorable and biased determinations against insurance claimants for the purpose of allowing insurance companies to improperly and unreasonably terminate policy-holders' benefits. *Id.* The Court ruled that "the precise boundaries of the Rule 26 relevance standard depend[s] on the context of the particular action . . . [and] Plaintiff's bad faith claim puts [the defendant doctor's] bias and evaluation practices directly at issue. Thus, to preclude the discovery of such information would hinder Plaintiff's ability to prove his claim." *Id.* at *1, 4. Further, the Court specifically noted that the doctor generated the records "for the preparation of civil litigation." *Id.* at *3. The Court ordered the defendant-doctor in *Small* to produce "any and all" medical records created for insurance companies because, though broad, that was the scope of documents that were relevant to the plaintiffs' bad faith claim. The Court did limit the scope of the subpoena, however, and did not compel production of records by the other doctors

in the defendant-doctor's medical practice.  *Id.* at *2.  The Court imposed this limitation because the other doctors' work was not the subject of the underlying lawsuit.  *Id.* at *2.

Similarly, the subpoena issued by Defendants in MDL 875 may be construed on its face to cover non-litigation records that are not relevant to the credibility or methodology utilized by screening doctors in the creation of diagnoses or opinions for asbestos litigation purposes. Defendants concede that these documents are not at issue in the evaluation of their litigation-screening methodologies.   This is because litigation physicians consistently testify that the patterns and practices they follow in their litigation work are completely different from their patterns and practice they follow when they are providing patient care in their non-litigation work.[10]  Therefore, consistent with the *Small* decision, Defendants request this Court order the production of all litigation/screening records identified in the subpoena and limit the production of documents only to the extent that the doctor's regular, non-litigation based patient files and materials be excluded from production.

In addition to the medical context above, the Eastern District of Pennsylvania has also authorized broad discovery in other contexts where fraud is at the heart of the case before the Court.   For example, antitrust litigation presents analogous circumstances and the Eastern District has found that the history of a defendant's activities is required in order to shed light

---

[10] Moreover, this Court has repeatedly ruled that there is no doctor-patient relationship in the screening context.  Feb. 25, 2009 Order, Judge Eduardo C. Robreno, *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL 875, p. 8-10 (E.D. Pa.) (finding that "no physician-patient privilege attached . . . [and] even if the physician-patient privilege applied, it has been waived"); Exhibit 9, Dr. Robert Springer, Dr. Harvey M. Richey, and Consultants in Pulmonary & Occupational Medicine, P.A. MDL 875 Production Order, at ¶ 5 (overruling all privilege objections); Holland Bieber & Associates, at ¶ 2 (holding that the subpoenaed items are not privileged); Exhibit 11, Occupational Medical Resources MDL 875 Production Order, at ¶ 4 ("find[ing] there are no doctor-patient relationships between OMR and any of the persons screened by OMR"); April 8, 2008 Transcript of Motions Hearing Before Judge James T. Giles, *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL 875, at p. 10-11 (E.D. Pa.) (ruling, "In the proposed order, it must reflect, after hearing from the plaintiff's side and defense side, that there would not have existed a doctor patient relationship between any of the persons named in the file and OMR").

Further, litigation physicians consistently concede that their litigation records were not generated pursuant to a physician patient relationship.  *E.g.*, June 18, 2003 Dep. of Dr. Segarra, *Glenn E. Twist, et al. v. Amoco Chem. Co., et al.*, Cause No. 8111*JG99, at p. 13 (Brazoria County, Tex. Dist. Ct.).

upon the alleged illegality of a potential monopoly. *New Park Entm't LLC v. Elec. Factory Concerts, Inc.*, 2000 WL 62315, at \*2 (E.D. Pa.). The Eastern District authorized full discovery of all relevant contracts because it determined that though contracts at issue appeared to be legal, they may prove to be illegal should the arrangements prior to the creation of the contracts show a monopoly which stifled competition. *Id.* The Court further acknowledged that though "producing the information may be onerous, . . . [s]uch conduct is generally covert and must be gleaned from records, conduct, and business relationships." *Id.* at \*3 (citations and quotations omitted).

Similarly, the validity of each specific report created by a screening doctor cannot be accurately evaluated without placing it into context with the body of work that precedes and follows each document. The analysis of each doctor's pattern and practice, along with that of the relevant screening company at issue, is the only method by which the Court can determine whether diagnoses that appear on their face to be reliable are, in truth, unreliable. Therefore, Defendants request this Court alter its Order so that it is consistent with *New Park*, and prior orders of this Court. This will allow Defendants and this Court to continue to "glean[] from records, conduct, and business relationships" the covert and fraudulent efforts of doctors and screeners whose diagnoses should be excluded by this Court.

## II.     The Parties Continue to Need Full Discovery to Identify the Fraud Remaining in This Court

The subpoenaed litigation records demonstrate the reliability of the methodology of the screening doctors and companies and, thus, the reliability of the diagnoses and opinions they created. For example, each screening doctor's negative reports are needed to assess the positive and negative rates and volume for that particular litigation doctor. History has shown that litigation physicians like Drs. Segarra, Berstein, and Rao have positive rates that far exceed, and

indeed are unsupported by, epidemiology studies and medical literature.

As outlined in Defendants' Motion to Exclude the Expert Testimony of Jay T. Segarra, filed on September 7, 2008, Defendants have piecemealed together a set of Dr. Segarra's records. This subset of his litigation records document that Dr. Segarra has routinely used unreliable diagnostic materials to consistently diagnose his quota of 47% of the tens of thousands of plaintiffs he has screened without regard to proper medical standards, including those set forth by the Association of Occupational and Environmental Clinics and the American Thoracic Society.[11]  Furthermore, Dr. Segarra's severe lack of credibility is nowhere more apparent than in the all too numerous instances where he diagnoses a plaintiff with asbestosis, and then later inexplicably changes his diagnosis to silicosis – all to satisfy the litigation plans of the plaintiffs' firms and screening companies who employ him.

Notwithstanding the above arguments asserted by Defendants based on the limited records currently available, in response to Defendants' Motion to Exclude Dr. Segarra, he provides the Court with the results of his own "internal audit" covering 2003-2005.   By conducting this limited audit and presenting the Court with his results, he concedes that a full review of his records is necessary to determine the legitimacy of his litigation work.  Neither Defendants nor the Court can finally and definitively evaluate his diagnoses, much less his portions of his methodology, without access to a complete copy of his entire set of litigation records as he has been screening since 1992.

Defendants' piecemealed set of Dr. Segarra's records are expansive but not complete. Dr. Segarra cannot, on the one hand, point this Court to his alleged reliability based on his own

---

[11] Lester Brickman, *Disparities*, 29 Cardozo L. Rev. 513,540-543 (2007) ("The result of a review of the fifth-eight studies (including the adjusted results of the review of the eight insulators' studies) is that of a total of 78,219 exposed worker's x-rays, 9,042 (11.56%) were found to have fibrosis graded as 1/0 or higher on the ILO scale.  If the insulators' studies are included without adjustment, then of the total 83,568 X-rays reviewed, 11,851 (14.18%) were found to have fibrosis graded as 1/0 or higher.")

internal audit and, on the other hand, prohibit Defendants from having access to at least the same materials so that Defendants can also evaluate his conclusions. Thus, Dr. Segarra has opened the door to an evaluation of his entire set of litigation records, not just the two years he references in his self audit. He cannot successfully hide behind objections to Defendants subpoena that would allow evaluation of the conclusions he presented to this Court in defense the reliability of his diagnoses. Dr. Segarra examined his litigation records and presented evidence to the Court regarding his evaluation of these records. He has opened the door to these documents by placing them in issue and Defendants should be allowed to examine these records and conduct their own independent evaluation of his work.

Another example of the types of evidence that can only be uncovered through complete productions by litigation doctors is the phenomenon of "flip-flops" that was briefed for the Court in Defendants' Combined Motion and Brief to Exclude Expert Testimony by Dr. Jay T. Segarra and to Dismiss Claims of Plaintiffs Relying on Same filed on September 7, 2007. Dr. Segarra "flip-flopped" his diagnosis of claimant John Netter. Though he is not a claimant in MDL 875, Mr. Netter's diagnostic records document the flawed diagnostic methodology of Dr. Segarra that goes to the heart of all diagnoses he creates. On November 9, 2004, Dr. Segarra interpreted x-rays of John Netter taken November 9, 2004 and reported that Mr. Netter had rounded opacities of size and shape P/Q in all lung zones with an ILO profusion of 1/0 and diagnosed him with pulmonary silicosis (mild chronic simple <u>silicosis</u>). The code on the November 9, 2004 documents provides that the screening was conducted in Laurel, Mississippi, by the screener Holland Bieber. Exhibit 16, John Netter silicosis records. Subsequently, on May 12, 2005, Dr. Segarra interpreted additional x-rays for John Netter taken May 12, 2005 and reported that Mr. Netter had irregular, linear opacities of size and shape T/S in the lower lung zones with an ILO

profusion of 1/0.  Dr. Segarra further stated in his report that there were "no rounded opacities in the upper lung zones and nothing to suggest the presence of silicosis."  In this second set of reports, Dr. Segarra diagnosed Mr. Netter with mild pulmonary <u>asbestosis</u>.  The code on the May 12, 2005 reports documents the screening was performed in Jackson, Mississippi also by the screener Holland Bieber.  Exhibit 17, John Netter asbestosis records.

Indicia of fraud like that outlined above and in the Motions to Exclude filed by Defendants in this litigation have been concealed for years because doctors and screeners have only been required to produce records that related to individual claimants' cases or small sub-sets of claimants, such as trial groups.  This resulted in essentially anecdotal challenges to their credibility.  Further, it prohibited parties and this Court from effectively evaluating litigation physicians' methodology and diagnoses.  For example, none of the following questions can be answered accurately without complete and accurate document productions of litigation records by doctors and screeners:

- What are the overall positive and negative rates?
- What are the daily positive and negative rates for individual screenings?
- Are different payments made for positive verses negative diagnoses?
- Were other conflicting diagnoses simultaneously created (i.e., was the individual diagnosed with a silica-related disease in one report and an asbestos-related disease in a separate report)?
- Was a differential diagnosis performed?
- Were x-rays shot pursuant to blank prescriptions?
- What is the doctor's intra-reader variability?
- Does the doctor read over-exposed and substandard quality x-ray films?
- Does the doctor's diagnosis change with the legal landscape (i.e., does the doctor only begin diagnosing silica-related illnesses once attorneys start filing silica-related lawsuits)?
- Does the doctor meet ATS and NIOSH standards for time spent on each plaintiff and on each evaluation?
- Does the doctor rely on discredited and Fifth Amendment doctors' x-ray reports to make a diagnosis?

- Does the doctor diagnose only one specific disease for all plaintiffs screened on a particular day (i.e., are all plaintiffs at a designated "silica screening" diagnosed with a silica-related illness while all plaintiffs at an "asbestos screening" are diagnosed with an asbestos-related illness)?
- Do the impairment rates for pulmonary function tests exceed the rates established in relevant medical literature?

Full and complete discovery of litigation records by screening doctors also results in the discovery of suspect and fraudulent activities that are unique to a particular doctor. For example, Defendants are currently preparing a motion to exclude the testimony and diagnoses of Dr. James P. Krainson based on the evidence included in his document production in this litigation. If Dr. Krainson's document production had been limited to only claimants pending in MDL 875 most, if not all, of the suspect activity uncovered by Defendants would have remained hidden. More importantly, Dr. Krainson's suspect diagnoses would continue to proceed unchecked and unchallenged.

As Defendants will show in their forthcoming Motion to Exclude Dr. Krainson, he, as an example, altered medical records in order to conceal prior asbestos-related diagnoses so that plaintiffs' claims would not be barred by the applicable statute of limitations. At his April 2, 2008 deposition Dr. Krainson was asked whether he had ever changed one of his readings or reports for litigation purposes. He stated he did not concern himself with whether or not a plaintiff's case would go forward based on his opinions:

> Q:    And that's your testimony still today, Doctor: that your thoughts when you're doing this type of work are not about whether or not a plaintiff's case will go forward, is that correct?
> A:    Correct. . . .
> Q:    And does that still hold true, Doctor: Have you ever changed one of your readings or opinions for litigation purposes?
> A:    No.

April 2, 2008 Deposition of Dr. James P. Krainson, M.D., *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL No. 875, at p. 32-33 (E.D. Pa.).  However, Dr. Krainson was then confronted with specific examples of reports that had been altered (for no medical reason) to hide references to earlier medical records and diagnoses that would have caused the plaintiff to exceed his/her statute of limitations.   One such example is set forth below in an April 6, 1992 facsimile from an attorney's office to Dr. Krainson regarding a claimant's medical records:



Dr. Krainson produced multiple copies of the report for this claimant. As shown below, one version of the report includes a paragraph in the "Review of Medical Records" section that documents a 1981 diagnosis of an asbestos related disease for this particular claimant.



Page four                              Re: Charles Loyd

IMPRESSION OF PULMONARY FUNCTION STUDIES:  Changes of obstructive
lung disease with good reversibility post bronchodilator therapy
without hyperinflation and a low Diffusing Capacity.  This may be
on the basis of interstitial lung disease or pulmonary vascular
disease.

CHEST X-RAY PA and Lateral:  Reveals normal soft tissues and bony
structures.  The cardiac silhouette is not enalrged.  There is extensive
pleural plaque formation seen both en face and in profile.  This is
extensively calcified.  There is also extensive diaphragmatic plaque
formation which is calcified.  The lung fields show a mild increase
in interstitial markings with an ILO profusion of 0/1.

REVIEW OF MEDICAL RECORDS:  Reveal that in 1981 Mr. Loyd was noted
to have history of asbestos exposure and pleural thickening on Chest
X-ray and this was all felt to be secondary to asbestos exposure.
He also had a CAT Scan in 1981 which revealed extensive bilateral
pleural studding and nodularity without pleural effusion or calcification
and the lung fields show no evidence of interstitial lung disease,
detectible by CAT Scan.

IMPRESSION:  Mr. Loyd has the following evidence for pulmonary
asbestosis and asbestos related pleural disease:

    1)  History of occupational exposure to asbestos.

    2)  Latency period greater than ten years between time of
        exposure and development of signs and symptoms.

    3)  Bibasilar rales.

    4)  Decreased diffusing capacity on Pulmonary Function Studies.

    5)  Bilateral pleural thickening and plaque formation which is
        calcified and calcified diaphragmatic plaque formation.

    6)  Increase in interstitial markings on Chest X-ray.

DISCUSSION:  The findings that Mr. Loyd currently has are suggestive
of progression of his asbestos related dsiease with further calcification
and now there is an increase in interstitial markings seen on plain
film which was not noted on CAT Scan in the past.  This may have been
secondary to inability of CAT Scanners of that generation to pick
up early interstitial markings or as noted before this, may be because
of increase and progression of his underlying disease.

**Dr. Krainson originally recorded Plaintiff Charles Loyd's asbestosis diagnosis from 1981 in his report**

MDL875-DrsMandK-0000006624

A second version of this report, also produced by Dr. Krainson pursuant to this Court's subpoena, documents that Dr. Krainson removed the reference pursuant to the instructions of the attorney representing this claimant.



After reviewing all of these documents during his deposition, Dr. Krainson testified that he could not think of a medical reason for deleting references to earlier diagnoses or diagnostic materials. When asked specifically why his office was working with plaintiffs' counsel to hide references

to older medical records and older diagnoses of asbestosis, Dr. Krainson testified, "I have no idea." *Id.* at p. 40.

Dr. Krainson's document production in MDL 875 brought to light his history of falsifying reports. As shown above, his removal of prior asbestos diagnoses from his reports allows plaintiffs whose asbestos claims are barred by the statue of limitations to nonetheless proceed with their claims in court. Further, Defendants have also been able to accurately determine that Dr. Krainson's positive rate defies all established studies regarding exposed populations. Finally, Defendants have identified evidence that establishes that each and every element of Dr. Krainson's diagnostic reports is unreliable and, therefore, he and his reports should be excluded by this Court. As the Court will see when Defendants present this evidence in the forthcoming Motion to Exclude, all of these records go to the heart of Dr. Krainson's pattern and practice in executing his methodology to create diagnoses for litigation. If Dr. Krainson's production had been limited only to claimants pending in MDL 875 much if not all of the evidence of unreliability of Dr. Krainson's diagnoses would have remained hidden. Consequently, Defendants would be required to defend against fraudulent and baseless claims and, more importantly, this Court's time and resources would continue to be usurped by claimants whose claims should be dismissed in lieu of claimants with legitimate claims.

## III.   Production of All Litigation Documents Minimizes the Burden on the Screening Doctors

To limit the litigation screening doctors' production to only their litigation records is the least burdensome remedy available under the subpoena. This is primarily due to the fact that it is terrifically burdensome for doctors to produce only a subset of the litigation records rather than produce all documents related to all litigation claims. Litigation screening doctors typically have no knowledge of which claimants are pending in which court, which claimants were submitted to

bankruptcy trusts, and/or which claimants diagnoses were never filed with a court but were only included in a global settlement.  Also, all of the litigation work by screening doctors is typically maintained separate and apart from regular, clinical medical work.  In all productions by screening doctors to date, each maintained litigation records in a system completely separate from their clinical practice records.[12]

Specifically with respect to Dr. Segarra, he currently limits his non-litigation work to a clinical practice in conjunction with Keesler Air Force Base.  Therefore, all of the records from his private practice will be maintained by the Air Force and not commingled with his litigation practice records.

Moreover, Defendants will pay, and have previously paid, all reasonable costs and fees associated with the production of each doctor's litigation records and, therefore, the financial burden of this production will be minimized, if not eliminated.

IV.     **Conclusion**

The parties and this Court now know that fraud exists in the inventory of claimants pending in MDL 875 and it was uncovered due to the full and complete discovery previously authorized by this Court.  Though Defendants agree with the Court's conclusion that the subpoenas on their face can be construed as overly broad to the extent that they appear to seek non-litigation records, Defendants respectfully request that the Court reconsider the remedy granted to address this issue.  By adjusting the scope of the production to require only the production of all litigation/screening records, the overly broad nature of the subpoena is effectively tempered because documents that are irrelevant to this Court's analysis are excluded

---

[12] Some litigation physicians no longer have any clinic practice and their entire careers are currently dedicated to litigation screening work.  For example, Dr. Ray Harron

from production.  Most importantly, however, this remedy does not impair the Court's ability to continue to uncover suspect and fraudulent claims that remain pending in MDL 875.

If the remedy provided in the Court's current Order had been applied by Judge Weiner, Judge Jack, or Judge Giles then the fraud now known to exist would have never been discovered. Therefore, Defendants respectfully submit that there is a more fair, right, and just result when the subpoenas are limited to only to a full and complete set of litigation/screening records.

WHEREFORE, PREMISES CONSIDERED, Certain Defendants respectfully request that this Court reconsider its Order filed on February 25, 2009, and amend it to encompass the production of all litigation/screening records of Drs. Segarra, Rao, and Bernstein or for such other relief as the Court may deem appropriate.

This the 12th day of March, 2009.


/s/ Marcy B. Croft
Walter G. Watkins, Jr. (MSB# 6988)
Marcy B. Croft (MSB# 10864)
Mary Margaret Gay (MSB# 100672)


OF COUNSEL:

FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 South Lamar Street
City Centre Building, Suite 100S
Post Office Box 22608
Jackson, Mississippi 39225-2608
Phone:          (601) 960-8600
Fax:            (601) 960-8613

## CERTIFICATE OF SERVICE

I hereby certify that I have electronic filed the foregoing document with this Court on the ALL ACTIONS docket, served Counsel for Plaintiffs Motley Rice LLC pursuant to the Federal Rules of Civil Procedure, and served all other counsel of record via United States mail, postage prepaid, a true and correct copy of the foregoing document at their usual business address or via electronic mail at their request.

THIS, the 12th day of March, 2009.

/s/ *Marcy B. Croft*
Walter G. Watkins, Jr. (MSB# 6988)
Marcy B. Croft (MSB# 10864)
Mary Margaret Gay (MSB# 100672)