Exhibit "C"

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

C O N F I D E N T I A L

IN RE:  ASBESTOS PRODUCTS
        LIABILITY LITIGATION (NO. VI)

THIS DOCUMENT RELATES TO: ) MDL NO. MDL 875
THE FOLLOWING CASES        )
IN THE UNITED STATES       )
DISTRICT COURT FOR THE     )
SOUTHERN DISTRICT OF       )        DEPOSITIION OF
MISSISSIPPI                )         MARC STRIGEL
_____

RAY ALSWORTH, et al,         )
                             )
          Plaintiffs,        )
                             )
                             )
      vs.                    )
                             )
SCAPA, et al                 )
                             )
          Defendants.        )
_____

HILRY A. ANDERSON,           )
                             )
          Plaintiff,         )
                             )
      vs.                    )
                             )
THE FLINTKOTE COMPANY,       )
et al                        )
                             )
          Defendants.        )
_____

(Caption continued on the next page.)

Page 2

```
1   (Caption Cont'd.)
2
3   CHESTER BANKS, et al    )
4         Plaintiffs,    )
5         vs.            )
6   OWENS-ILLINOIS, INC.,    )
          et al              )
7         Defendants.    )
8                          )
9   HENRY BRIGGS, et al    )
10        Plaintiffs,    )
11        vs.            )
12  NATIONAL SERVICE    )
    INDUSTRIES,         )
13        et al          )
14        Defendants.    )
                         )
15
            - - -
16
            Philadelphia, Pennsylvania
17          Wednesday, February 18, 2009
18          - - -
19
            Deposition of MARC STRIGEL, taken
20  pursuant to notice, at Brent Coon &
    Associates, 1500 J.F.K. Boulevard, Suite 1301,
21  on the above date, beginning at approximately
    1:05 p.m., before Michelle L. Gray, Certified
22  Shorthand Reporter and Notary Public.
23
24
25
```

Page 3

```
1   APPEARANCES:
2     JOHN E. HERRICK, ESQUIRE
      Motley Rice, LLC
3        28 Bridgeside Boulevard,
         Mt. Pleasant, South Carolina 29465
4        (843) 216-9100
5        Counsel for Plaintiffs
6
      DAVID C. MARSHALL, ESQUIRE
7     Hawkins & Parnell, LLP
         4000 Suntrust Plaza
8        303 Peachtree Street, NE
         Atlanta, Georgia 30308
9        (404) 614-7591
10       - and -
11    MARCY BRYAN CROFT, ESQUIRE
         - and -
12    AMANDA D. SUMMERLIN, ESQUIRE
      Forman, Perry, Watkins,
13    Krutz & Tardy, LLP
         200 South Lamar Street, Suite 100
14       Jackson, Mississippi 39201
         (601) 973-8991
15
         Counsel for Defendants, NSI & Capritti
16
17    WILLIAM R. HANLON, ESQUIRE
      Goodwin Procter, LLP
18       901 New York Avenue, N.W.
         Washington, D.C. 20001
19       (202) 346-4000
20       Counsel for PACE & Marc Strigel
21
      ALSO PRESENT: Lane Andrae, Motley Rice
22
23       - - -
24
25    (INDEX at end of transcript.)
```

Page 4

```
1            ... MARC STRIGEL having been
2    first duly sworn, was examined and testified
3    as follows:
4            - - -
5            EXAMINATION
6            - - -
7    BY MR. HERRICK:
8        Q.  Good afternoon, Mr. Strigel.  How
9    are you today?
10       A.  Good, thanks.
11       Q.  I'm going to be asking you the
12   majority of the questions, if not all of the
13   questions today.  It's primarily going to
14   revolve around what I think we've referred to
15   in a previous deposition and what you might as
16   well call the North Brothers Hilry Anderson
17   settlement.
18           Is that a term that you are
19   comfortable using?
20       A.  Sure.
21       Q.  Okay.  Let's start off by getting
22   some background information from you.  Tell me
23   about your educational background if you
24   would, please?
25       A.  Graduated high school in 1994.  I
```

Page 5

```
1    took some semesters in community college and
2    I'm still working on my degree.
3        Q.  Tell me about your work history
4    then?
5        A.  At the CCR when I started working on
6    anything in this industry was 1996.  I worked
7    there until December of 2001.  At that time I
8    went to work for Peterson Consulting, which
9    was also known as PACE; Peterson Asbestos
10   Consulting Enterprises.  They, in turn, were
11   taken over by Navigant Consulting, where I
12   still work.
13           At the CCR I worked as a paralegal.
14   At PACE I worked as a claims processor and
15   then a settlements manager.  I left that role
16   about two years ago, I think.
17       Q.  Did you say claims processor and
18   settlement manager?
19       A.  Yes.
20       Q.  You said you left that role
21   two years ago.  What role?
22       A.  Settlements manager role.
23       Q.  Okay.  Are you still with PACE?
24       A.  Well, I'm with Navigant Consulting.
25   PACE is a unit of Navigant Consulting.  I'm
```

Page 6

1  not working in that particular unit anymore.
2     Q.  Okay. How was it -- you told me that
3  when you worked for CCR you worked as a
4  paralegal. Tell me what kinds of things that
5  you did.
6     A.  Basically we would get settlement
7  agreements and I would then review the
8  documentation to ensure processing of the
9  claims. That documentation would be job site
10 information, medical documentation,
11 biographical information and releases. And we
12 would just make sure that we got the
13 documentation that we were supposed to get.
14    Q.  Okay. You did that for
15 approximately five years?
16    A.  I think the first two years. The
17 first year and-a-half I worked in a file room.
18 And the rest of the time.
19    Q.  You started out in the file room and
20 worked your way up?
21    A.  Yes.
22    Q.  Okay. And when you left the CCR, is
23 that because CCR dissolved?
24    A.  Yes.
25    Q.  So you stayed through to the end?

Page 7

1     A.  Yes.
2     Q.  And then how is it that you came to
3  be employed by Peterson Consulting?
4     A.  They came in, asked a few people if
5  they were interested in working for them. It
6  would be similar type of work they explained.
7     I interviewed there and a few other
8  places. I liked the offer and I went.
9     Q.  Did you work with folks from PACE
10 when you were at CCR?
11    A.  Yeah, there were a few people over
12 -- do you mean people that worked at the CCR
13 that moved to PACE?
14    Q.  Let me ask the question again
15 because obviously I didn't do it very well.
16    When you were at the CCR were there
17 people at PACE who were working in-house for
18 lack of a better term at CCR?
19    A.  Yes.
20    Q.  What were the circumstances
21 surrounding that as best as you can recall?
22    A.  I don't know. I think they worked
23 in the billing department. I'm more guessing
24 than anything else.
25    MR. HANLON: No, you are not

Page 8

1  guessing. You are not going to guess.
2  BY MR. HERRICK:
3     Q.  No. Don't guess.
4     If I ask you -- you haven't had your
5  deposition taken before, have you?
6     A.  No, I have not.
7     Q.  I probably ought to lay this out.
8  If I ask you a question that you don't
9  understand, let me know that you don't
10 understand it and I'll try and rephrase it.
11    I'm sure I'll do that over the
12 course of the deposition. In fact, I've done
13 it already. Feel free to do that. I have no
14 pride in my questioning or anything like that.
15 I'm not working off of some written outline
16 that I labored over for many years. I'm not
17 going to have hurt feelings about it.
18    A.  Okay.
19    Q.  Let me know if I'm asking a silly
20 question, one that doesn't make sense, one
21 that you can't answer.
22    A.  Okay.
23    Q.  On the other hand, if you do answer
24 a question, I'll assume that you understood
25 it. Is that fair?

Page 9

1     A.  Sounds fair.
2     Q.  If you are uncomfortable with any of
3  the terms I'm using, we talked about defining
4  the subject of this deposition as the Hilry
5  Anderson/NSI settlement. If I'm using terms
6  that are not appropriate, let me know, I'll
7  rephrase the question. I'm not trying to trip
8  you up in any of this or anything like that.
9  I want to make sure we're communicating with
10 one another?
11    A.  You got it.
12    Q.  Also, if at any time you want to
13 take a break, let me know, we'll take a break.
14 I ask if there's a question pending we resolve
15 the question and move on before we take a
16 break. The court reporter is taking down
17 everything that's said here. It's important
18 that we not speak over one another even though
19 unlike ordinary conversation where you already
20 know what I'm going to say, let me finish my
21 question, counsel might wish to object, and
22 then you give your answer and it will flow
23 more quickly.
24    Also, all of your responses need to
25 be verbal so the court reporter can take it

Marc Strigel  February 18, 2009

## Page 10

1  down, like a yes or a no, instead of a nod of
2  the head. Those are the basic ground rules.
3  　　A. Okay.
4  　　Q. All right. So you started out at
5  CCR in the file room. Then you became more of
6  a paralegal. And would you call your role
7  there a claims processor?
8  　　A. Yes. They called it a paralegal,
9  but I never went through any sort of
10  certification.
11  　　Q. How did you learn to become a claims
12  processor?
13  　　A. Just regular training I guess it
14  was.
15  　　Q. Was there a manual or handbook or
16  something like that, for lack of a better
17  term, a flowchart on how claims moved to
18  resolution through CCR?
19  　　A. I never saw one.
20  　　Q. So I take it somebody had to walk
21  you through that, show you the ropes, but was
22  there a period of apprenticeship or anything
23  that went along with that?
24  　　A. Well, basically, I went through a
25  training where they explained to us how to

## Page 11

1  read things, such as, ILO charts and how to
2  record work history into the system.
3  　　　And there were other people who had
4  been claims processors for a longer period of
5  time and I was told if I had any questions to
6  ask them.
7  　　Q. And were you given responsibility
8  for a particular group of cases? How did you
9  go about getting assigned claims for you to
10  process?
11  　　A. At the CCR I guess they did it based
12  on -- they did it based on volume, whomever
13  had enough free time I guess would get the
14  next settlement that came in the door.
15  　　Q. And were these individual case
16  settlements, groups of cases, or a combination
17  of the two?
18  　　A. Combination of the two.
19  　　Q. And when the case came to you for
20  claims administration, had the case already
21  been resolved?
22  　　　MR. MARSHALL: Object to the
23  form of the question. "Resolved" might
24  be -- is vague and ambiguous.
25  BY MR. HERRICK:

## Page 12

1  　　Q. Go ahead and answer. If you want me
2  to rephrase it.
3  　　A. I was going to ask you what did you
4  mean by "resolved".
5  　　Q. Had the cases already been assigned
6  a settlement value?
7  　　A. Yes.
8  　　Q. So you weren't involved in
9  determining what the value was of the cases
10  that you were processing?
11  　　A. We are not, no. No.
12  　　Q. And how were you apprised of the
13  value of the case?
14  　　A. It should be in a settlement
15  agreement.
16  　　Q. So a term we used this morning was
17  -- yeah, a settlement agreement. A written
18  settlement agreement?
19  　　A. Yes.
20  　　Q. A settlement confirmation letter?
21  　　A. Yes.
22  　　Q. You are familiar with those two
23  terms?
24  　　A. Yes.
25  　　Q. And that would have been a tool that

## Page 13

1  you used as a claims processor to determine
2  what the value was of the claim?
3  　　A. Yes.
4  　　Q. And then beyond that tell me how you
5  went about fulfilling your function?
6  　　A. Basically, it was data entry into a
7  system. From there we would just take the
8  documentation that was supplied to us from the
9  plaintiff firm. Enter that information into
10  the system. That was pretty much the extent
11  of my responsibility at CCR.
12  　　Q. What is this system that you were
13  entering information into?
14  　　A. Back then we just called it the
15  claims system. It was just an Oracle-based
16  system.
17  　　Q. What information would you enter
18  into the system?
19  　　A. Biographical information.
20  　　Q. Let's break that down.
21  　　A. Date of birth, date of death, if
22  applicable, Social Security Number, name,
23  spouse's name. I think that about covers it.
24  　　Q. That's the biographical information?
25  　　A. Yes. And then work history,

Marc Strigel  February 18, 2009

Page 14

1  occupation, job sites, years worked to and
2  from.  Then we would add the medical data
3  which was making sure the documentation
4  corresponded with the disease the claim
5  settled for and the diagnosis date.
6      Q.  All right.  You said you made sure
7  that the documentation corresponded with the
8  disease settled for?
9      A.  Yes.
10     Q.  If it was a mesothelioma claim you
11 would want some documentation, a pathology
12 report or an expert report?
13     A.  Correct.
14     Q.  And if it was an asbestosis claim
15 you would want an ILO report or something like
16 that?
17     A.  Correct.
18     Q.  And did you actually enter the
19 medical record itself into the system or just
20 the diagnosis from the medical record?
21     A.  Just the diagnosis.
22     Q.  What else was entered into the
23 system?
24     A.  If the claimant was deceased who the
25 estate representative would have been.  The

Page 15

1  date we received the release.  That's all I
2  remember right now.
3      Q.  I think you mentioned that you got
4  the documentation from the plaintiff's firm.
5  How did the plaintiff's firm know what to send
6  you?
7      A.  It should be outlined in the
8  settlement agreement.
9      Q.  So that was something that was
10 determined by somebody else before the
11 settlement confirmation letter got to you?
12     A.  Yes.
13     Q.  And typically, as I understand it,
14 in conjunction with a settlement confirmation
15 letter there would be a release request form
16 that went out?
17         MR. HANLON:  Are you asking the
18 questions about the CCR's practice?
19         MR. HERRICK:  Yes, I am.
20         MR. HANLON:  I'll give you some
21 leeway.  It's not relevant to what's at
22 issue.
23         MR. HERRICK:  Okay.
24         THE WITNESS:  The standard, the
25 usual letter that went out would have a

Page 16

1  blank release request form on it.
2  BY MR. HERRICK:
3      Q.  When the plaintiff would fill out
4  that release request form and send it back in,
5  who would they send it to?
6      A.  They would send it to the CCR.
7      Q.  Did you have any function with
8  respect to the release?
9      A.  Yes, we would.
10     Q.  Okay.  What was that?
11     A.  We would get a release request form
12 in and then send out a release, generate the
13 release based on the information on the
14 release request form.
15     Q.  What information did you need to
16 have before you would generate the release?
17     A.  Whatever was outlined in the
18 settlement agreement.
19     Q.  And was it your practice at the CCR
20 that the release would not be generated and
21 sent out until all the information outlined in
22 the settlement agreement had been provided?
23     A.  Depending on what the agreement
24 stated.  They weren't all written the same
25 way.  There was no standard cookie cutter form

Page 17

1  of settlement agreement.
2      Q.  Did you have a role in evaluating
3  whether or not the documentation provided by
4  the plaintiff's firm met the requirements of
5  the settlement confirmation letter?
6      A.  Usually it's pretty clear.  The
7  medical states, like I used earlier, an
8  example of mesothelioma.  Clearly the person
9  has it or he clearly doesn't have it.  If
10 there was ever a grey area we would ask the
11 defense counsel to clarify the documentation
12 for us.
13     Q.  So if someone had settled a case for
14 mesothelioma and provided you all the
15 information requested in the settlement
16 confirmation letter except for the diagnosing
17 medical, what would you do?
18     A.  We would notify them that they
19 haven't fulfilled the requirements and we
20 still need the diagnosing medical.
21     Q.  And would you not generate a release
22 until that diagnosing medical had been
23 provided?
24         MR. HANLON:  I object.  He said
25 all settlements were different, that

A. WILLIAM ROBERTS, JR. & ASSOCIATES  (800) 743-DEPO
SCHEDULEDEPO.COM

## Page 18

1  there was no cookie cutter. You're
2  asking questions about settlements that
3  by definition were entered into more than
4  eight years ago. This deposition is not
5  supposed to be about those matters.
6  BY MR. HERRICK:
7    Q.  Go ahead and answer.
8    A.  I would basically look at the
9  settlement agreement. If the settlement
10 agreement said we should generate the releases
11 once we received everything, then we would
12 send out the release.
13    Q.  How did your duties change, if they
14 did, when you went with PACE?
15    A.  I'm sorry, could you repeat the
16 question?
17    Q.  How did your duties change, if at
18 all, when you went to PACE?
19    A.  At first they were the exact same.
20    Q.  For how long were they the exact
21 same?
22    A.  A year and-a-half maybe.
23    Q.  Did your physical location change
24 when you started working with PACE?
25    A.  Yes.

## Page 19

1    Q.  Where did you go?
2    A.  To their offices which were in
3  Princeton, New Jersey just like the CCR, but a
4  different location, Lenox Drive.
5    Q.  Are you still there today?
6    A.  Down the road a little further. We
7  moved from that office.
8    Q.  The whole operation moved from that
9  office to where you are now?
10   A.  Yes.
11   Q.  Still on Lenox Drive?
12   A.  Yes.
13   Q.  What happened after you were at PACE
14 for the year and-a-half that wound up in a
15 change of your duties?
16   A.  I moved from processing claims to
17 what they called the settlement manager.
18   Q.  Okay. And what were your new duties
19 as settlement manager?
20   A.  To take settlements that were coming
21 in and make sure they were getting assigned to
22 various processors, ensuring that claims were
23 billed to insurance carriers, and ensuring
24 that payments were made.
25   Q.  For how long did you continue as

## Page 20

1  settlement manager?
2    A.  Summer of '07.
3    Q.  And were your duties basically the
4  same throughout the time you were settlement
5  manager?
6    A.  Sure.
7    Q.  Okay. And so I guess that's about a
8  year-and-a-half ago, summer of '07?
9    A.  Yes.
10   Q.  What happened in the summer of '07,
11 what did you do then?
12   A.  I moved off that project on to a
13 different project.
14   Q.  Did I understand that you moved from
15 working for PACE to now working for Navigant?
16   A.  Navigant is the parent company.
17 Navigant is the company. PACE is just a unit
18 of Navigant. I was no longer working on the
19 PACE project.
20   Q.  Tell me what you know about when did
21 Navigant come into the picture?
22   A.  I believe it was 2004. In that time
23 frame.
24   Q.  Is it your understanding that
25 Navigant bought PACE?

## Page 21

1    A.  I'm not sure what that arrangement
2  was.
3    Q.  And was it at that point in time in
4  the 2004 time frame that PACE became a
5  division of Navigant?
6    A.  I'm not sure if Navigant was in the
7  picture before that or not. It's just I
8  remember that there was more of a Navigant
9  brand recognition at that time.
10   Q.  At some point in time did your
11 paychecks start being from Navigant as opposed
12 to PACE?
13      MR. HANLON:  Objection to the
14   extent that it assumes that his checks
15   were ever from PACE.
16 BY MR. HERRICK:
17   Q.  Were your checks at one time written
18 by PACE?
19   A.  As long as I remember they've always
20 been Navigant. I don't recall if they were
21 anything before Navigant or not.
22      MR. HERRICK:  Good objection.
23      MR. HANLON:  Thanks, John.
24 BY MR. HERRICK:
25   Q.  So this event around about 2006,

A. WILLIAM ROBERTS, JR. & ASSOCIATES   (800) 743-DEPO
SCHEDULEDEPO.COM

Marc Strigel  February 18, 2009

## Page 22

1  this increased brand recognition -- excuse me,
2  2004 -- that name "Navigant" wasn't new to you
3  because you had been getting paychecks from
4  Navigant from the time you left CCR; is that
5  fair?
6      A.  Yeah, I knew who Navigant was at the
7  time.
8      Q.  What are your duties now for
9  Navigant?
10     A.  I work in their financial services
11 practice.
12     Q.  Give me just a brief description of
13 what that entails?
14     A.  Currently, I'm on a project with a
15 client helping them -- it's a client in the
16 financial industry, helping them write HR
17 guidelines.
18     Q.  What precipitated the change in the
19 summer of 2007, leaving the PACE division and
20 going with -- going outside the PACE division?
21     A.  I had asked my boss that I was
22 looking to do something different.
23     Q.  And writing HR guidelines is
24 certainly that.
25         At what point in time did you --

## Page 23

1  well, let me ask you this.
2          Did you at some point in time assume
3  responsibility to the Hilry Anderson
4  settlement?
5      A.  Yes.
6      Q.  When did that happen?
7      A.  I believe immediately when I took
8  over as settlement manager.
9      Q.  Okay.  Was it a new settlement at
10 that point in time or had someone else been
11 handling it prior to you taking responsibility
12 for it?
13     A.  The prior settlement manager was
14 handling it at the time.
15     Q.  Who was the prior settlement
16 manager?
17     A.  Darren DeBelasi.
18     Q.  What happened to him?
19     A.  He moved to another project also and
20 has since left the firm.
21     Q.  And I take it as settlement manager
22 you weren't -- you didn't have the hands-on
23 responsibility of processing the settlements,
24 but you were overseeing the processing of the
25 settlements?

## Page 24

1      A.  Correct.
2      Q.  Who were you working with -- who was
3  doing the hands-on work processing the
4  settlement?
5      A.  Various people over the years.
6          (Document marked for
7          identification as Exhibit Strigel-1.)
8  BY MR. HERRICK:
9      Q.  Have you -- let me show you what's
10 been marked as Exhibit Number 1 and ask you if
11 you can identify that.
12     A.  It's a subpoena for me to get
13 deposed.
14     Q.  Okay.  You've seen that before?
15     A.  I have.
16     Q.  What did you do with that subpoena
17 when you got it?
18         MR. HANLON:  This version or an
19     earlier version.
20 BY MR. HERRICK:
21     Q.  The earlier version of it, I guess
22 would be the better question?
23         MR. HANLON:  Tell him what
24     version you want him to answer about.
25 BY MR. HERRICK:

## Page 25

1      Q.  You were first served a subpoena to
2  give testimony in December of 2007, right?
3      A.  I was never served.  Well, I was
4  never -- my boss called me and told me that
5  they received something, that I could be
6  deposed.
7      Q.  When was the first time you saw this
8  deposition notice?
9          MR. HANLON:  If you have.
10         MR. HERRICK:  Yeah, it could be
11     right now.
12         THE WITNESS:  They kind of all
13     look the same to me.  I'm not sure which
14     one is which.
15 BY MR. HERRICK:
16     Q.  That's fair.  I think the only
17 difference is the date.
18         What did you do in an attempt to
19 comply with the exhibits to that subpoena and
20 deposition notice?
21     A.  I believe I was asked to produce
22 some e-mails.
23     Q.  Okay.  Anything else?
24     A.  I think it was just the e-mails.
25     Q.  Do I understand that at some point

Page 26

1    in time NSI had hired or worked with PACE to
2    handle their settlement processing?
3        A.  That's correct.
4        Q.  And that relationship ended at some
5    point in time I understand?
6        A.  Yes.
7        Q.  When did that end?
8        A.  I heard about it, but I'm not sure
9    of exactly when it happened.  I don't think --
10   I think it was after I moved on from PACE.
11       Q.  Okay.  That was my next question.
12           Have you seen the Hilry Anderson
13   settlement agreement?
14       A.  I have.
15       Q.  Did you use the Hilry Anderson
16   settlement agreement in performing your duties
17   as settlement manager?
18       A.  I did.
19       Q.  And tell me how you did that.
20       A.  Well, the processors that were
21   working on entering the information in the
22   system, we went through and told them what
23   criteria had to be met to move forward and
24   enter the data into the system.
25           We let them know in cases where it

Page 27

1    wasn't met we had to alert plaintiff's counsel
2    that there was a deficiency.
3        Q.  If you go back to Exhibit C, I
4    think.  That's Exhibit C to Exhibit 1 to your
5    deposition.  Is that the Hilry Anderson
6    settlement agreement that we've been talking
7    about?
8        A.  Yes.
9        Q.  That agreement has a couple of
10   attachments to it, Appendix B; A, medical
11   criteria; B, exposure criteria; and C,
12   timeliness criteria.  If you look at the back.
13           MR. HANLON:  Is that a
14       question?
15           MR. HERRICK:  No I'm just
16       directing him to it.
17   BY MR. HERRICK:
18       Q.  Are those the criteria that you used
19   in the settlement processing role?
20       A.  Yes.
21       Q.  Rather than what's in the agreement
22   itself?
23           MR. HANLON:  Your first
24       question did not distinguish between the
25       attachment and the agreement itself.  You

Page 28

1        might want to start over.
2    BY MR. HERRICK:
3        Q.  Were the appendices what you used in
4    your settlement processing role to determine
5    whether or not criteria were met?
6        A.  Yes.
7        Q.  Did you use anything from the body
8    of the agreement itself?
9            MR. HANLON:  Take your time to
10       review these if you need to.
11   BY MR. HERRICK:
12       Q.  Yeah, take all the time you need.
13           MR. HANLON:  You are presenting
14       this as the entire settlement agreement,
15       all the appendices that were attached?
16           MR. HERRICK:  No.
17           THE WITNESS:  Yeah, I used
18       information from the body too.
19   BY MR. HERRICK:
20       Q.  What information from the body did
21   you use?
22       A.  The number of cases and the total
23   dollar amount.
24       Q.  If you look at Paragraph 2 on the
25   front page.  It says:  Appendix A to this

Page 29

1    agreement is a listing of all plaintiffs whose
2    -- and it goes on from there.  I don't need to
3    repeat the whole thing.
4            Have you seen Appendix A to this
5    agreement?
6        A.  I have.
7        Q.  Did you produce a copy of that for
8    your deposition here today?
9        A.  I don't recall if I did or not.
10       Q.  From whom did you receive the
11   Appendix A to this agreement?
12           MR. MARSHALL:  Let me just put
13       one thing on the record now.
14           Mr. Strigel, I'm counsel for
15       NSI.  As a representative of NSI, we do
16       assert the attorney/client privilege and
17       work product privilege.  We do not waive
18       the privilege for the purpose of the
19       deposition.
20           To the extent that your answer
21       is derived from communications with NSI
22       or its representatives, we will object
23       and so inform you and your counsel.
24           If your answer is derived from
25       a third party, such as, a plaintiff's

Page 30

1  lawyer or some other third party, then
2  certainly we do not have a valid
3  privilege objection.  I want to make that
4  very clear for the record.
5          THE WITNESS:  Okay.
6  BY MR. HERRICK:
7      Q.  My question is:  From whom did you
8  receive the Exhibit A, Appendix A?
9      A.  A long time ago.  I don't recall who
10 gave it to me.
11     Q.  What did you do with it?
12     A.  We denoted those claims in the
13 system as claims that were part of this
14 settlement.
15     Q.  In order to fulfill your role, what
16 further was needed to complete the settlement
17 of those claims that were listed on Appendix
18 A?
19     A.  The medical criteria was needed.
20 The job site criteria was needed.  A signed
21 and valid release was needed.  As well as any
22 state paper or documentation or death
23 certificate if the person was deceased.
24     Q.  What was your practice and procedure
25 with respect to this settlement agreement in

Page 31

1  alerting counsel of deficiencies?
2          MR. MARSHALL:  I want to impose
3  an objection on this settlement
4  agreement.
5          John, I think we're clear that
6  you're talking about the Hilry Anderson
7  settlement.  Obviously, the Hilry
8  Anderson settlement has prolonged over
9  many years.  For that reason I think when
10 you say "this settlement agreement",
11 particularly in light of the motion
12 that's pending before the court, is vague
13 and ambiguous and subject to different
14 interpretations.
15 BY MR. HERRICK:
16     Q.  Go ahead and answer.
17     A.  Could you repeat the question?
18         MR. HERRICK:  Read it back for
19 me, please.
20         (Whereupon the court reporter
21 read back the requested portion of the
22 testimony.)
23         THE WITNESS:  In alerting
24 counsel to what?
25         MR. HERRICK:  Of deficiencies.

Page 32

1          THE WITNESS:  We would send a
2  deficiency report.
3  BY MR. HERRICK:
4      Q.  Is Fernando Mosquera somebody who
5  worked for you processing the Hilry Anderson
6  settlement agreement?
7      A.  Yes.
8          MR. HERRICK:  Let's mark this
9  as 2.
10         (Document marked for
11 identification as Exhibit Strigel-2.)
12         MR. HANLON:  Do you have a
13 copy?
14         MR. HERRICK:  No, I do not.
15 This is a document that you
16 provided.  It has Bates number on it.
17 This is Bate stamped Strigel
18 128 to 152.
19         MR. HANLON:  Do you want him to
20 review the document?
21         MR. HERRICK:  Only to the
22 extent that he needs to answer my
23 questions.  I'm happy to have him do
24 that.
25 BY MR. HERRICK:

Page 33

1      Q.  Is this one of the e-mails that you
2  pulled up in response to the subpoena or was
3  this pulled up by someone else, if you know?
4      A.  I'm not sure.
5      Q.  If you flip over to the next page.
6  I'm sorry, the next page.
7          Is that a document whose form is
8  familiar to you?
9      A.  Yes.
10     Q.  And what would you call that?
11     A.  A deficiency report.
12     Q.  And does that document indicate what
13 items are missing from various claims?
14     A.  Yes.
15     Q.  Mr. Strigel, is the fact that a name
16 of a plaintiff appears on that document that's
17 before you marked as Exhibit Number 2 mean
18 that that plaintiff was on Appendix A to the
19 Hilry Anderson settlement agreement?
20     A.  No.
21     Q.  Why not?
22     A.  We received submissions of cases
23 that were not on the Attachment A.
24     Q.  Okay.  And what did you do with
25 those submissions?

A. WILLIAM ROBERTS, JR. & ASSOCIATES   (800) 743-DEPO

SCHEDULEDEPO.COM

Page 34

1    A.  That would involve communications
2  with NSI.
3        MR. MARSHALL:  Then I would
4    object and place it as privileged.
5        MR. HANLON:  Let me consult
6    with my client.
7        MR. HERRICK:  Sure.
8        (Short break.)
9  BY MR. HERRICK:
10    Q.  When you got a submission from --
11  let's start more broad than that.
12        When you got a submission from the
13  plaintiff's firm on the Hilry Anderson
14  settlement, what was the first thing you did?
15    A.  We received them by the boxes.  And
16  they were just assigned to processors to begin
17  working on them.  By working on them, seeing
18  if the documentation was there that was called
19  for in the agreement.
20    Q.  And as I understand it, it was your
21  job to assign the processors to the Hilry
22  Anderson settlement?
23    A.  Yes.
24    Q.  So a box comes in and is filled with
25  submissions from Steve Shackelford's office,

Page 35

1  for example.  They are basically a form that
2  lists what the disease process is, who the
3  claimant is, and that sort of thing?
4    A.  Yes.
5    Q.  When you got those things, what
6  would you do, what was the practice and
7  procedure?
8    A.  Someone would review the
9  documentation to see if the medical was there,
10  the work history.  And from there they would
11  look to see that the claimant was listed on
12  the Attachment A and that there was an
13  allocation specific to that person, and enter
14  the data into the system.
15    Q.  If that person wasn't listed on
16  Attachment A, what happened next?
17    A.  At first we noticed that there were
18  quite a few and we informed defense counsel
19  that we were getting submissions that were not
20  on the Attachment A.
21    Q.  Did you give any notification to
22  plaintiff's counsel that these submissions
23  were not on Attachment A?
24    A.  Yes.
25    Q.  And what form did that take?

Page 36

1    A.  We did notify them that there were
2  claims that were not on the Attachment A in
3  the submissions.  I don't recall what form the
4  communication was.
5    Q.  Does the fact that a claim was not
6  from a plaintiff who appeared on Appendix A or
7  Attachment A to the Hilry Anderson agreement
8  stop the settlement process?
9    A.  At first it did and then we were
10  told to process the claims.
11    Q.  And how did you determine the dollar
12  amounts to be allocated to the claims that did
13  not appear on Exhibit A of the Hilry Anderson
14  settlement agreement?
15    A.  That would involve communication.
16        MR. MARSHALL:  Objection.
17    Privileged.
18  BY MR. HERRICK:
19    Q.  So I take it that counsel told you
20  what the allocations were?
21        MR. MARSHALL:  Objection.
22    Privileged.
23        MR. HANLON:  Instruct him on
24    the privilege assertion not to answer the
25    question.

Page 37

1        MR. HERRICK:  I think that's
2  disingenuous.
3        MR. MARSHALL:  If you want to
4    try to ask your question, John -- it's
5    not my business to tell you how to ask
6    your questions.
7        But if you can ask the question
8    to make it clear that you are not asking
9    for attorney/client or work product
10    privileged information and the witness
11    has a basis to answer the question that
12    doesn't involve communication, I would
13    have no basis to assert the privilege and
14    I would not object.
15        If the sole basis of his
16    information is from a communication that
17    he had with one of NSI's representatives,
18    such as, defense counsel, then I think it
19    would be -- I think that would be a
20    waiver of the privilege that you would
21    later say that we waived it.  I don't
22    think it's disingenuous.  That's
23    certainly not my intent.
24  BY MR. HERRICK:
25    Q.  Would it be fair to say that you

Marc Strigel  February 18, 2009

## Page 38

1  didn't know what the value to be assigned to
2  any particular claim was without consulting
3  with defense counsel?
4      A.  Could you repeat that?
5      Q.  Would it be fair to say that you
6  didn't know what the value of any particular
7  submission was that didn't appear on Exhibit A
8  or Appendix A to the Hilry Anderson settlement
9  agreement without consulting with defense
10  counsel?
11      A.  Yes.  There's no document.
12      Q.  So the dollar amounts weren't
13  provided to you by the plaintiff's counsel?
14      A.  Again, that would fall under
15  communication I had with Marcy.
16          MR. MARSHALL:  I object.
17          MR. HANLON:  Wait a second.
18  Excuse me.
19          MS. CROFT:  Misstates his
20  testimony.
21          (Short break.)
22          MR. HANLON:  Try again.
23  BY MR. HERRICK:
24      Q.  So I take it then that the
25  plaintiff's counsel didn't tell you what the

## Page 39

1  dollar values were of the claims that didn't
2  appear on Appendix A?
3      A.  Plaintiff's counsel did submit us --
4  to me -- the allocations for those claims.
5      Q.  How does that reconcile with your
6  testimony just a few minutes ago that you
7  didn't know what the values were unless you
8  conferred with counsel?
9      A.  We did confer with counsel and
10  counsel advised us that --
11          MR. MARSHALL:  Let me make sure
12  I'm clear that I don't want to waive the
13  attorney/client privilege or the work
14  product privilege.
15          So if you learned information
16  through a communication, a conversation,
17  e-mail, correspondence with defense
18  counsel, then we do not -- we assert the
19  privilege.
20          MR. HANLON:  Let me talk to
21  counsel for NSI.
22          (Short break.)
23          MR. HERRICK:  During the break
24  we had a conversation with counsel.  And
25  I have agreed with counsel for NSI that

## Page 40

1  my intent in taking this deposition is
2  not to seek privileged communications and
3  not to put NSI in the position of having
4  to waive broadly, in the broad sense, its
5  attorney/client or work product
6  privileges.
7          So I have agreed with counsel,
8  and I will hereby stipulate on the record
9  that by asking a question and expecting a
10  response to the question that I ask, I
11  will not use that response to make the
12  argument that NSI has waived any
13  applicable privileges it might have with
14  respect to this matter.
15          MR. MARSHALL:  Thank you.
16          Is it my further understanding
17  that your questions are not intended to
18  elicit privileged information?
19          MR. HERRICK:  That's correct,
20  they are not.
21          MR. MARSHALL:  We could read
22  the question back.  There's only one
23  other objection that I want to note.
24          You have asked in this most
25  recent line of questioning about a fairly

## Page 41

1  generic subject matter in the sense that
2  you were talking about I think claimants
3  not on Exhibit A.
4          I think that is perhaps
5  overbroad when you try to incorporate
6  every claimant involved in this dispute
7  that was not on Exhibit A.  So I think
8  there's an overbreadth objection there.
9          With that if you want to have
10  the court reporter read the last question
11  back we can try to do that.
12          (Whereupon the court reporter
13  read back the requested portion of the
14  testimony.)
15          THE WITNESS:  We couldn't move
16  forward because we didn't have
17  allocations.  And we told Marcy -- we
18  told NSI that we didn't have allocations
19  for these claims, they were not on
20  Attachment A.  They told us to get those
21  allocations from plaintiff's counsel.
22  BY MR. HERRICK:
23      Q.  Okay.  And then did you go to
24  plaintiff's counsel and get those allocations?
25      A.  We did.

A. WILLIAM ROBERTS, JR. & ASSOCIATES  (800) 743-DEPO
SCHEDULEDEPO.COM

Page 42

1     Q.   What determined when you would send
2  a release to plaintiff's counsel for a
3  plaintiff to sign?
4              MR. HANLON:  Generally?
5  Specific claims?  With respect to this
6  agreement?
7  BY MR. HERRICK:
8     Q.   With respect to this agreement?
9     A.   For the claims in this agreement we
10  would process them to make sure that they
11  qualified for medical documentation, for their
12  job site information, that we received the
13  appropriate biographical information, and that
14  they were on Attachment A, and we had an
15  allocation, and we would then send a release.
16     Q.   So a release wouldn't be sent until
17  an allocation had been made?
18     A.   Correct.
19     Q.   And all the deficiencies, if there
20  were any, had been cured?
21     A.   Correct.
22     Q.   I guess it's conceivable that you
23  could get a submission, and I imagine you did
24  get submissions that were not deficient in any
25  way, they had all the information on there?

Page 43

1     A.   That's correct.
2     Q.   And in that instance your settlement
3  processors would log the information into the
4  system, whatever it was you were using at the
5  time, and generate the release?
6     A.   That's correct.
7     Q.   Who generated the release, was that
8  your function or was that your function as a
9  settlement manager I guess?
10     A.   No.  The individual processor would
11  generate releases for the claims that he
12  processed and we would try to put them
13  together, as it made logical sense, instead of
14  sending five packages of single releases out
15  through the day, we would put them altogether
16  at the end of the day and send them in one
17  package, or every other day.  Whatever seemed
18  to make logical sense.
19     Q.   With respect to this settlement, the
20  Hilry Anderson settlement, was there a release
21  request form that went out?
22              MR. MARSHALL:  Again, I just
23  object to the overbreadth with the number
24  of claimants, those that were
25  substituted.  I think that question is

Page 44

1  overbroad.  So I'm not sure there's a
2  uniform answer for all 2,000 plus
3  claimants.  To the extent that you can
4  answer the question you can.
5              THE WITNESS:  My recollection
6  of the way settlement claim packages came
7  in may have been different from counsel
8  to counsel.  And if we had enough
9  information to generate the release we
10  wouldn't ask for anymore.  So if there
11  was a cover sheet that represented
12  whatever you want to call it, a release
13  request form, if it had a person's name,
14  whether they were married, Social
15  Security Number, and passed every other
16  qualification, then we would try to
17  generate the release based on the
18  information that we had.
19  BY MR. HERRICK:
20     Q.   You didn't routinely send a release
21  request form for claims submitted under this
22  agreement, but you might have requested more
23  information if it wasn't contained in the
24  submission you received?
25     A.   I believe that counsel for the most

Page 45

1  part were sending a cover letter that would
2  have contained anything on a release request
3  form and, therefore, there shouldn't have been
4  a need for us to ask for a release request
5  form.
6     Q.   As I understand it, there were --
7  give me some idea of how many different
8  individuals under your direction were
9  processing claims under the Hilry Anderson
10  settlement?  And this is where I want an
11  estimate.  Over five, 10, 15, 20?
12     A.   15 or 20 maybe over the years.
13     Q.   If I understand with respect to the
14  Hilry Anderson settlement, and correct me if
15  I'm wrong, even at any given point in time,
16  you didn't have a settlement processor or
17  settlement processors who were dedicated to
18  this agreement?
19              MR. HANLON:  What do you mean
20  by "dedicated"?
21              MR. HERRICK:  If materials came
22  in that it always went to these one or
23  two people.  That's what I mean by
24  dedicated.
25              THE WITNESS:  I think that

Pages 42 to 45

Page 46

1  evolved over time. I think for maybe a
2  specific time frame somebody may have
3  been dedicated to it.
4      From start to finish, I
5  couldn't speak to that.
6  BY MR. HERRICK:
7      Q. Let me ask you this. Were you
8  responsible for this settlement agreement as a
9  settlement manager up until the time you left
10  the PACE side?
11      A. Yes.
12      Q. Who took your place?
13      A. Saroja Rajgopal. I can help with
14  the spelling. S-A-R-O-J-A, R-A-J-G-O-P-A-L.
15      Q. And had this Saroja person been a
16  settlement manager prior to you leaving or was
17  that a promotion for him when you left?
18      A. She --
19      Q. Or her. I should have known.
20      A. She had different clients where she
21  was a manager for.
22      Q. So this was just more work for her,
23  not necessarily a promotion?
24      A. I believe it was a promotion.
25      Q. Okay. Excellent.

Page 47

1      With respect to your settlement
2  processing role in the Hilry Anderson
3  agreement, did your settlement processor do
4  any evaluation of the medical records beyond
5  just looking to see that the medical records
6  supported the malignancy or the nonmalignant
7  disease?
8      A. I don't believe so. I don't believe
9  they should have.
10      Q. Based upon the criteria contained in
11  the Hilry Anderson settlement, the medical
12  criteria, would you agree with me that a case
13  could fulfill the medical criteria solely --
14  for a nonmalignant case -- solely through a
15  provision of a B-read report?
16      A. It could, solely through a B-read
17  report.
18      Q. When you received an executed
19  release from the plaintiff, what steps would
20  you take in the Hilry Anderson settlement?
21      MR. MARSHALL: Same objection
22  to the overbreadth of the claimants in
23  the Hilry Anderson settlement agreement.
24      THE WITNESS: I believe we
25  would review the release to make sure it

Page 48

1  was executed properly, ensure that we had
2  a death certificate and state papers if
3  the person had been deceased, and we
4  would enter a release received date into
5  our system.
6  BY MR. HERRICK:
7      Q. Who made the determination as to
8  when the check was cut and sent out?
9      A. NSI.
10      Q. When you say "NSI" there, are you
11  talking about NSI in-house or NSI as
12  represented by its attorneys?
13      A. I don't understand what you mean by
14  in-house.
15      Q. Okay. How would you learn whether
16  or not a payment had been made?
17      A. I was responsible for making
18  payments.
19      Q. Okay. So someone would notify --
20  just tell me how that worked rather than me
21  try and guess.
22      A. In order for a check to get cut, I
23  would have to notify our accounting department
24  of what claims were being paid, and that
25  direction was given to me from NSI and

Page 49

1  counsel.
2      Q. Okay. Let me see if I understand
3  this process. When you got a release back you
4  would enter it on the system?
5      A. Yes.
6      Q. And to whom would you give
7  notification that the release had been
8  received?
9      A. We would give updates to NSI and
10  their counsel of what information we had
11  received from plaintiff's counsel.
12      Q. And what -- with what frequency
13  would you do that? Let me give you an
14  example.
15      You mentioned before that if your
16  folks had generated releases they wouldn't
17  send out five separate packages over the day,
18  they would wait until the end of the day and
19  send them out all at one time. I'm assuming
20  the same worked coming back the other way when
21  you got an executed release back. Tell me how
22  that worked.
23      A. I think it was various depending on
24  the time. But NSI, in general, I believe we
25  supplied them with reports on a weekly basis.

A. WILLIAM ROBERTS, JR. & ASSOCIATES  (800) 743-DEPO
SCHEDULEDEPO.COM

Marc Strigel   February 18, 2009

Page 50

1    Q.   Then as I understand it, you would
2  be contacted about which claims were going to
3  be paid at some point?
4    A.   I would not make the determination
5  of what claims would be paid.
6    Q.   Someone else made that determination
7  and communicated it to you?
8    A.   Correct.
9    Q.   And then you would request a check
10  from accounting?
11    A.   That's correct.
12    Q.   And who would then mail the check to
13  plaintiff's counsel?
14    A.   Our accounting department.
15    Q.   So once you requested the check from
16  accounting, was your responsibility with
17  respect to that individual claimant over and
18  done with?
19    A.   Yes.
20    Q.   Okay.  Was there some sort of
21  procedure with respect to how many claims
22  would wind up being paid on a check?
23    A.   I don't know if there was a
24  procedure or not that was used.  We would just
25  submit our reports and be advised what to pay.

Page 51

1  I don't know what thought process went into
2  that.
3    Q.   I take it there were instances where
4  one claim was paid and instances where
5  multiple claims were paid?
6    A.   Yeah.
7    Q.   Okay.  So there wasn't any
8  particular rhyme or reason to that?
9    A.   Not that I could see.
10       MR. HANLON:  Good time for a
11  5-minute break?
12       MR. HERRICK:  Sure.
13       (Short break.)
14  BY MR. HERRICK:
15    Q.   I didn't ask you, Mr. Strigel, but
16  with respect to training materials at PACE,
17  have you utilized those in training your new
18  settlement processors when they come in?
19    A.   They have materials on how to use
20  the system, things like that.
21    Q.   Okay.  Anything like a flowchart for
22  how the settlement processing system works?
23    A.   How the system works, yeah.
24    Q.   How about the settlement process
25  itself, the steps towards the settlement

Page 52

1  process, any materials that relate that
2  information?
3    A.   Every agreement is unique in its own
4  way.  A supervisor would have to determine
5  what the particular agreement calls for.  And
6  then they would relay that information to the
7  processor.
8    Q.   Who was Margaret Podstawa?
9    A.   One of the supervisors.
10    Q.   She was one of the supervisors?
11    A.   I'm not sure what time she was made
12  a supervisor.  I believe now she's a
13  supervisor.
14    Q.   Did she work underneath -- well, did
15  she work for you on the NSI settlement?
16    A.   Yes.
17    Q.   And that was before she was made a
18  supervisor?
19    A.   I'm not exactly sure when she was
20  made a supervisor, when she was a supervisor.
21    Q.   Do you know if by July of 2005 she
22  had been made a supervisor?
23    A.   I think so.
24    Q.   While you were processing the Hilry
25  Anderson settlement for NSI with this group of

Page 53

1  plaintiffs, and this group of plaintiff
2  counsel, you were also processing settlements
3  on behalf of other defendants, were you not?
4    A.   Yes.
5    Q.   And were you assigned those as well?
6    A.   Yes.
7    Q.   Okay.  And that would have been
8  Amchem, CertainTeed and Union Carbide?
9    A.   They had settlements.
10    Q.   With respect to the settlements that
11  you were processing for Amchem, Union Carbide
12  and CertainTeed, you didn't send out a release
13  until --
14       MR. HANLON:  Unless you can
15  show me some relevance to this particular
16  agreement, I'm not going to let him
17  answer any questions about other
18  defendants.  They consider that
19  information confidential.  I don't see
20  how it relates to the NSI settlement,
21  which is the subject of the notice on
22  which we're appearing here.
23       MR. HERRICK:  Because they are
24  all dealt with together.
25  BY MR. HERRICK:

Pages 50 to 53

Page 54

1    Q.  When you sent out a release with
2  respect to CertainTeed, Amchem and Union
3  Carbide, it was because a settlement had
4  already been funded?
5        MR. HANLON:  Instruct you not
6  to answer.
7        MR. HERRICK:  Certify the
8  question.
9        MR. MARSHALL:  I would join in
10  that objection.
11        MR. HERRICK:  Why don't you
12  have a look at that before I ask any
13  questions about it.  I don't have another
14  copy, I apologize.
15        MR. HANLON:  It doesn't appear
16  to be something I produced.
17        MR. HERRICK:  It's not.
18        MR. MARSHALL:  We'll have the
19  same stipulation as far as filing of the
20  deposition being under seal that we
21  discussed earlier with Mr. Capritti's
22  deposition also apply to this deposition.
23        MR. HERRICK:  Fine.
24        (Document marked for
25  identification as Exhibit Strigel-3.)

Page 55

1  BY MR. HERRICK:
2    Q.  My question before I marked that
3  document was:  Would you agree with me that
4  before a release was sent out by Amchem,
5  CertainTeed or Union Carbide, that that
6  settlement had been funded?
7        MR. MARSHALL:  Object to form.
8        MR. HANLON:  I instruct him not
9  to answer again.
10        MR. HERRICK:  Counsel, I will
11  seek sanctions and costs.  That is not
12  attorney/client privileged.
13        MR. HANLON:  The general
14  question as to another defendant is
15  considered confidential information by
16  that client and by Navigant.  You are not
17  here to ask questions about anybody but
18  NSI.
19        MR. HERRICK:  It's not a
20  legally recognizable privilege.  It's not
21  a legally cognizable privilege.
22        I'm putting you on notice.  If
23  you're going to instruct your client not
24  to answer on the basis of something other
25  than attorney/client privilege or work

Page 56

1  product privilege, I'm going to seek --
2        MR. HANLON:  It's not the
3  subject of your notice.  It's not the
4  subject of this deposition.  It's not
5  what he's asked to be here for.
6        MR. HERRICK:  I don't care.
7  It's all lumped in together.
8        MR. HANLON:  No, it's not
9  lumped in together.  Here is your notice.
10  I don't see anything in here about any
11  company except NSI.
12        MR. HERRICK:  You are on
13  notice.
14        MR. HANLON:  You are on notice
15  too.
16  BY MR. HERRICK:
17    Q.  Do you know who Margaret Podstawa
18  was?
19    A.  Yes.
20    Q.  Let me have that back.
21        MR. HANLON:  It would be nice
22  if you had a copy of the document so that
23  he could look at it while you are asking
24  him questions about the document.
25        MR. HERRICK:  Let's take a

Page 57

1  break.
2        (Short break.)
3  BY MR. HERRICK:
4    Q.  There were some cases under this
5  deal that were paid $1,000, right?
6        MR. HANLON:  Which are you
7  referring to?
8  BY MR. HERRICK:
9    Q.  NSI, the Hilry Anderson deal?
10    A.  I forget what the allocations were
11  to be honest with you.
12    Q.  Do you know what the total amount
13  NSI paid out under this Hilry Anderson
14  settlement?
15    A.  The exact figure, no.
16    Q.  Do you know whether or not it was
17  more than the $22 million listed in the
18  agreement?
19    A.  It was more.
20    Q.  Do you know how much more
21  approximately?
22    A.  Two million.
23        MR. HANLON:  You are not
24  guessing, are you?  We don't want you to
25  guess.

Pages 54 to 57

Marc Strigel  February 18, 2009

Page 58

1    THE WITNESS:  Yeah, I'm
2    guessing.
3    BY MR. HERRICK:
4    Q.  You'll agree with me that some of
5    the cases that were paid pursuant to this
6    agreement were what PACE has termed "futures
7    cases"?
8    A.  There are cases that were not on the
9    Attachment A that were paid.  And throughout
10   the course of this settlement I think some
11   people called them substitutions.  Some people
12   called them futures.  I think that those two
13   terms just got mixed up a lot.
14       Ultimately, I wouldn't put a clear
15   definition on what PACE called them because I
16   don't think we had a clear definition of
17   those.
18       MR. HERRICK:  Let's mark this.
19       (Document marked for
20   identification as Exhibit Strigel-4.)
21   BY MR. HERRICK:
22   Q.  I just handed you Exhibit Number 4.
23   Can you identify that?
24       MR. HANLON:  Give him a chance
25   to read it, will you?

Page 59

1    THE WITNESS:  Yeah.  This is
2    sort of a system generated letter that
3    goes out when we send releases.
4    BY MR. HERRICK:
5    Q.  The signatory to that letter is who?
6    A.  Margaret Podstawa.
7    Q.  Is that on PACE letterhead?
8    A.  It is.
9    Q.  Do you recognize that as a PACE
10   document?
11   A.  Yes.
12   Q.  And I guess this is when they
13   started doing the branding because the
14   Navigant logo makes up the "A", or am I wrong
15   about that?
16   A.  Yep. Yep.
17   Q.  And what does this letter tell you
18   about where that particular case referenced in
19   Strigel Exhibit Number 4 fits in with the
20   Hilry Anderson NSI settlement?
21       MR. HANLON:  Which case are you
22   referring to?
23       MR. HERRICK:  The one
24   referenced in Exhibit 4.
25       MR. HANLON:  I don't see it.

Page 60

1    Can you help me?
2        MR. HERRICK:  Okay.  I'm sorry,
3    you're right.
4    BY MR. HERRICK:
5    Q.  That letter indicates a list of
6    cases for whom releases were provided as
7    enclosed with the letter, correct?
8    A.  Yes.
9    Q.  And was that the typical procedure
10   at PACE at or about this time in 2006?
11   A.  Yeah.  When we would create releases
12   we would accompany those with cover letters
13   such as this one.
14   Q.  And this cover letter specifically
15   talks about releases for 11/1/2001 Hilry
16   Anderson futures settlement, correct?
17   A.  Yes.
18   Q.  And it also references it's a
19   National Service Industries or North Brothers
20   releases?
21   A.  Yes.
22   Q.  Does this tell you at least that
23   with respect to the releases on the enclosure
24   that we do not have a copy of here, that these
25   were future settlements for the NSI

Page 61

1    settlement?
2        MR. MARSHALL:  I'm going to
3    object.  I think to have the witness talk
4    about futures in the context of this
5    motion is vague, ambiguous.  People use
6    it differently.  So I object to the
7    question.
8    BY MR. HERRICK:
9    Q.  Go ahead and answer my question.
10   A.  This is actually a system generated
11   letter.  Where you see the bolded print,
12   "11/1/2001 Hilry Anderson Futures", the way
13   the system is setup is we do a process which
14   is called tagging claims to a settlement
15   agreement.
16       In this particular agreement we
17   tagged all the cases that were on the
18   Attachment A to the Hilry Anderson settlement.
19   We were told at some time to process cases
20   that were not on the Attachment A.
21       The way our system is setup, we have
22   to tag them to some type of group -- grouping
23   if you will.  At that time it was given the
24   name "Hilry Anderson Futures".  And nobody had
25   the foreknowledge to see that this might be on

A. WILLIAM ROBERTS, JR. & ASSOCIATES  (800) 743-DEPO
SCHEDULEDEPO.COM

Page 62

1  a system generated letter one day and somebody
2  may refer to those claims as futures claims
3  based on some decision of what to call a
4  tagging group, which was probably done in 2001
5  as part of our process that nobody gave more
6  than two seconds of thought to what to tag
7  these claims to.
8      This is a system generated letter
9  where somebody didn't say, hey, these are for
10  futures cases, let me call it that in the
11  title. This is a printout based on our
12  system, unfortunately.
13     Q.  Does that mean that you're able to
14  tell that none of the -- and we don't know
15  because we don't have the attachment to
16  Exhibit Number 4. We don't know what case
17  numbers are on there.
18      But does that tag line, for lack of
19  a better term, indicate to you that none of
20  these NSI claimants were on the schedule or
21  the Exhibit A to the NSI agreement?
22     A.  It wouldn't, and I'll tell you why.
23  Perhaps several processors could have
24  processed releases that day, generated
25  releases that day. Some of them may have been

Page 63

1  from the original Attachment A, some of them
2  may have been in the secondary grouping which
3  is described as the futures.
4      They didn't print out 20 different
5  cover letters. This, perhaps, is the one that
6  they picked out. No rhyme or reason why.
7  They just knew they had to have a cover
8  letter. Didn't think of what it said and they
9  are just sending you guys releases. That's
10  probably as far as they thought it through.
11     That listing could contain
12  Attachment A claims. It could contain
13  releases which were not on the Attachment A.
14     Q.  Are you telling me then that all of
15  the letters that went out after a certain
16  point in time referencing the Hilry Anderson
17  settlement called it the Hilry Anderson
18  Futures settlement?
19     A.  I couldn't tell you. I never looked
20  into them.
21     Q.  If we go back to Exhibit Number 3,
22  which is the e-mail chain from Margaret
23  Podstawa.
24      MR. HANLON: You have to give
25  that back to us.

Page 64

1      MR. HERRICK: I've got it right
2  here.
3  BY MR. HERRICK:
4      Q.  As you can tell from the subject
5  line there, it says "former CCR futures"?
6      A.  Yes. It does say former CCR
7  futures.
8      Q.  That was what Margaret Podstawa
9  called the subject matter of this particular
10  e-mail, right?
11      A.  That's what Margaret Podstawa called
12  this particular e-mail, yes.
13      Q.  And when we're talking about former
14  CCR futures, NSI would fit that bill in terms
15  of former CCR, right?
16      A.  They were a former CCR client,
17  correct.
18      Q.  And, in fact, this one is also
19  talking about CertainTeed, Amchem and Union
20  Carbide, all of whom are former CCR?
21      A.  That's correct.
22      Q.  Have you seen any documentation that
23  was shared with plaintiff's counsel which
24  termed these cases that were resolved by NSI
25  pursuant to the Hilry Anderson settlement and

Page 65

1  didn't appear on the Appendix A to the
2  agreement, have you seen any correspondence to
3  plaintiff's counsel that termed those cases
4  substitution cases?
5      A.  I have.
6      Q.  To plaintiff's counsel?
7      A.  I've seen them called substitutions.
8  I'm not sure if I know if that had been -- if
9  that had been sent to plaintiff's counsel or
10  if that was sent to us.
11      MR. HERRICK: I'll state for
12  the record that I've been produced
13  nothing, counsel. I assume to the extent
14  that there's any documents referring to
15  these cases as substitutions, that they
16  are documents with which NSI has claimed
17  a privilege which indicates to me that
18  they didn't come to plaintiff's counsel
19  because those obviously would not be
20  privileged documents.
21      MR. MARSHALL: I agree with
22  you, John, that if they went to the
23  plaintiff's counsel they would not be
24  privileged documents.
25      However, you have equal, if not

Page 66

1  greater ability, to access the documents
2  received by the plaintiff's counsel. So
3  I don't think it's our obligation to
4  produce all the nonprivileged documents
5  that you receive. So I reject your
6  assertion.
7       MR. HERRICK: Okay.
8       (Document marked for
9  identification as Exhibit Strigel-5.)
10 BY MR. HERRICK:
11  Q.  Do you recognize that as an e-mail
12  that you sent on or about November 9th of
13  2005?
14       MR. HANLON: There's two
15  e-mails.
16       MR. HERRICK: There's one that
17  has anything other than a forward in it,
18  right?
19       MR. HANLON: It looks to me
20  there's one from Angela Jordan, there's
21  one from Ellen Duvall, and there's one
22  from Marc Strigel. So there are three
23  e-mails here. It's your document. I'm
24  just pointing out to him that it's not
25  one e-mail. It's three.

Page 67

1  BY MR. HERRICK:
2  Q.  Do you recognize the e-mail typed by
3  you there?
4  A.  Yes.
5  Q.  Which you sent to Amanda Summerlin?
6  A.  Yes.
7  Q.  And Wallace Nuttycombe was one of
8  your settlement processors, is that correct?
9  A.  Correct.
10  Q.  And for a time he was -- well, he
11  was assigned at least some of the claims from
12  the Hilry Anderson NSI settlement?
13  A.  Yes.
14  Q.  You write to Amanda: We have about
15  $275,000 payable to them and we will cut a
16  check in the next few days.
17       To what are you referring there?
18  A.  I have no idea. That could be for
19  any one of the defendants for any one of the
20  settlements. There's nothing in here that
21  tells me what I'm referencing.
22  Q.  It goes on to say: For the NSI
23  claims that they need releases, most are not
24  on the original Attachment A which means they
25  are futures.

Page 68

1       What do you mean by that?
2  A.  Well, at the time I only understood
3  there to be claims on the Attachment A and
4  claims not on the Attachment A, and my only
5  understanding at the time I guess was that
6  they -- claims not on the Attachment A were
7  futures claims.
8  Q.  Okay. And, again, this was
9  November 9, 2005; is that fair?
10  A.  Yeah, that's the date, November 9,
11  2005.
12  Q.  Was there an attachment to this
13  e-mail?
14  A.  There doesn't appear to be.
15  Q.  Okay.
16       (Document marked for
17  identification as Exhibit Strigel-6.)
18 BY MR. HERRICK:
19  Q.  I don't want to ask you about the
20  whole thing. If you want to look at the last
21  two pages.
22  A.  Did you mean not to include this
23  one? So did you mean these two pages, the
24  ones you have tabbed?
25  Q.  No, not necessarily. If they don't

Page 69

1  relate, they don't relate. That's just how
2  they were segregated to me.
3  A.  This e-mail is the same as this.
4  Q.  Okay.
5       MR. HANLON: Is there a
6  question?
7       MR. HERRICK: Yeah.
8       THE WITNESS: Okay.
9 BY MR. HERRICK:
10  Q.  There's some discussion there about
11  the term "payable". And how does -- how do
12  you understand that term to be used as a
13  representative of PACE and someone who has
14  worked with -- and I guess that's Wallace
15  Nuttycombe?
16  A.  Yep.
17       MR. MARSHALL: For the record,
18  can we identify which e-mail we're
19  referring to so when we review the record
20  later?
21       MR. HERRICK: How many pages in
22  is that?
23       MR. MARSHALL: Or by date.
24       MR. HERRICK: Date and time
25  would be easiest.

Pages 66 to 69

Page 70

1    THE WITNESS: E-mail from
2  Wallace Nuttycombe to Sharon Edwards on
3  February 7, 2006, at 9:40 a.m.
4    MR. MARSHALL: Thank you.
5    THE WITNESS: The way I
6  interpret what Wallace is saying, he
7  states: They are payable, however, need
8  client approval to actually be paid.
9    What he means there is there's
10  nothing needed from our end to make
11  payment with the exception of client
12  approval.
13  BY MR. HERRICK:
14    Q.  So, in other words, you've got
15  everything -- PACE had everything that they
16  needed?
17    A.  Except client approval.
18    Q.  And you told me earlier in this
19  deposition that you wouldn't send -- would
20  that indicate to you that you already have a
21  release?
22    A.  That would indicate to me that we
23  already have a release.
24    Q.  And you told us earlier in this
25  deposition that you wouldn't send out a

Page 71

1  release unless you already had an allocation
2  from the client, correct?
3    A.  That is correct.
4    Q.  That's all I have for that one.
5    Was there a time when NSI quit
6  paying the Hilry Anderson settlement?
7    A.  I don't know what they are doing as
8  of now. I haven't worked on this project for
9  quite some time.
10    Q.  During the time you were there, I
11  take it you never got a notification from NSI
12  to stop processing Hilry Anderson claims?
13    A.  I believe we continued processing
14  Hilry Anderson claims.
15    Q.  Okay. You told me before that when
16  you got releases in on the Hilry Anderson
17  claims you would notify the client, I think
18  what you said is you would do a weekly report?
19    A.  We would give them a weekly report,
20  not necessarily for any settlement they had.
21  It was all inclusive. It was not a weekly
22  report just for the Hilry Anderson.
23    Q.  The weekly report was much broader
24  than what I'm interested in which is the Hilry
25  Anderson settlement?

Page 72

1    A.  That's correct.
2    MR. HANLON: I wish you were
3  just interested in Hilry Anderson.
4  BY MR. HERRICK:
5    Q.  The weekly report would encompass
6  all of the settlement agreements that you were
7  working on for NSI?
8    A.  That is correct.
9    Q.  And let's focus back now on the
10  Hilry Anderson NSI settlement. To the extent
11  that you had cases where all your work had
12  been done; they were ready to be payable, I
13  guess is the term you used; and you're waiting
14  for the client's go ahead to pay the cases,
15  would those stay on the weekly report until
16  they were paid, or did you send them that one
17  time and then you didn't send it to them again
18  because you already sent it to them?
19    A.  It would stay on the weekly report.
20    Q.  Did the weekly report also include
21  the dollar amounts that were allocated for the
22  particular claims?
23    A.  It did not give a claim by claim
24  allocation. It gave an overall amount and
25  number of claims. And if they requested

Page 73

1  anything specific beyond that, we would
2  provide them with reports on an ad hoc basis.
3    Q.  What other information would be
4  contained in the report?
5    MR. HANLON: On an ad hoc
6  basis?
7    MR. HERRICK: No, no, no.
8  BY MR. HERRICK:
9    Q.  Let me start again.
10    What I really want to know is was it
11  just a report or was there a separate report
12  for claims where you all had done everything
13  you had to do and they were now payable and
14  just waiting for the go ahead from NSI to cut
15  the check, was that -- were all of those
16  claims on one report?
17    A.  Yes, but by settlement, not on a
18  claim by claim basis.
19    Q.  What do you mean by settlement?
20    A.  Law firm A may have a settlement
21  with NSI. That settlement would be listed as
22  law firm A, number of claims, dollar amount,
23  settlement date. And so on and so forth.
24    For this example, let's say Hilry
25  Anderson would be noted, the number of claims

Pages 70 to 73

Marc Strigel  February 18, 2009

## Page 74

1  and the dollar amounts that we've processed up
2  to that day.
3     Q.  When you left the PACE side of
4  things, do you recall about what the dollar
5  amount was for claims waiting to be paid for
6  the Hilry Anderson settlement?
7     A.  I don't.
8     Q.  But that's a running total that you
9  provided to NSI, so NSI would be -- NSI could
10  look at that weekly report and know exactly
11  what PACE had already approved for the Hilry
12  Anderson settlement?
13     A.  NSI would be able to take the last
14  e-mail, I guess as far as I can tell from what
15  I had, and see how many claims we had
16  processed and the value of those claims.
17     Q.  Do you recall having a conversation
18  with Joe Rice of my firm about the settlement?
19     A.  I do.
20     Q.  In that conversation do you recall
21  telling him that Marcy was holding up the
22  payment of these Hilry Anderson claims?
23     A.  I don't remember what the exact
24  wording was, but the overall thought I wanted
25  to convey was that it was out of my hands and

## Page 75

1  that he needed to speak with NSI and their
2  defense counsel.
3     Q.  Do you recall at some point in time
4  with respect to this settlement that there
5  were 114 claims that sat in a box in the
6  corner of a former Navigant employee's office
7  for almost a year?
8     A.  I don't remember that.  But if it
9  happened, it's not good.
10     Q.  If it happened it wouldn't surprise
11  you?
12        MR. HANLON:  He didn't say
13     that.  You said that.
14        MR. HERRICK:  I did say that.
15  BY MR. HERRICK:
16     Q.  Would it surprise you?
17     A.  It would surprise me.
18        (Document marked for
19     identification as Exhibit Strigel-7.)
20  BY MR. HERRICK:
21     Q.  That exhibit, Exhibit Number 7, the
22  last page of that is a document from PACE, is
23  it not?
24     A.  It is.
25     Q.  Are you familiar with that type of

## Page 76

1  document from PACE?
2     A.  This would be very easy for us to
3  produce, yeah.
4     Q.  And what is that, would that be
5  something that would accompany a check that
6  PACE had mailed out?
7     A.  I'm not sure if they enclose -- at
8  one time they had lists.  At another time they
9  didn't.  I'm not sure.
10     Q.  That was not your function?
11     A.  No.  This is an accounting function.
12     Q.  Okay.
13        (Document marked for
14     identification as Exhibit Strigel-8.)
15  BY MR. HERRICK:
16     Q.  In the middle of that exhibit
17  there's an e-mail from you which says:  I'm
18  checking with Marcy to see what she wants me
19  to pay.
20        Give me some context for that, if
21  you would please.
22     A.  It's basically what I had said
23  before about we supply a list of what we
24  processed to date.  And from there we are told
25  what to pay and then we pay it.

## Page 77

1        (Document marked for
2     identification as Exhibit Strigel-9.)
3        THE WITNESS:  Do you want to
4     refer to all of these?
5        MR. HERRICK:  Yeah, you're
6     probably going to.  Sorry.
7  BY MR. HERRICK:
8     Q.  Are you ready?
9     A.  Yep.
10     Q.  I'm actually asking about the first
11  page of that e-mail chain.  It's an e-mail
12  from Marcy to Joe Rice and yourself on
13  January 17, 2007, at 12:48 p.m.
14        Do you see that?
15     A.  Yes.
16     Q.  She says:  I have asked Marc for the
17  most up-to-date list of all unpaid claims and
18  their status.
19        Did you provide that to her?
20     A.  Yes.
21     Q.  Did she already have at the time
22  that she wrote this e-mail the list of cases
23  that were payable?
24     A.  I wouldn't think so.
25     Q.  Was that not something that was

A. WILLIAM ROBERTS, JR. & ASSOCIATES   (800) 743-DEPO
SCHEDULEDEPO.COM

## Page 78

1  provided on a regular basis?
2     A.  The number of claims and the amount
3  of claims we had processed was probably
4  provided.
5     Q.  But not the list themselves.  Okay.
6       In response to this e-mail and
7  request from Marcy, what did you do?
8     A.  I'm sure I complied with her
9  request.
10     Q.  Okay.
11       (Document marked for
12  identification as Exhibit Strigel-10.)
13       MS. CROFT:  Did you mean to
14  attach this e-mail chain, the letter on
15  the back, or are they separate?
16       MR. HERRICK:  It beats me.  It
17  really doesn't have any significance.
18       MS. CROFT:  As long as we are
19  not alleging they were part of the e-mail
20  chain, that's fine.
21  BY MR. HERRICK:
22     Q.  That's got most of the same e-mail
23  chain on it.
24     A.  Okay.
25     Q.  With the exception of the very top,

## Page 79

1  I think is different.
2       MR. HANLON:  And the
3  attachment.
4  BY MR. HERRICK:
5     Q.  That appears to be in response to
6  the previous exhibit that we looked at, the
7  request for you to provide some information
8  about the status of claims?
9     A.  Yes.
10     Q.  There's an attachment to that.  What
11  is that attachment?
12     A.  The attachment is a deficiency
13  report.
14     Q.  Is there any indication on that
15  deficiency report as to whether or not those
16  claims listed were present claims or futures
17  claims under the Hilry Anderson settlement
18  agreement?
19       MR. MARSHALL:  Same objection
20  on the futures terminology.
21       THE WITNESS:  I can't decipher
22  from this report if they are Attachment A
23  claims or claims not on the Attachment A.
24  BY MR. HERRICK:
25     Q.  And is that because there's not a

## Page 80

1  field for that on that particular report?
2     A.  Yeah.  At this point I would feel
3  more comfortable checking each claim to
4  Attachment A to verify that.
5     Q.  Who has Attachment A?
6     A.  I believe Navigant has a copy of it.
7     Q.  Do you know why that wasn't provided
8  in response to the Notice of Deposition?
9     A.  I don't.
10     Q.  Are you able to look at that report
11  that's attached to Exhibit 10 and determine
12  whether or not that was one that either you
13  created or was created at your request?
14     A.  This report?
15     Q.  Yes.
16     A.  This report was created by PACE.
17     Q.  Okay.  Was that something that you
18  had done in response to Marcy's request, or do
19  you know?
20     A.  I don't know.
21     Q.  Let me hand you a copy of Capritti
22  Exhibit Number 2.  I'll ask you to take a
23  quick look at that if you would.
24       MR. HERRICK:  Let's take a
25  short break.

## Page 81

1       (Short break.)
2  BY MR. HERRICK:
3     Q.  You've now had a chance to look at
4  Capritti Exhibit Number 2?
5     A.  I have.
6     Q.  Is that a document that you've seen
7  before?  And by that I'm not referring to the
8  letter to Marcy, but the attachment to it?
9     A.  Yes.
10     Q.  And do you understand that to be
11  Exhibit A to the settlement agreement?
12     A.  Yes.
13     Q.  Well, that was helpful.
14       Is there a way to determine how many
15  of those Exhibit A plaintiffs remain unpaid?
16     A.  I guess just the manual
17  reconciliation of the list versus what was
18  paid.
19     Q.  Is that something that you've done
20  in the past?
21     A.  Yeah.
22     Q.  When you were requested by Marcy --
23       MR. HERRICK:  I'm sorry I'm
24  being so familiar with everybody here.
25  Ms. Croft.

Page 82

1      MS. CROFT: I would prefer you
2  to use Mrs. Croft.
3  BY MR. HERRICK:
4      Q. -- for the most up-to-date list of
5  unpaid claims and their status in your Exhibit
6  Number 10, Strigel-10, did you do that manual
7  reconciliation and let her know what claims
8  from Exhibit A remained unpaid?
9      A. I believe that was claims that we
10  had processed and received releases on that
11  were not paid. I do not believe that included
12  claims where there were deficiencies where
13  there were releases not submitted.
14      Q. It would be fair to say that with
15  respect to this agreement, being the Hilry
16  Anderson agreement, the NSI agreement, that if
17  the releases had been generated, that meant
18  that to the extent that there had ever been
19  any deficiencies, those deficiencies had been
20  cured?
21      MR. MARSHALL: Object to the
22  form of the question. Assumes facts not
23  in evidence.
24      THE WITNESS: If the release
25  was generated it would mean that there

Page 83

1  were no biographical, medical, or
2  worksite deficiencies.
3  BY MR. HERRICK:
4      Q. Okay. What do you know about any
5  claims NSI might have made against Navigant or
6  PACE related to the NSI/Hilry Anderson
7  agreement?
8      A. I'm not aware of any.
9      Q. Were you ever given any direction
10  with respect to this NSI/Hilry Anderson
11  settlement regarding any doctors whose
12  medicals you are no longer going to accept?
13      A. That would involve --
14      MR. MARSHALL: It calls for
15  privileged communication. And in spite
16  of the stipulation we talked about
17  earlier, I think that goes too far.
18  BY MR. HERRICK:
19      Q. Let me ask this then. Have you ever
20  generated a deficiency with respect to any
21  claims submitted under the Hilry Anderson NSI
22  settlement where the deficiency was related to
23  not the absence of a medical record but who
24  the medical record was from?
25      A. Yes.

Page 84

1      Q. Okay. And when did you do that?
2      A. I don't think I could give you the
3  exact dates. I'm not sure. But I could say
4  that deficiency reports were created where I
5  believe the wording would have been something
6  along the lines of an unapproved doctor.
7      Q. And the criteria that you utilized
8  in processing this claim -- the claims
9  submitted under the Hilry Anderson NSI
10  settlement -- didn't have any restrictions on
11  doctors, did they?
12      MR. MARSHALL: Object to the
13  form. The document speaks for itself. I
14  think the question is overbroad. But you
15  can answer.
16      MR. HANLON: Can I have the
17  question back?
18      (Whereupon the court reporter
19  read back the requested portion of the
20  testimony.)
21      THE WITNESS: We used the
22  agreement for the criteria and the
23  agreement did not have a restriction on
24  the doctor.
25  BY MR. HERRICK:

Page 85

1      Q. When was the first time that you
2  sent back a deficiency that claimed there was
3  not a qualified doctor with respect to the
4  Hilry Anderson NSI settlement?
5      A. I don't recall.
6      Q. On this report that's attached to
7  Strigel Number 10 --
8      MR. HANLON: We don't have
9  Strigel Number 10 in front of us.
10      MR. HERRICK: I'm going to give
11  it back to you.
12      THE WITNESS: Thanks.
13  BY MR. HERRICK:
14      Q. That appears to have been generated
15  Thursday, December 28th --
16      A. 2006.
17      Q. -- 2006. Am I interpreting that
18  correctly, that that annotation at the bottom
19  of the third page of that exhibit indicates
20  that that's when that report was generated?
21      A. Yes.
22      Q. Okay. When you printed out this
23  report, was it your intention to list all of
24  the deficient claims that had been submitted
25  under the NSI/Hilry Anderson settlement?

Pages 82 to 85

Page 86

1     A.  The intent of this report is to let
2   you know of all the current deficiencies that
3   we are aware of.  So it doesn't necessarily
4   say this is all we will find.  This is all we
5   have found up until now that has yet to be
6   resolved.
7         So it would not include prior
8   deficiencies that have been resolved.  It
9   doesn't have deficiencies we may find in
10  processing claims tomorrow.  It's the current
11  list of deficiencies.
12    Q.  But to the extent that -- let me ask
13  it this way.
14        So to the extent that -- for
15  instance, Bessie Anderson, does that list all
16  of the deficiencies that existed in December
17  of 2006 with respect to the Bessie Anderson
18  case?
19    A.  Yes.  At that time this particular
20  one states "release not notarized".  We
21  wouldn't know that is a deficiency until we
22  got the release back.  So you could see that
23  that may not be all inclusive.  It may include
24  deficiencies --
25    Q.  So those were all --

Page 87

1         MR. HANLON:  Let him finish
2   answering the question.
3         THE WITNESS:  It's all the
4   deficiencies we know about up until then,
5   yeah.
6   BY MR. HERRICK:
7     Q.  That's a good example because you
8   wouldn't know if it was deficient until you
9   got the release back?
10    A.  Exactly.
11    Q.  Let's look at William Budd.  His
12  deficiency is "no exposure at approved job
13  site".
14    A.  Okay.
15    Q.  Did you have a list of approved job
16  sites that you went by to determine that
17  deficiency?
18    A.  I recall that job sites were based
19  on a geographical location, that it was based
20  on state.
21    Q.  Qualifying states?
22    A.  I believe so.
23    Q.  Okay.  Now, if you also had a --
24  when you printed a deficiency report like
25  this, you would print every deficiency that

Page 88

1   you were aware of at the time, right?
2     A.  Correct.
3     Q.  So if there was a medical deficiency
4   in that case at that time, you would have
5   printed that out as well?
6     A.  Correct.
7     Q.  And as I understand it, this would
8   have been deficient claims that had at least
9   been submitted?
10    A.  Yes.
11    Q.  To PACE?
12    A.  Yes.
13    Q.  And to the extent that claims were
14  submitted after this date, they may well be
15  deficient but they wouldn't appear on this
16  report?
17    A.  Correct.
18    Q.  And I think I understand what you
19  said about, for instance, not notarizing the
20  release could be a deficiency after the claim
21  had already been approved?
22    A.  After it had been processed for
23  release generation, yes.
24    Q.  Okay.  If you had earlier made a
25  deficiency on a case -- excuse me -- cited as

Page 89

1   a deficiency in one of these claims that it
2   was not an approved doctor, if that had not
3   been cured, that would continue to appear on
4   your deficiency list, would it not?
5     A.  It should.
6     Q.  I couldn't have termed it better
7   myself.  What we've got down here at the
8   bottom of that exhibit, Page 12 of 12,
9   "Injured Parties with Deficiencies: 74"?
10    A.  74.
11    Q.  So does that tell you that these 12
12  pages list deficiencies for 74 claims?
13    A.  Yes.
14    Q.  And is it fair to say then in
15  December of 2006, out of all the cases that
16  have been submitted pursuant to the Hilry
17  Anderson settlement, PACE was only aware of
18  deficiencies in 74 cases?
19    A.  Submitted and processed up to that
20  time.  If there were cases that we had not
21  gotten to processing yet, they would not yet
22  appear on the deficiency report because we
23  hadn't been able to note them in our system
24  yet.  But to the rest of your point, that's
25  correct.

Pages 86 to 89

Marc Strigel  February 18, 2009

Page 90

1    Q.  What was your scheduling for that,
2  how did that work?  When a case came in how
3  was it assigned?  How quickly was it worked
4  up?  What was your goal, your standards, for
5  processing claims?
6    A.  As soon as possible.  Usually every
7  agreement has different turnaround criteria.
8  Some 30 days, some 60, some 90.  It was up to
9  us to meet those deadlines.
10    Q.  Was there a requirement in this
11  particular agreement, as you understood it,
12  that NSI through PACE had a certain amount of
13  time within which to identify a deficiency
14  otherwise that deficiency would be waived?
15    A.  I believe there is something in
16  there, but I don't recall what the exact terms
17  were.
18    Q.  Do you know whether during the
19  course of this agreement there had been any
20  claims submitted under the upgrade or disease
21  additional compensation section of the
22  agreement?
23    A.  I think there had been.
24    Q.  Let me see if this -- and this is
25  one of the exhibits.  I guess it's an

Page 91

1  attachment to your deposition notice as well.
2        It talks about --
3        MR. MARSHALL:  Can you
4    reference what you are reading from?
5        MR. HERRICK:  The settlement
6    agreement.
7  BY MR. HERRICK:
8    Q.  Under Paragraph 9 it talks about:
9  NSI shall have 60 days from receipt of this
10  information to review all medical exposure and
11  timeliness documentation for deficiencies in
12  same.
13        So is that kind of what you were
14  referring to when you said every agreement is
15  either 30, 60 or 90 days, or something like
16  that, in terms of the turnaround time that
17  PACE had to look at the case?
18    A.  That's what I was referring to.
19        MS. CROFT:  Where is that in
20    here?
21        MR. HERRICK:  Paragraph 9.
22        MS. CROFT:  Right after it
23    gives all the plaintiff deadlines or
24    before?
25        MR. HERRICK:  Right there where

Page 92

1  the copier line is.
2        MS. CROFT:  I see.  Right after
3    it says where plaintiffs have to provide
4    everything within 60 days to the date of
5    the execution of this agreement?
6        MR. HERRICK:  Right.
7  BY MR. HERRICK:
8    Q.  In fact, it even goes on to talk
9  about NSI has the opportunity to look at
10  deficiencies and the executed releases, and
11  that has to do with notarization, probate
12  papers, that sort of thing?
13        MR. HANLON:  You are asking
14    whether he reads that in the agreement?
15    Is that the question?
16        MR. HERRICK:  Right.
17  BY MR. HERRICK:
18    Q.  That's what you would do with
19  respect to the releases?
20    A.  Could you just start over and
21  rephrase that question?
22    Q.  There's a provision in there that
23  talks about the time that you have to look at
24  releases once they are returned to identify
25  deficiencies.  Is that what you followed as

Page 93

1  well?
2    A.  Yes.
3        (Document marked for
4    identification as Exhibit Strigel-11.)
5  BY MR. HERRICK:
6    Q.  I want to ask you about your e-mail
7  which appears at the top of the second page.
8    A.  Yep.
9    Q.  It says:  You can set these up as
10  four new groups and label them Hilry Anderson
11  Futures.
12        What are you referring to there?
13    A.  As I had mentioned earlier, our
14  system has a way of tagging claims in
15  groupings.  I was just telling her that as an
16  administrative way of me keeping track of
17  these.
18    Q.  And the four groups would have been
19  NSI, CCR, CertainTeed and Union Carbide --
20  excuse me, NSI, Amchem, CertainTeed and Union
21  Carbide, or are you able to tell that from the
22  document?
23    A.  I can't tell from the document.
24    Q.  That's a guess on my part then.
25        It says:  Use the original

A. WILLIAM ROBERTS, JR. & ASSOCIATES  (800) 743-DEPO
SCHEDULEDEPO.COM

Page 94

1   agreements as the SCL's -- what are SCL's?
2       A.   SCL is an acronym for settlement
3   confirmation letter.
4       Q.   -- and tag the claims on the -- tag
5   the claims to the new groups.
6            Is that what you were talking about
7   before?
8       A.   Yes.
9       Q.   Then it goes on to say:  You can
10  have somebody -- have someone process these
11  for payment.  See me with any questions.
12      A.   Yes.
13      Q.   And that was your direction to
14  Jennifer Nichols?
15      A.   That's correct.
16      Q.   And she was one of your claims
17  processors in 2004?
18      A.   Correct.
19           (Document marked for
20      identification as Exhibit Strigel-12.)
21  BY MR. HERRICK:
22      Q.   I'm going to hand you Strigel-12.
23      A.   Okay.
24      Q.   Okay.  What is Jill asking for
25  there?  Oh, it's not Jill.

Page 95

1       A.   Beverly.
2       Q.   No, not Beverly.
3       A.   Jen Nichols.
4       Q.   Yes.  What is she asking for?
5       A.   "Thank you, Beverly.  Is it possible
6   to add a dollar amount for each deal so that
7   we have a control total to work off of."
8       Q.   Do you understand that that applies
9   to, when she says "each deal", that that
10  applies to the overall CCR futures as opposed
11  to what we've been talking about today which
12  has been the NSI/Hilry Anderson?
13      A.   I would be assuming.  I don't know
14  what she means.
15           (Document marked for
16      identification as Exhibit Strigel-13.)
17  BY MR. HERRICK:
18      Q.   Let me ask you about this one.
19      A.   Okay.
20      Q.   Again, this is an e-mail chain that
21  you became involved with at some point?
22      A.   Yes.
23      Q.   Someone directed that Jill Bailey
24  get directly in touch with you regarding the
25  releases she was seeking for the CCR futures

Page 96

1   cases?
2       A.   Yes.
3       Q.   And would you assume that that
4   includes the NSI/Hilry Anderson settlement?
5            MR. MARSHALL:  Object to the
6       form.  Lack of foundation.  The exhibit
7       is not clear that that's what it is
8       referring to.
9            If you can answer you can.
10           THE WITNESS:  Could you repeat
11      that question?
12           (Whereupon the court reporter
13      read back the requested portion of the
14      testimony.)
15           THE WITNESS:  Yes, I believe it
16      included the NSI/Hilry Anderson
17      settlement.
18  BY MR. HERRICK:
19      Q.   And you specifically asked Jill
20  Bailey, you apologize -- well, you didn't
21  apologize.  But you said you had been out of
22  the office for a couple of weeks and you asked
23  her if these were original submissions or
24  future claims, did you not?
25      A.   I do.

Page 97

1       Q.   And she replied to you that she
2   thought that they were -- "I suppose they
3   would be futures"; did she not?
4       A.   That is correct.  That is her
5   response.
6            MR. HANLON:  She actually says
7       they are allowed to be submitted under
8       the settlement agreements and I suppose
9       there would be futures.
10  BY MR. HERRICK:
11      Q.   During your processing of any of
12  these settlements, did you ever become aware
13  of Marcy and Bob Capritti sitting down with
14  plaintiff's counsel and working out the values
15  of any futures cases?
16      A.   I wouldn't have been involved.
17           MR. HERRICK:  I think subject
18      to the questions, that's all I have.
19           MR. MARSHALL:  No questions.
20           (Witness excused.)
21           (Deposition concluded at
22      approximately 4:04 p.m.)
23
24
25

Pages 94 to 97

Page 98

```
1        I N D E X
2
3   WITNESS:              PAGE
4   MARC STRIGEL
5    By Mr. Herrick        4
6
7         - - -
8
9
10      E X H I B I T S
11
12  NO.     DESCRIPTION      PAGE
13  Strigel-1  Notice of      24
14           Deposition
15
16  Strigel-2  E-mail Chain &   32
17           Attachment
18           Strigel 128-152
19
20  Strigel-3  E-mail Chain    54
21
22  Strigel-4  Letter, 1/3/6   58
23
24
25
```

Page 100

```
1    C E R T I F I E D   Q U E S T I O N S
2
3      PAGE          LINE
4      54        1
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 99

```
1   E X H I B I T S (Cont'd.)
2
3   NO.     DESCRIPTION      PAGE
4   Strigel-5   E-mail Chain    66
5
6   Strigel-6   E-mail Chain    68
7
8   Strigel-7   E-mail Chain    75
9
10  Strigel-8   E-mail Chain    76
11
12  Strigel-9   E-mail Chain    77
13
14  Strigel-10  E-mail Chain    78
15            & Attachment
16
17  Strigel-11  E-mail Chain    93
18
19  Strigel-12  E-mail Chain    94
20
21  Strigel-13  E-mail Chain    95
22
23         - - -
24
25
```

Page 101

```
1       I have read the foregoing transcript of my
2   deposition given on FEBRUARY 18, 2009, and it
3   is true, correct and complete, to the best of
4   my knowledge, recollection and belief, except
5   for the corrections noted hereon and/or list
6   of corrections, if any, attached on a separate
7   sheet herewith.
8
9
10
11
12   _____
13   MARC STRIGEL
14
15
16
17   Subscribed and sworn to
18   before me this _____ day
19   of _____, 20____.
20
21
22   _____
23   Notary Public
24
25
```

A. WILLIAM ROBERTS, JR. & ASSOCIATES   (800) 743-DEPO

SCHEDULEDEPO.COM

Page 102

```
 1          CERTIFICATE
 2
 3      I HEREBY CERTIFY that the
 4  proceedings, evidence and objections are
 5  contained fully and accurately in the
 6  stenographic notes taken by me upon the
 7  deposition of MARC STRIGEL, taken on FEBRUARY
 8  18, 2009, and that this is a true and correct
 9  transcript of same.
10
11
12
13
14          _____
15          MICHELLE L. GRAY, CSR
            and Notary Public
16
17      (The foregoing certification of this
18  transcript does not apply to any reproduction
19  of same by any means, unless under the direct
20  control and/or supervision of the certifying
21  reporter.)
22
23
24
25
```

**A**

ability 66:1
able 62:13 74:13
  80:10 89:23 93:21
absence 83:23
accept 83:12
access 66:1
accompany 60:12
  76:5
accounting 48:23
  50:10,14,16 76:11
accurately 102:5
acronym 94:2
ad 73:2,5
add 14:2 95:6
additional 90:21
administration
  11:20
administrative
  93:16
advised 39:10 50:25
afternoon 4:8
ago 5:16,21 18:4
  20:8 30:9 39:6
agree 47:12 55:3
  58:4 65:21
agreed 39:25 40:7
agreement 12:15,17
  12:18 15:8 16:18
  16:22,23 17:1 18:9
  18:10 26:13,16
  27:6,9,21,25 28:8
  28:14 29:1,5,11
  30:25 31:4,10 32:6
  33:19 34:19 36:7
  36:14 38:9 42:6,8
  42:9 44:22 45:18
  46:8 47:3,23 52:3
  52:5 53:16 57:18
  58:6 61:15,16
  62:21 65:2 79:18
  81:11 82:15,16,16
  83:7 84:22,23 90:7
  90:11,19,22 91:6
  91:14 92:5,14
agreements 6:7 72:6
  94:1 97:8
ahead 12:1 18:7
  31:16 61:9 72:14
  73:14
al 1:10,13,19 2:2,6,9
  2:13
alert 27:1
alerting 31:1,23
alleging 78:19

allocated 36:12
  72:21
allocation 35:13
  42:15,17 71:1
  72:24
allocations 36:20
  39:4 41:17,18,21
  41:24 57:10
allowed 97:7
ALSWORTH 1:10
altogether 43:15
Amanda 3:12 67:5
  67:14
ambiguous 11:24
  31:13 61:5
Amchem 53:8,11
  54:2 55:4 64:19
  93:20
amount 28:23 57:12
  72:24 73:22 74:5
  78:2 90:12 95:6
amounts 36:12
  38:12 72:21 74:1
Anderson 1:16 4:16
  23:3 26:12,15 27:5
  31:6,8 32:5 33:19
  34:13,22 36:7,13
  38:8 43:20 45:9,14
  47:2,11,20,23
  52:25 57:9,13
  59:20 60:16 61:12
  61:18,24 63:16,17
  64:25 67:12 71:6
  71:12,14,16,22,25
  72:3,10 73:25 74:6
  74:12,22 79:17
  82:16 83:6,10,21
  84:9 85:4,25 86:15
  86:17 89:17 93:10
  95:12 96:4,16
Anderson/NSI 9:5
Andrae 3:21
and-a-half 6:17
  18:22 19:14 20:8
and/or 101:5 102:20
Angela 66:20
annotation 85:18
answer 8:21,23 9:22
  12:1 18:7 24:24
  29:20,24 31:16
  32:22 36:24 37:11
  44:2,4 53:17 54:6
  55:9,24 61:9 84:15
  96:9
answering 87:2

anybody 55:17
anymore 6:1 44:10
apologize 54:14
  96:20,21
appear 36:13 38:7
  39:2 54:15 65:1
  68:14 88:15 89:3
  89:22
**APPEARANCES**
  3:1
appeared 36:6
appearing 53:22
appears 33:16 79:5
  85:14 93:7
appendices 28:3,15
Appendix 27:10
  28:25 29:4,11 30:8
  30:17 33:18 36:6
  38:8 39:2 65:1
applicable 13:22
  40:13
applies 95:8,10
apply 54:22 102:18
apprenticeship
  10:22
apprised 12:12
appropriate 9:6
  42:13
approval 70:8,12,17
approved 74:11
  87:12,15 88:21
  89:2
approximately 2:21
  6:15 57:21 97:22
area 17:10
argument 40:12
arrangement 21:1
Asbestos 1:4 5:9
asbestosis 14:14
asked 7:4 22:21
  25:21 40:24 56:5
  77:16 96:19,22
asking 4:11 8:19
  15:17 18:2 37:8
  40:9 56:23 77:10
  92:13 94:24 95:4
assert 29:16 37:13
  39:18
assertion 36:24 66:6
assign 34:21
assigned 11:9 12:5
  19:21 34:16 38:1
  53:5 67:11 90:3
Associates 2:20
assume 8:24 23:2

65:13 96:3
assumes 21:14 82:22
assuming 49:19
  95:13
Atlanta 3:8
attach 78:14
attached 28:15
  80:11 85:6 101:6
attachment 27:25
  33:23 35:12,16,20
  35:23 36:2,7 41:20
  42:14 58:9 61:18
  61:20 62:15 63:1
  63:12,13 67:24
  68:3,4,6,12 79:3
  79:10,11,12,22,23
  80:4,5 81:8 91:1
  98:17 99:15
attachments 27:10
attempt 25:18
attorneys 48:12
attorney/client
  29:16 37:9 39:13
  40:5 55:12,25
Avenue 3:18
aware 83:8 86:3
  88:1 89:17 97:12
a.m 70:3

**B**

B 27:10,11 98:10
  99:1
back 13:14 16:4 27:3
  27:12 31:18,21
  40:22 41:11,13
  49:3,20,21 56:20
  63:21,25 72:9
  78:15 84:17,19
  85:2,11 86:22 87:9
  96:13
background 4:22,23
Bailey 95:23 96:20
**BANKS** 2:2
based 11:11,12
  16:13 44:17 47:10
  62:3,11 87:18,19
basic 10:2
basically 6:6 10:24
  13:6 18:8 20:3
  35:1 76:22
basis 37:11,13,15
  49:25 55:24 73:2,6
  73:18 78:1
Bate 32:17
Bates 32:16

beats 78:16
beginning 2:21
behalf 53:3
belief 101:4
believe 20:22 23:7
  25:21 44:25 46:24
  47:8,8,24 49:24
  52:12 71:13 80:6
  82:9,11 84:5 87:22
  90:15 96:15
Bessie 86:15,17
best 7:21 101:3
better 7:18 10:16
  24:22 62:19 89:6
Beverly 95:1,2,5
beyond 13:4 47:4
  73:1
bill 64:14
billed 19:23
billing 7:23
biographical 6:11
  13:19,24 42:13
  83:1
birth 13:21
blank 16:1
Bob 97:13
body 28:7,18,20
bolded 61:11
boss 22:21 25:4
bottom 85:18 89:8
bought 20:25
Boulevard 2:20 3:3
box 34:24 75:5
boxes 34:15
brand 21:9 22:1
branding 59:13
break 9:13,13,16
  13:20 34:8 38:21
  39:22,23 51:11,13
  57:1,2 80:25 81:1
Brent 2:20
Bridgeside 3:3
brief 22:12
**BRIGGS** 2:9
broad 34:11 40:4
broader 71:23
broadly 40:4
Brothers 4:16 60:19
**BRYAN** 3:11
Budd 87:11
business 37:5
B-read 47:15,16

**C**

C 1:2 3:6 27:3,4,11

100:1
call 4:16 10:6 33:10
  44:12 62:3,10
called 10:8 13:14
  19:17 25:4 34:18
  58:11,12,15 61:14
  63:17 64:9,11 65:7
calls 52:5 83:14
Capritti 3:15 80:21
  81:4 97:13
Capritti's 54:21
Caption 1:22 2:1
Carbide 53:8,11
  54:3 55:5 64:20
  93:19,21
care 56:6
Carolina 3:3
carriers 19:23
case 11:15,19,20
  12:13 17:13 47:12
  47:14 59:18,21
  62:16 86:18 88:4
  88:25 90:2 91:17
cases 1:6 11:8,16
  12:5,9 26:25 28:22
  33:22 57:4 58:5,7
  58:8 60:6 61:17,19
  62:10 64:24 65:3,4
  65:15 72:11,14
  77:22 89:15,18,20
  96:1 97:15
CCR 5:5,13 6:3,22
  6:23 7:10,12,16,18
  10:5,18 11:11
  13:11 16:6,19 19:3
  22:4 64:5,6,14,15
  64:16,20 93:19
  95:10,25
CCR's 15:18
certain 63:15 90:12
certainly 22:24 30:2
  37:23
CertainTeed 53:8,12
  54:2 55:5 64:19
  93:19,20
certificate 30:23
  48:2 102:1
certification 10:10
  102:17
Certified 2:21
Certify 54:7 102:3
certifying 102:20
chain 63:22 77:11
  78:14,20,23 95:20
  98:16,20 99:4,6,8

99:10,12,14,17,19
  99:21
chance 58:24 81:3
change 18:13,17,23
  19:15 22:18
charts 11:1
check 48:8,22 50:9
  50:12,15,22 67:16
  73:15 76:5
checking 76:18 80:3
checks 21:14,17
CHESTER 2:2
circumstances 7:20
cited 88:25
claim 13:2 14:4,10
  14:14 36:5 38:2
  44:6 51:4 72:23,23
  73:18,18 80:3 84:8
  88:20
claimant 14:24 35:3
  35:11 41:6 50:17
claimants 41:2 43:24
  44:3 47:22 62:20
claimed 65:16 85:2
claims 5:14,17 6:9
  10:7,11,17 11:4,9
  11:20 13:1,15
  19:16,22 30:12,13
  30:17 33:13 36:2
  36:10,12 39:1,4
  41:19 42:5,9 43:11
  44:21 45:9 48:24
  50:2,5,21 51:5
  61:14 62:2,2,7
  63:12 67:11,23
  68:3,4,6,7 71:12
  71:14,17 72:22,25
  73:12,16,22,25
  74:5,15,16,22 75:5
  77:17 78:2,3 79:8
  79:16,16,17,23,23
  82:5,7,9,12 83:5
  83:21 84:8 85:24
  86:10 88:8,13 89:1
  89:12 90:5,20
  93:14 94:4,5,16
  96:24
clarify 17:11
clear 17:6 30:4 31:5
  37:8 39:12 58:14
  58:16 96:7
clearly 17:8,9
client 22:15,15 34:6
  55:16,23 64:16
  70:8,11,17 71:2,17

clients 46:20
client's 72:14
cognizable 55:21
college 5:1
combination 11:16
  11:18
come 20:21 51:18
  65:18
comes 34:24
comfortable 4:19
  80:3
coming 19:20 49:20
communicated 50:7
communicating 9:9
communication 36:4
  36:15 37:12,16
  38:15 39:16 83:15
communications
  29:21 34:1 40:2
community 5:1
company 1:19 20:16
  20:17 56:11
compensation 90:21
complete 30:16
  101:3
complied 78:8
comply 25:19
conceivable 42:22
concluded 97:21
confer 39:9
conferred 39:8
confidential 53:19
  55:15
confirmation 12:20
  15:11,14 17:5,16
  94:3
conjunction 15:14
consider 53:18
considered 55:15
consult 34:5
consulting 5:8,10,11
  5:24,25 7:3 38:2,9
contacted 50:2
contain 63:11,12
contained 44:23
  45:2 47:10 73:4
  102:5
context 61:4 76:20
continue 19:25 89:3
continued 1:22
  71:13
control 95:7 102:20
Cont'd 2:1 99:1
conversation 9:19
  39:16,24 74:17,20

convey 74:25
cookie 16:25 18:1
Coon 2:20
copier 92:1
copy 29:7 32:13
  54:14 56:22 60:24
  80:6,21
corner 75:6
correct 14:13,17
  24:1 26:3 40:19
  42:18,21 43:1,6
  45:14 50:8,11 60:7
  60:16 64:17,21
  67:8,9 71:2,3 72:1
  72:8 88:2,6,17
  89:25 94:15,18
  97:4 101:3 102:8
corrections 101:5,6
correctly 85:18
corresponded 14:4,7
correspondence
  39:17 65:2
costs 55:11
counsel 3:5,15,20
  9:21 17:11 27:1
  29:14,23 31:1,24
  35:18,22 36:19
  37:18 38:3,10,13
  38:25 39:3,8,9,10
  39:18,21,24,25
  40:7 41:21,24 42:2
  44:7,8,25 49:1,10
  49:11 50:13 53:2
  55:10 64:23 65:3,6
  65:9,13,18,23 66:2
  75:2 97:14
couple 27:9 96:22
course 8:12 58:10
  90:19
court 1:1,7 9:16,25
  31:12,20 41:10,12
  84:18 96:12
cover 44:11 45:1
  60:12,14 63:5,7
covers 13:23
create 60:11
created 80:13,13,16
  84:4
criteria 26:23 27:11
  27:11,12,18 28:5
  30:19,20 47:10,12
  47:13 84:7,22 90:7
Croft 3:11 38:19
  78:13,18 81:25
  82:1,2 91:19,22

92:2
CSR 102:15
cured 42:20 82:20
  89:3
current 86:2,10
Currently 22:14
cut 48:8,22 67:15
  73:14
cutter 16:25 18:1

_____

## D

D 1:2 3:12 98:1
  100:1
Darren 23:17
data 13:6 14:2 26:24
  35:14
date 2:21 13:21,21
  14:5 15:1 25:17
  48:4 68:10 69:23
  69:24 73:23 76:24
  84:18 92:4
dates 84:3
DAVID 3:6
day 43:15,16,17
  49:17,18 62:1,24
  62:25 74:2 101:18
days 67:16 90:8 91:9
  91:15 92:4
deadlines 90:9 91:23
deal 57:5,9 95:6,9
dealt 53:24
death 13:21 30:22
  48:2
DeBelasi 23:17
deceased 14:24
  30:23 48:3
December 5:7 25:2
  85:15 86:16 89:15
decipher 79:21
decision 62:3
dedicated 45:17,20
  45:24 46:3
defendant 55:14
defendants 1:14,20
  2:7,14 3:15 53:3
  53:18 67:19
defense 17:11 35:18
  37:18 38:3,9 39:17
  75:2
deficiencies 31:1,25
  42:19 82:12,19,19
  83:2 86:2,8,9,11
  86:16,24 87:4 89:9
  89:12,18 91:11
  92:10,25

deficiency 27:2 32:2
  33:11 79:12,15
  83:20,22 84:4 85:2
  86:21 87:12,17,24
  87:25 88:3,20,25
  89:1,4,22 90:13,14
deficient 42:24
  85:24 87:8 88:8,15
defining 9:3
definition 18:3 58:15
  58:16
degree 5:2
denoted 30:12
department 7:23
  48:23 50:14
depending 16:23
  49:23
deposed 24:13 25:6
DEPOSITIION 1:7
deposition 2:19 4:15
  8:5,12 9:4 18:4
  25:8,20 27:5 29:8
  29:19 40:1 54:20
  54:22,22 56:4
  70:19,25 80:8 91:1
  97:21 98:14 101:2
  102:7
derived 29:21,24
described 63:3
description 22:12
  98:12 99:3
determination 48:7
  50:4,6
determine 13:1 28:4
  36:11 52:4 80:11
  81:14 87:16
determined 15:10
  42:1
determining 12:9
diagnosing 17:16,20
  17:22
diagnosis 14:5,20,21
difference 25:17
different 17:25 19:4
  20:13 22:22 31:13
  44:7 45:7 46:20
  63:4 79:1 90:7
differently 61:6
direct 102:19
directed 95:23
directing 27:16
direction 45:8 48:25
  83:9 94:13
directly 95:24
discussed 54:21

discussion 69:10
disease 14:4,8 35:2
  47:7 90:20
disingenuous 37:2
  37:22
dispute 41:6
dissolved 6:23
distinguish 27:24
DISTRICT 1:1,1,7,7
division 21:5 22:19
  22:20
doctor 84:6,24 85:3
  89:2
doctors 83:11 84:11
document 1:5 24:6
  32:10,15,20 33:7
  33:12,16 38:11
  54:24 55:3 56:22
  56:24 58:19 59:10
  66:8,23 68:16
  75:18,22 76:1,13
  77:1 78:11 81:6
  84:13 93:3,22,23
  94:19 95:15
documentation 6:8,9
  6:10,13 13:8 14:3
  14:7,11 15:4 17:3
  17:11 30:22 34:18
  35:9 42:11 64:22
  91:11
documents 65:14,16
  65:20,24 66:1,4
doing 24:3 59:13
  71:7
dollar 28:23 36:11
  38:12 39:1 72:21
  73:22 74:1,4 95:6
door 11:14
Drive 19:4,11
duly 4:2
duties 18:13,17
  19:15,18 20:3 22:8
  26:16
Duvall 66:21
D.C 3:18

_____ E _____

E 1:2 3:2 98:1,10
  99:1 100:1,1,1
earlier 17:7 24:19,21
  54:21 70:18,24
  83:17 88:24 93:13
easiest 69:25
EASTERN 1:1
easy 76:2

educational 4:23
Edwards 70:2
eight 18:4
either 80:12 91:15
elicit 40:18
Ellen 66:21
employed 7:3
employee's 75:6
enclose 76:7
enclosed 60:7
enclosure 60:23
encompass 72:5
ended 26:4
ensure 6:8 48:1
ensuring 19:22,23
entails 22:13
enter 13:9,17 14:18
  26:24 35:13 48:4
  49:4
entered 14:22 18:3
entering 13:13 26:21
Enterprises 5:10
entire 28:14
entry 13:6
equal 65:25
ESQUIRE 3:2,6,11
  3:12,17
estate 14:25
estimate 45:11
et 1:10,13,19 2:2,6,9
  2:13
evaluating 17:2
evaluation 47:4
event 21:25
everybody 81:24
evidence 82:23
  102:4
evolved 46:1
exact 18:19,20 57:15
  74:23 84:3 90:16
exactly 26:9 52:19
  74:10 87:10
EXAMINATION
  4:5
examined 4:2
example 17:8 35:1
  49:14 73:24 87:7
Excellent 46:25
exception 70:11
  78:25
excuse 22:1 38:18
  88:25 93:20
excused 97:20
executed 47:18 48:1
  49:21 92:10

execution 92:5
exhibit 24:7,10 27:3
  27:4,4 30:8 32:11
  33:17 36:13 38:7
  41:3,7 54:25 58:20
  58:22 59:19,24
  62:16,21 63:21
  66:9 68:17 75:19
  75:21,21 76:14,16
  77:2 78:12 79:6
  80:11,22 81:4,11
  81:15 82:5,8 85:19
  89:8 93:4 94:20
  95:16 96:6
exhibits 25:19 90:25
existed 86:16
expecting 40:9
expert 14:12
explained 7:6 10:25
exposure 27:11
  87:12 91:10
extent 13:10 21:14
  29:20 32:22 44:3
  65:13 72:10 82:18
  86:12,14 88:13
e-mail 39:17 63:22
  64:10,12 66:11,25
  67:2 68:13 69:3,18
  70:1 74:14 76:17
  77:11,11,22 78:6
  78:14,19,22 93:6
  95:20 98:16,20
  99:4,6,8,10,12,14
  99:17,19,21
e-mails 25:22,24
  33:1 66:15,23

_____ F _____

F 1:2 100:1
fact 8:12 33:15 36:5
  64:18 92:8
facts 82:22
fair 8:25 9:1 22:5
  25:16 37:25 38:5
  68:9 82:14 89:14
fairly 40:25
fall 38:14
familiar 12:22 33:8
  75:25 81:24
far 54:19 63:10
  74:14 83:17
February 2:17 70:3
  101:2 102:7
feel 8:13 80:2
feelings 8:17

Fernando 32:4
field 80:1
figure 57:15
file 6:17,19 10:5
filing 54:19
fill 16:3
filled 34:24
financial 22:10,16
find 86:4,9
fine 54:23 78:20
finish 9:20 46:4 87:1
firm 13:9 15:4,5
  17:4 23:20 34:13
  73:20,22 74:18
first 4:2 6:16,17
  18:19 25:1,7 27:23
  34:14 35:17 36:9
  77:10 85:1
fit 64:14
fits 59:19
five 6:15 43:14 45:11
  49:17
FLINTKOTE 1:19
flip 33:5
flow 9:2
flowchart 10:17
  51:21
focus 72:9
folks 7:9 49:16
followed 92:25
FOLLOWING 1:6
follows 4:3
foregoing 101:1
  102:17
foreknowledge
  61:25
forget 57:10
form 11:23 15:15
  16:1,4,11,14,25
  33:7 35:1,25 36:3
  43:21 44:13,21
  45:3,5 55:7 82:22
  84:13 96:6
Forman 3:12
former 64:5,6,13,15
  64:16,20 75:6
forth 73:23
forward 26:23 41:16
  66:17
found 86:5
foundation 96:6
four 93:10,18
frame 20:23 21:4
  46:2
free 8:13 11:13

frequency 49:12
front 28:25 85:9
fulfill 30:15 47:13
fulfilled 17:19
fulfilling 13:5
fully 102:5
function 13:5 16:7
  43:8,8 76:10,11
funded 54:4 55:6
further 19:6 30:16
  40:16
future 60:25 96:24
futures 58:6,12
  60:16 61:4,12,24
  62:2,10 63:3,18
  64:5,7,14 67:25
  68:7 79:16,20
  93:11 95:10,25
  97:3,9,15

G

general 49:24 55:13
Generally 42:4
generate 16:12,16
  17:21 18:10 43:5
  43:11 44:9,17
generated 16:20
  43:7 49:16 59:2
  61:10 62:1,8,24
  82:17,25 83:20
  85:14,20
generation 88:23
generic 41:1
geographical 87:19
Georgia 3:8
getting 4:21 11:9
  19:21 22:3 35:19
give 9:22 15:20
  22:12 25:2 35:21
  45:7 49:6,9,13
  58:24 63:24 71:19
  72:23 76:20 84:2
  85:10
given 11:7 45:15
  48:25 61:23 83:9
  101:2
gives 91:23
go 11:9 12:1 18:7
  19:1 27:3 31:16
  41:23 61:9 63:21
  72:14 73:14
goal 90:4
goes 29:2 59:3 67:22
  83:17 92:8 94:9
going 4:11,13 8:1,17

9:20 12:3 22:20,20
  50:2 53:16 55:23
  56:1 61:2 77:6
  83:12 85:10 94:22
good 4:8,10 21:22
  51:10 75:9 87:7
Goodwin 3:17
gotten 89:21
Graduated 4:25
Gray 2:21 102:15
greater 66:1
grey 17:10
ground 10:2
group 11:8 52:25
  53:1 61:22 62:4
grouping 61:22 63:2
groupings 93:15
groups 11:6 93:10
  93:18 94:5
guess 8:1,3 10:13
  11:11,13 20:7
  24:21 42:22 43:9
  48:21 57:25 59:12
  68:5 69:14 72:13
  74:14 81:16 90:25
  93:24
guessing 7:23 8:1
  57:24 58:2
guidelines 22:17,23
guys 63:9

H

H 98:10 99:1
hand 8:23 80:21
  94:22
handbook 10:15
handed 58:22
handle 26:2
handling 23:11,14
hands 74:25
hands-on 23:22 24:3
HANLON 3:17 7:25
  15:17,20 17:24
  21:13,23 24:18,23
  25:9 27:13,23 28:9
  28:13 32:12,19
  34:5 36:23 38:17
  38:22 39:20 42:4
  45:19 51:10 53:14
  54:5,15 55:8,13
  56:2,8,14,21 57:6
  57:23 58:24 59:21
  59:25 63:24 66:14
  66:19 69:5 72:2
  73:5 75:12 79:2

84:16 85:8 87:1
  92:13 97:6
happen 23:6
happened 19:13
  20:10 23:18 26:9
  35:16 75:9,10
happy 32:23
Hawkins 3:7
head 10:2
heard 26:8
help 46:13 60:1
helpful 81:13
helping 22:15,16
HENRY 2:9
hereon 101:5
herewith 101:7
Herrick 3:2 4:7 8:2
  11:25 15:19,23
  16:2 18:6 21:16,22
  21:24 24:8,20,25
  25:10,15 27:15,17
  28:2,11,16,19 30:6
  31:15,18,25 32:3,8
  32:14,21,25 34:7,9
  36:18 37:1,24
  38:23 39:23 40:19
  41:22 42:7 44:19
  45:21 46:6 48:6
  51:12,14 53:23,25
  54:7,11,17,23 55:1
  55:10,19 56:6,12
  56:16,25 57:3,8
  58:3,18,21 59:4,23
  60:2,4 61:8 64:1,3
  65:11 66:7,10,16
  67:1 68:18 69:7,9
  69:21,24 70:13
  72:4 73:7,8 75:14
  75:15,20 76:15
  77:5,7 78:16,21
  79:4,24 80:24 81:2
  81:23 82:3 83:3,18
  84:25 85:10,13
  87:6 91:5,7,21,25
  92:6,7,16,17 93:5
  94:21 95:17 96:18
  97:10,17 98:5
hey 62:9
high 4:25
Hilry 1:16 4:16 9:4
  23:3 26:12,15 27:5
  31:6,7 32:5 33:19
  34:13,21 36:7,13
  38:8 43:20 45:9,14
  47:2,11,20,23

52:24 57:9,13
  59:20 60:15 61:12
  61:18,24 63:16,17
  64:25 67:12 71:6
  71:12,14,16,22,24
  72:3,10 73:24 74:6
  74:11,22 79:17
  82:15 83:21 84:9
  85:4 89:16 93:10
hired 26:1
history 5:3 11:2
  13:25 35:10
hoc 73:2,5
holding 74:21
honest 57:11
HR 22:16,23
hurt 8:17

I

idea 45:7 67:18
identification 24:7
  32:11 54:25 58:20
  66:9 68:17 75:19
  76:14 77:2 78:12
  93:4 94:20 95:16
identify 24:11 58:23
  69:18 90:13 92:24
ILO 11:1 14:15
imagine 42:23
immediately 23:7
important 9:17
impose 31:2
include 68:22 72:20
  86:7,23
included 82:11
  96:16
includes 96:4
inclusive 71:21
  86:23
incorporate 41:5
increased 22:1
INDEX 3:25
indicate 33:12 62:19
  70:20,22
indicates 60:5 65:17
  85:19
indication 79:14
individual 11:15
  43:10 50:17
individuals 45:8
Industries 2:12
  60:19
industry 5:6 22:16
inform 29:23
information 4:22

6:10,11 13:9,13,17
  13:19,24 16:13,15
  16:21 17:15 26:21
  28:18,20 37:10,16
  39:15 40:18 42:12
  42:13,25 43:3 44:9
  44:18,23 49:10
  52:2,6 53:19 55:15
  73:3 79:7 91:10
informed 35:18
Injured 89:9
instance 43:2 86:15
  88:19
instances 51:3,4
instruct 36:23 54:5
  55:8,23
insurance 19:23
intended 40:17
intent 37:23 40:1
  86:1
intention 85:23
interested 7:5 71:24
  72:3
interpret 70:6
interpretations
  31:14
interpreting 85:17
interviewed 7:7
involve 34:1 36:15
  37:12 83:13
involved 12:8 41:6
  95:21 97:16
in-house 7:17 48:11
  48:14
issue 15:22
items 33:13

J

Jackson 3:14
January 77:13
Jen 95:3
Jennifer 94:14
Jersey 19:3
Jill 94:24,25 95:23
  96:19
job 6:9 14:1 30:20
  34:21 42:12 87:12
  87:15,18
Joe 74:18 77:12
John 3:2 21:23 31:5
  37:4 65:22
join 54:9
Jordan 66:20
July 52:21
J.F.K 2:20

| K | | | | |
|---|---|---|---|---|
| keeping 93:16 | line 40:25 62:18 64:5 | 77:12 78:7 81:8,22 | million 57:17,22 | Notary 2:22 101:23 |
| kind 25:12 91:13 | 92:1 100:3 | 97:13 | minutes 39:6 | 102:15 |
| kinds 6:4 | lines 84:6 | Marcy's 80:18 | missing 33:13 | note 40:23 89:23 |
| knew 22:6 63:7 | list 60:5 76:23 77:17 | Margaret 52:8 | Mississippi 1:8 3:14 | noted 73:25 101:5 |
| know 7:22 8:9,19 | 77:22 78:5 81:17 | 56:17 59:6 63:22 | Misstates 38:19 | notes 102:6 |
| 9:6,13,20 15:5 | 82:4 85:23 86:11 | 64:8,11 | mixed 58:13 | notice 2:20 25:8,20 |
| 20:20 26:25 33:3 | 86:15 87:15 89:4 | mark 32:8 58:18 | morning 12:16 | 53:21 55:22 56:3,9 |
| 38:1,6 39:7 50:23 | 89:12 101:5 | marked 24:6,10 | Mosquera 32:4 | 56:13,14 80:8 91:1 |
| 51:1 52:21 56:17 | listed 30:17 35:11,15 | 32:10 33:17 54:24 | motion 31:11 61:5 | 98:13 |
| 57:12,16,20 62:14 | 57:17 73:21 79:16 | 55:2 58:19 66:8 | Motley 3:21 | noticed 35:17 |
| 62:16 65:8 71:7 | listing 29:1 63:11 | 68:16 75:18 76:13 | move 9:15 26:23 | notification 35:21 |
| 73:10 74:10 80:7 | lists 35:2 76:8 | 77:1 78:11 93:3 | 41:15 | 49:7 71:11 |
| 80:19,20 82:7 83:4 | LITIGATION 1:4 | 94:19 95:15 | moved 7:13 10:17 | notify 17:18 36:1 |
| 86:2,21 87:4,8 | little 19:6 | married 44:14 | 19:7,8,16 20:12,14 | 48:19,23 71:17 |
| 90:18 95:13 | LLC 3:2 | MARSHALL 3:6 | 23:19 26:10 | November 66:12 |
| knowledge 101:4 | LLP 3:7,13,17 | 11:22 29:12 31:2 | Mt 3:3 | 68:9,10 |
| known 5:9 46:19 | location 18:23 19:4 | 34:3 36:16,21 37:3 | multiple 51:5 | NSI 3:15 26:1 29:15 |
| Krutz 3:13 | 87:19 | 38:16 39:11 40:15 | | 29:15,21 34:2 |
| | log 43:3 | 40:21 43:22 47:21 | N | 39:21,25 40:3,12 |
| L | logical 43:13,18 | 54:9,18 55:7 61:2 | | 41:18 48:9,10,11 |
| | logo 59:14 | 65:21 69:17,23 | N 1:2,2 98:1 100:1 | 48:11,25 49:9,24 |
| L 1:2 2:21 102:15 | long 18:20 19:25 | 70:4 79:19 82:21 | name 13:22,23 22:2 | 52:15,25 53:20 |
| label 93:10 | 21:19 30:9 78:18 | 83:14 84:12 91:3 | 33:15 44:13 61:24 | 55:18 56:11 57:9 |
| labored 8:16 | longer 11:4 20:18 | 96:5 97:19 | National 2:12 60:19 | 57:13 59:20 60:25 |
| lack 7:18 10:16 | 83:12 | materials 45:21 | Navigant 5:11,24,25 | 62:20,21 64:14,24 |
| 62:18 96:6 | look 18:8 25:13 | 51:16,19 52:1 | 20:15,16,17,18,21 | 65:16 67:12,22 |
| Lamar 3:13 | 27:12 28:24 35:11 | matter 40:14 41:1 | 20:25 21:5,6,8,11 | 71:5,11 72:7,10 |
| Lane 3:21 | 54:12 56:23 68:20 | 64:9 | 21:20,21 22:2,4,6 | 73:14,21 74:9,9,9 |
| law 73:20,22 | 74:10 80:10,23 | matters 18:5 | 22:9 55:16 59:14 | 74:13 75:1 82:16 |
| lawyer 30:1 | 81:3 87:11 91:17 | MDL 1:5,5 | 75:6 80:6 83:5 | 83:5,21 84:9 85:4 |
| lay 8:7 | 92:9,23 | mean 7:12 12:4 | NE 3:8 | 90:12 91:9 92:9 |
| learn 10:11 48:15 | looked 63:19 79:6 | 33:17 45:19,23 | necessarily 46:23 | 93:19,20 |
| learned 39:15 | looking 22:22 47:5 | 48:13 62:13 68:1 | 68:25 71:20 86:3 | NSI's 37:17 |
| leaving 22:19 46:16 | looks 66:19 | 68:22,23 73:19 | need 9:24 16:15 | NSI/Hilry 83:6,10 |
| leeway 15:21 | lot 58:13 | 78:13 82:25 | 17:20 28:10,12 | 85:25 95:12 96:4 |
| left 5:15,20 6:22 | lumped 56:7,9 | means 67:24 70:9 | 29:2 45:4 67:23 | 96:16 |
| 22:4 23:20 46:9,17 | | 95:14 102:19 | 70:7 | number 13:22 24:10 |
| 74:3 | M | meant 82:17 | needed 30:16,19,20 | 28:22 32:16 33:17 |
| legally 55:20,21 | | medical 6:10 14:2,19 | 30:21 70:10,16 | 43:23 44:15 58:22 |
| Lenox 19:4,11 | mail 50:12 | 14:20 17:7,17,20 | 75:1 | 59:19 62:16 63:21 |
| letter 12:20 15:11,15 | mailed 76:6 | 17:22 27:10 30:19 | needs 32:22 | 72:25 73:22,25 |
| 15:25 17:5,16 45:1 | majority 4:12 | 35:9 42:11 47:4,5 | never 10:9,19 25:3,4 | 75:21 78:2 80:22 |
| 59:2,5,17 60:5,7 | making 14:3 48:17 | 47:11,13 83:1,23 | 63:19 71:11 | 81:4 82:6 85:7,9 |
| 60:14 61:11 62:1,8 | malignancy 47:6 | 83:24 88:3 91:10 | new 3:18 19:3,18 | numbers 62:17 |
| 63:8 78:14 81:8 | manager 5:15,18,22 | medicals 83:12 | 22:2 23:9 51:17 | Nuttycombe 67:7 |
| 94:3 98:22 | 19:17,19 20:1,5 | meet 90:9 | 93:10 94:5 | 69:15 70:2 |
| letterhead 59:7 | 23:8,13,16,21 | mentioned 15:3 | nice 56:21 | N.W 3:18 |
| letters 60:12 63:5,15 | 26:17 43:9 46:9,16 | 49:15 93:13 | Nichols 94:14 95:3 | |
| let's 4:21 13:20 32:8 | 46:21 | mesothelioma 14:10 | nod 10:1 | O |
| 34:11 56:25 58:18 | manual 10:15 81:16 | 17:8,14 | nonmalignant 47:6 | |
| 72:9 73:24 80:24 | 82:6 | met 17:4 26:23 27:1 | 47:14 | O 1:2 100:1 |
| 87:11 | Marc 1:8 2:19 3:20 | 28:5 | nonprivileged 66:4 | object 9:21 11:22 |
| LIABILITY 1:4 | 4:1 66:22 77:16 | Michelle 2:21 | North 4:16 60:19 | 17:24 29:22 34:4 |
| light 31:11 | 98:4 101:13 102:7 | 102:15 | notarization 92:11 | 37:14 38:16 43:23 |
| liked 7:8 | Marcy 3:11 38:15 | middle 76:16 | notarized 86:20 | 55:7 61:3,6 82:21 |
| | 41:17 74:21 76:18 | | notarizing 88:19 | 84:12 96:5 |

objection 21:13,22
   30:3 31:3 36:16,21
   40:23 41:8 47:21
   54:10 79:19
objections 102:4
obligation 66:3
obviously 7:15 31:7
   65:19
occupation 14:1
offer 7:8
office 19:7,9 34:25
   75:6 96:22
offices 19:2
Oh 94:25
Okay 4:21 5:23 6:2
   6:14,22 8:18,22
   10:3 15:23 16:10
   19:18 20:7 23:9
   24:14 25:23 26:1
   30:5 33:24 41:23
   46:25 48:15,19
   49:2 50:20 51:7,21
   53:7 60:2 66:7
   68:8,15 69:4,8
   71:15 76:12 78:5
   78:10,24 80:17
   83:4 84:1 85:22
   87:14,23 88:24
   94:23,24 95:19
once 18:11 50:15
   92:24
ones 68:24
operation 19:8
opportunity 92:9
opposed 21:11 95:10
Oracle-based 13:15
order 30:15 48:22
ordinary 9:19
original 63:1 67:24
   93:25 96:23
ought 8:7
outline 8:15
outlined 15:7 16:17
   16:21
outside 22:20
overall 72:24 74:24
   95:10
overbreadth 41:8
   43:23 47:22
overbroad 41:5 44:1
   84:14
overseeing 23:24
OWENS-ILLINOIS
   2:5

P
PACE 3:20 5:9,14
   5:23,25 7:9,13,17
   18:14,18,24 19:13
   20:15,17,19,25
   21:4,12,15,18
   22:19,20 26:1,10
   46:10 51:16 58:6
   58:15 59:7,9 60:10
   69:13 70:15 74:3
   74:11 75:22 76:1,6
   80:16 83:6 88:11
   89:17 90:12 91:17
package 43:17
packages 43:14 44:6
   49:17
page 1:22 28:25 33:5
   33:6 75:22 77:11
   85:19 89:8 93:7
   98:3,12 99:3 100:3
pages 68:21,23
   69:21 89:12
paid 48:24 50:3,5,22
   51:4,5 57:5,13
   58:5,9 70:8 72:16
   74:5 81:18 82:11
paper 30:22
papers 48:2 92:12
Paragraph 28:24
   91:8,21
paralegal 5:13 6:4
   10:6,8
parent 20:16
Parnell 3:7
part 30:13 45:1 62:5
   78:19 93:24
particular 6:1 11:8
   38:2,6 51:8 52:5
   53:15 59:18 61:16
   64:9,12 72:22 80:1
   86:19 90:11
particularly 31:11
Parties 89:9
party 29:25 30:1
passed 44:15
pathology 14:11
pay 50:25 72:14
   76:19,25,25
payable 67:15 69:11
   70:7 72:12 73:13
   77:23
paychecks 21:11
   22:3
paying 71:6
payment 48:16

70:11 74:22 94:11
payments 19:24
   48:18
Peachtree 3:8
pending 9:14 31:12
Pennsylvania 1:1
   2:16
people 7:4,11,12,17
   11:3 24:5 45:23
   58:11,11 61:5
performing 26:16
period 10:22 11:4
Perry 3:12
person 17:8 30:23
   35:13,15 46:15
   48:3
person's 44:13
Peterson 5:8,9 7:3
Philadelphia 2:16
physical 18:23
picked 63:6
picture 20:21 21:7
place 34:4 46:12
places 7:8
plaintiff 1:17 13:9
   16:3 33:16,18 36:6
   42:3 47:19 53:1
   91:23
plaintiffs 1:11 2:3,10
   3:5 29:1 53:1
   81:15 92:3
plaintiff's 15:4,5
   17:4 27:1 29:25
   34:13 35:22 38:13
   38:25 39:3 41:21
   41:24 42:2 49:11
   50:13 64:23 65:3,6
   65:9,18,23 66:2
   97:14
Plaza 3:7
Pleasant 3:3
please 4:24 31:19
   76:21
plus 44:2
Podstawa 52:8
   56:17 59:6 63:23
   64:8,11
point 21:3,10 22:25
   23:2,10 25:25 26:5
   45:15 50:3 63:16
   75:3 80:2 89:24
   95:21
pointing 66:24
portion 31:21 41:13
   84:19 96:13

position 40:3
possible 90:6 95:5
practice 15:18 16:19
   22:11 30:24 35:6
precipitated 22:18
prefer 82:1
present 3:21 79:16
presenting 28:13
pretty 13:10 17:6
previous 4:15 79:6
pride 8:14
primarily 4:13
Princeton 19:3
print 61:11 63:4
   87:25
printed 85:22 87:24
   88:5
printout 62:11
prior 23:11,13,15
   46:16 86:7
privilege 29:16,17
   29:18 30:3 36:24
   37:13,20 39:13,14
   39:19 55:20,21,25
   56:1 65:17
privileged 34:4
   36:17,22 37:10
   40:2,18 55:12
   65:20,24 83:15
privileges 40:6,13
probably 8:7 62:4
   63:10 77:6 78:3
probate 92:11
procedure 30:24
   35:7 50:21,24 60:9
proceedings 102:4
process 11:10 35:2
   36:8,10 42:10 49:3
   51:1,24 52:1 61:13
   61:19 62:5 94:10
processed 43:12
   62:24 74:1,16
   76:24 78:3 82:10
   88:22 89:19
processing 6:8 12:10
   19:16 23:23,24
   24:3 26:2 27:19
   28:4 32:5 45:9
   47:2 51:22 52:24
   53:2,11 71:12,13
   84:8 86:10 89:21
   90:5 97:11
processor 5:14,17
   10:7,12 13:1 43:10
   45:16 47:3 52:7

processors 11:4
   19:22 26:20 34:16
   34:21 43:3 45:17
   51:18 62:23 67:8
   94:17
Procter 3:17
produce 25:21 29:7
   66:4 76:3
produced 54:16
   65:12
product 29:17 37:9
   39:14 40:5 56:1
PRODUCTS 1:4
project 20:12,13,19
   22:14 23:19 71:8
prolonged 31:8
promotion 46:17,23
   46:24
properly 48:1
provide 73:2 77:19
   79:7 92:3
provided 16:22 17:3
   17:14,23 32:16
   38:13 60:6 74:9
   78:1,4 80:7
provision 47:15
   92:22
Public 2:22 101:23
   102:15
pulled 33:2,3
purpose 29:18
pursuant 2:20 58:5
   64:25 89:16
put 29:12 40:3 43:12
   43:15 58:14
putting 55:22
p.m 2:21 77:13
   97:22

Q
qualification 44:16
qualified 42:11 85:3
Qualifying 87:21
question 7:14 8:8,20
   8:24 9:7,14,15,21
   11:23 18:16 24:22
   26:11 27:14,24
   30:7 31:17 36:25
   37:4,7,11 40:9,10
   40:22 41:10 43:25
   44:4 54:8 55:2,14
   61:7,9 69:6 82:22
   84:14,17 87:2
   92:15,21 96:11
questioning 8:14

40:25
questions 4:12,13
  11:5 15:18 18:2
  32:23 37:6 40:17
  53:17 54:13 55:17
  56:24 94:11 97:18
  97:19
quick 80:23
quickly 9:23 90:3
quit 71:5
quite 35:18 71:9

**R**

R 3:17 100:1
Rajgopal 46:13
RAY 1:10
read 11:1 31:18,21
  40:21 41:10,13
  58:25 84:19 96:13
  101:1
reading 91:4
reads 92:14
ready 72:12 77:8
really 73:10 78:17
reason 31:9 51:8
  63:6
recall 7:21 21:20
  29:9 30:9 36:3
  74:4,17,20 75:3
  85:5 87:18 90:16
receipt 91:9
receive 29:10 30:8
  66:5
received 15:1 18:11
  25:5 33:22 34:15
  42:12 44:24 47:18
  48:4 49:8,11 66:2
  82:10
recognition 21:9
  22:1
recognizable 55:20
recognize 59:9 66:11
  67:2
recollection 44:5
  101:4
reconcile 39:5
reconciliation 81:17
  82:7
record 11:2 14:19,20
  29:13 30:4 40:8
  65:12 69:17,19
  83:23,24
records 47:4,5
refer 62:2 77:4
reference 91:4

referenced 59:18,24
references 60:18
referencing 63:16
  67:21
referred 4:14
referring 57:7 59:22
  65:14 67:17 69:19
  81:7 91:14,18
  93:12 96:8
regarding 83:11
  95:24
regular 10:13 78:1
reject 66:5
relate 52:1 69:1,1
related 83:6,22
relates 1:5 53:20
relationship 26:4
relay 52:6
release 15:1,15 16:1
  16:4,8,11,12,13,14
  16:16,20 17:21
  18:12 30:21 42:2
  42:15,16 43:5,7,20
  44:9,12,17,20 45:2
  45:4 47:19,25 48:4
  49:3,7,21 53:12
  54:1 55:4 70:21,23
  71:1 82:24 86:20
  86:22 87:9 88:20
  88:23
releases 6:11 18:10
  43:11,14 49:16
  59:3 60:6,11,15,20
  60:23 62:24,25
  63:9,13 67:23
  71:16 82:10,13,17
  92:10,19,24 95:25
relevance 53:15
relevant 15:21
remain 81:15
remained 82:8
remember 15:2 21:8
  21:19 74:23 75:8
repeat 18:15 29:3
  31:17 38:4 96:10
rephrase 8:10 9:7
  12:2 92:21
replied 97:1
report 14:12,12,15
  32:2 33:11 47:15
  47:17 71:18,19,22
  71:23 72:5,15,19
  72:20 73:4,11,11
  73:16 74:10 79:13
  79:15,22 80:1,10

80:14,16 85:6,20
  85:23 86:1 87:24
  88:16 89:22
reporter 2:22 9:16
  9:25 31:20 41:10
  41:12 84:18 96:12
  102:21
reports 49:25 50:25
  73:2 84:4
representative 14:25
  29:15 69:13
representatives
  29:22 37:17
represented 44:11
  48:12
reproduction 102:18
request 15:15 16:1,4
  16:11,14 43:21
  44:13,21 45:2,4
  50:9 78:7,9 79:7
  80:13,18
requested 17:15
  31:21 41:13 44:22
  50:15 72:25 81:22
  84:19 96:13
requirement 90:10
requirements 17:4
  17:19
resolution 10:18
resolve 9:14
resolved 11:21,23
  12:4 64:24 86:6,8
respect 16:8 30:25
  40:14 42:5,8 43:19
  45:13 47:1 50:17
  50:21 51:16 53:10
  54:2 60:23 75:4
  82:15 83:10,20
  85:3 86:17 92:19
response 33:2 40:10
  40:11 78:6 79:5
  80:8,18 97:5
responses 9:24
responsibility 11:7
  13:11 23:3,11,23
  50:16
responsible 46:8
  48:17
rest 6:18 89:24
restriction 84:23
restrictions 84:10
returned 92:24
review 6:7 28:10
  32:20 35:8 47:25
  69:19 91:10

revolve 4:14
rhyme 51:8 63:6
Rice 3:2,21 74:18
  77:12
right 10:4 14:6 15:2
  25:2,11 57:5 60:3
  64:1,10,15 66:18
  88:1 91:22,25 92:2
  92:6,16
road 19:6
role 5:15,20,21,22
  10:6 17:2 27:19
  28:4 30:15 47:2
room 6:17,19 10:5
ropes 10:21
routinely 44:20
rules 10:2
running 74:8
R-A-J-G-O-P-A-L
  46:14

**S**

S 98:10 99:1 100:1,1
sanctions 55:11
Saroja 46:13,15
sat 75:5
saw 10:19 25:7
saying 70:6
says 28:25 64:5
  76:17 77:16 92:3
  93:9,25 95:9 97:6
SCAPA 1:13
schedule 62:20
scheduling 90:1
school 4:25
SCL 94:2
SCL's 94:1,1
seal 54:20
second 38:17 93:7
secondary 63:2
seconds 62:6
section 90:21
Security 13:22 44:15
see 35:9,11 47:5 49:2
  51:9 53:19 56:10
  59:25 61:11,25
  74:15 76:18 77:14
  86:22 90:24 92:2
  94:11
seeing 34:17
seek 40:2 55:11 56:1
seeking 95:25
seen 24:14 26:12
  29:4 64:22 65:2,7
  81:6

segregated 69:2
semesters 5:1
send 15:5 16:4,5,6
  16:12 18:12 32:1
  42:1,15 43:16
  44:20 49:17,19
  53:12 59:3 70:19
  70:25 72:16,17
sending 43:14 45:1
  63:9
sense 8:20 40:4 41:1
  43:13,18
sent 16:21 42:16
  48:8 54:1 55:4
  65:9,10 66:12 67:5
  72:18 85:2
separate 49:17
  73:11 78:15 101:6
served 25:1,3
Service 2:12 60:19
services 22:10
set 93:9
settled 14:5,8 17:13
settlement 4:17 5:18
  6:6 9:5 11:14 12:6
  12:14,17,18,20
  15:8,11,14 16:18
  16:22 17:1,5,15
  18:9,9 19:17,19
  20:1,4 23:4,8,9,13
  23:15,21 24:4 26:2
  26:13,16,17 27:6
  27:19 28:4,14
  30:14,16,25 31:3,7
  31:8,10 32:6 33:19
  34:14,22 36:8,14
  38:8 43:2,9,19,20
  44:6 45:10,14,16
  45:17 46:8,9,16
  47:1,3,11,20,23
  51:18,22,24,25
  52:15,25 53:20
  54:3 55:6 57:14
  58:10 59:20 60:16
  61:1,14,18 63:17
  63:18 64:25 67:8
  67:12 71:6,20,25
  72:6,10 73:17,19
  73:20,21,23 74:6
  74:12,18 75:4
  79:17 81:11 83:11
  83:22 84:10 85:4
  85:25 89:17 91:5
  94:2 96:4,17 97:8
settlements 5:15,22

11:16 17:25 18:2
19:20 23:23,25
53:2,9,10 60:25
67:20 97:12
**setup** 61:13,21
**Shackelford's** 34:25
**shared** 64:23
**Sharon** 70:2
**sheet** 44:11 101:7
**short** 34:8 38:21
39:22 51:13 57:2
80:25 81:1
**Shorthand** 2:22
**show** 10:21 24:9
53:15
**side** 46:10 74:3
**sign** 42:3
**signatory** 59:5
**signed** 30:20
**significance** 78:17
**silly** 8:19
**similar** 7:6
**single** 43:14
**site** 6:9 30:20 42:12
87:13
**sites** 14:1 87:16,18
**sitting** 97:13
**Social** 13:22 44:14
**sole** 37:15
**solely** 47:13,14,16
**somebody** 10:20
15:10 32:4 46:2
62:1,9 94:10
**soon** 90:6
**sorry** 18:15 33:6
60:2 77:6 81:23
**sort** 10:9 35:3 50:20
59:2 92:12
**Sounds** 9:1
**South** 3:3,13
**SOUTHERN** 1:7
**speak** 9:18 46:5 75:1
**speaks** 84:13
**specific** 35:13 42:5
46:2 73:1
**specifically** 60:14
96:19
**spelling** 46:14
**spite** 83:15
**spouse's** 13:23
**stamped** 32:17
**standard** 15:24
16:25
**standards** 90:4
**start** 4:21 21:11 28:1

**started** 5:5 6:19 10:4
18:24 59:13
**state** 30:22 48:2
65:11 87:20
**stated** 16:24
**states** 1:1,6 17:7
70:7 86:20 87:21
**status** 77:18 79:8
82:5
**stay** 72:15,19
**stayed** 6:25
**stenographic** 102:6
**steps** 47:19 51:25
**Steve** 34:25
**stipulate** 40:8
**stipulation** 54:19
83:16
**stop** 36:8 71:12
**Street** 3:8,13
**Strigel** 1:8 2:19 3:20
4:1,8 29:14 32:17
33:15 51:15 59:19
66:22 85:7,9 98:4
98:18 101:13
102:7
**Strigel-1** 24:7 98:13
**Strigel-10** 78:12
82:6 99:14
**Strigel-11** 93:4
99:17
**Strigel-12** 94:20,22
99:19
**Strigel-13** 95:16
99:21
**Strigel-2** 32:11
98:16
**Strigel-3** 54:25
98:20
**Strigel-4** 58:20
98:22
**Strigel-5** 66:9 99:4
**Strigel-6** 68:17 99:6
**Strigel-7** 75:19 99:8
**Strigel-8** 76:14
99:10
**Strigel-9** 77:2 99:12
**subject** 9:4 31:13
41:1 53:21 56:3,4
64:4,9 97:17
**submission** 34:10,12
38:7 42:23 44:24
**submissions** 33:22
33:25 34:25 35:19

35:22 36:3 42:24
96:23
**submit** 39:3 50:25
**submitted** 44:21
82:13 83:21 84:9
85:24 88:9,14
89:16,19 90:20
97:7
**subpoena** 24:12,16
25:1,19 33:2
**Subscribed** 101:17
**substituted** 43:25
**substitution** 65:4
**substitutions** 58:11
65:7,15
**Suite** 2:20 3:13
**summer** 20:2,8,10
22:19
**Summerlin** 3:12
67:5
**Suntrust** 3:7
**supervision** 102:20
**supervisor** 52:4,12
52:13,18,20,20,22
**supervisors** 52:9,10
**supplied** 13:8 49:25
**supply** 76:23
**supported** 47:6
**suppose** 97:2,8
**supposed** 6:13 18:5
9:9 14:3,6 19:21
20:6 21:1,6 25:13
26:8 33:4 34:7
39:11 42:10 44:1
47:25 51:12 52:11
52:19 65:8 76:7,9
78:8 84:3
**surprise** 75:10,16,17
**surrounding** 7:21
**sworn** 4:2 101:17
**system** 11:2 13:7,10
13:12,15,16,18
14:19,23 26:22,24
30:13 35:14 43:4
48:5 49:4 51:20,22
51:23 59:2 61:10
61:13,21 62:1,8,12
89:23 93:14
**S-A-R-O-J-A** 46:14

**T**

**T** 1:2 98:10 99:1
100:1,1
**tabbed** 68:24

**tag** 61:22 62:6,18
94:4,4
**tagged** 61:17
**tagging** 61:14 62:4
93:14
**take** 9:13,13,15,25
10:20 13:7 19:20
23:21 28:9,12
35:25 36:19 38:24
47:20 51:3 56:25
71:11 74:13 80:22
80:24
**taken** 2:19 5:11 8:5
102:6,7
**talk** 39:20 61:3 92:8
**talked** 9:3 83:16
**talking** 27:6 31:6
41:2 48:11 64:13
64:19 94:6 95:11
**talks** 60:15 91:2,8
92:23
**Tardy** 3:13
**tell** 4:22 5:3 6:4 13:4
20:20 24:23 26:19
37:5 38:25 48:20
49:21 59:17 60:22
62:14,22 63:19
64:4 74:14 89:11
92:1,23
**telling** 63:14 74:21
93:15
**tells** 67:21
**term** 4:18 7:18 10:17
12:16 62:19 69:11
69:12 72:13
**termed** 58:6 64:24
**terminology** 79:20
**terms** 9:3,5 12:23
58:13 64:14 90:16
91:16
**testified** 4:2
**testimony** 25:2
31:22 38:20 39:6
41:14 84:20 96:14
**Thank** 40:15 70:4
95:5
**thanks** 4:10 21:23
85:12
**thing** 29:3,13 34:14
35:3 68:20 92:12
**things** 6:4 11:1 35:5
51:20 74:4
**think** 4:14 5:16 6:16
7:22 13:23 15:3

25:16,24 26:9,10
27:4 31:5,9 37:1
37:18,19,22 41:2,4
41:7 43:25 45:25
46:1 49:23 52:23
58:10,12,16 61:3
63:8 66:3 71:17
77:24 79:1 83:17
84:2,14 88:18
90:23 97:17
**third** 29:25 30:1
85:19
**thought** 51:1 62:6
63:10 74:24 97:2
**three** 66:22,25
**Thursday** 85:15
**time** 5:7 6:18 9:12
11:5,13 20:4,22
21:3,4,9,10,17
22:4,7,25 23:2,10
23:14 25:7 26:1,5
28:9,12 30:9 43:5
45:15 46:1,2,9
49:19,24 51:10
52:11 60:10 61:19
61:23 63:16 67:10
68:2,5 69:24 71:5
71:9,10 72:17 75:3
76:8,8 77:21 85:1
86:19 88:1,4 89:20
90:13 91:16 92:23
**timeliness** 27:12
91:11
**title** 62:11
**today** 4:9,13 19:5
29:8 95:11
**told** 6:2 11:5 25:4
26:22 36:10,19
41:17,18,20 61:19
70:18,24 71:15
76:24
**tomorrow** 86:10
**tool** 12:25
**top** 78:25 93:7
**total** 28:22 57:12
74:8 95:7
**touch** 95:24
**track** 93:16
**training** 10:13,25
51:16,17
**transcript** 3:25
101:1 102:9,18
**trip** 9:7
**true** 101:3 102:8
**try** 8:10 37:4 38:22

41:5,11 43:12
44:16 48:21
**trying** 9:7
**turn** 5:10
**turnaround** 90:7
91:16
**two** 5:16,21 6:16
11:17,18 12:22
45:23 57:22 58:12
62:6 66:14 68:21
68:23
**type** 7:6 61:22 75:25
**typed** 67:2
**typical** 60:9
**typically** 15:13

**U**

**U** 100:1
**Ultimately** 58:14
**unapproved** 84:6
**uncomfortable** 9:2
**underneath** 52:14
**understand** 8:9,10
15:13 20:14 25:25
26:5 34:20 45:6,13
48:13 49:2 50:1
69:12 81:10 88:7
88:18 95:8
**understanding**
20:24 40:16 68:5
**understood** 8:24
68:2 90:11
**unfortunately** 62:12
**uniform** 44:2
**Union** 53:8,11 54:2
55:5 64:19 93:19
93:20
**unique** 52:3
**unit** 5:25 6:1 20:17
**UNITED** 1:1,6
**unpaid** 77:17 81:15
82:5,8
**updates** 49:9
**upgrade** 90:20
**up-to-date** 77:17
82:4
**use** 26:15 28:7,21
40:11 51:19 61:5
82:2 93:25
**usual** 15:25
**Usually** 17:6 90:6
**utilized** 51:17 84:7

**V**

**vague** 11:24 31:12

61:5
**valid** 30:2,21
**value** 12:6,9,13 13:2
38:1,6 74:16
**values** 39:1,7 97:14
**various** 19:22 24:5
33:13 49:23
**verbal** 9:25
**verify** 80:4
**version** 24:18,19,21
24:24
**versus** 81:17
**VI** 1:4
**volume** 11:12
**vs** 1:12,18 2:4,11

**W**

**wait** 38:17 49:18
**waiting** 72:13 73:14
74:5
**waive** 29:17 39:12
40:4
**waived** 37:21 40:12
90:14
**waiver** 37:20
**walk** 10:20
**Wallace** 67:7 69:14
70:2,6
**want** 9:9,12 12:1
14:11,15 24:24
28:1 30:3 31:2
32:19 37:3 39:12
40:23 41:9 44:12
45:10 57:24 68:19
68:20 73:10 77:3
93:6
**wanted** 74:24
**wants** 76:18
**Washington** 3:18
**wasn't** 22:2 27:1
35:15 44:23 51:7
80:7
**Watkins** 3:12
**way** 6:20 16:25
42:25 44:6 49:20
52:4 61:12,21 70:5
81:14 86:13 93:14
93:16
**Wednesday** 2:17
**weekly** 49:25 71:18
71:19,21,23 72:5
72:15,19,20 74:10
**weeks** 96:22
**went** 5:8 7:8 10:9,23
10:24 13:5 15:16

15:25 18:14,18
36:22 43:21 45:22
51:1 63:15 65:22
87:16
**weren't** 12:8 16:24
23:22 38:12
**we'll** 9:13 54:18
**we're** 9:9 31:5 53:22
64:13 69:18
**we've** 4:14 27:6 74:1
89:7 95:11
**William** 3:17 87:11
**wind** 50:22
**wish** 9:21 72:2
**witness** 15:24 25:12
28:17 30:5 31:23
32:1 37:10 41:15
44:5 45:25 47:24
58:1 59:1 61:3
69:8 70:1,5 77:3
79:21 82:24 84:21
85:12 87:3 96:10
96:15 97:20 98:3
**wording** 74:24 84:5
**words** 70:14
**work** 5:3,8,12 7:6,9
11:2 13:25 22:10
24:3 29:17 35:10
37:9 39:13 40:5
46:22 52:14,15
55:25 72:11 90:2
95:7
**worked** 5:6,13,14
6:3,3,17,20 7:12
7:22 14:1 26:1
32:5 48:20 49:20
49:22 69:14 71:8
90:3
**working** 5:2,5 6:1
7:5,17 8:15 18:24
20:15,15,18 24:2
26:21 34:17,17
72:7 97:14
**works** 51:22,23
**worksite** 83:2
**wouldn't** 42:16
44:10 49:16 58:14
62:22 70:19,25
75:10 77:24 86:21
87:8 88:15 97:16
**wound** 19:14
**write** 22:16 67:14
**writing** 22:23
**written** 8:15 12:17
16:24 21:17

**wrong** 45:15 59:14
**wrote** 77:22

**X**

**X** 98:1,10 99:1

**Y**

**yeah** 7:11 12:17 22:6
25:10 28:12,17
51:6,23 58:1 59:1
60:11 68:10 69:7
76:3 77:5 80:2
81:21 87:5
**year** 6:17 18:22
19:14 20:8 75:7
**years** 5:16,21 6:15
6:16 8:16 14:1
18:4 24:5 31:9
45:12
**Yep** 59:16,16 69:16
77:9 93:8
**York** 3:18

**$**

**$1,000** 57:5
**$22** 57:17
**$275,000** 67:15

**0**

**07** 20:2,8,10

**1**

**1** 24:10 27:4 100:4
**1/3/6** 98:22
**1:05** 2:21
**10** 45:11 80:11 82:6
85:7,9
**100** 3:13
**11/1/2001** 60:15
61:12
**114** 75:5
**12** 89:8,8,11
**12:48** 77:13
**128** 32:18
**128-152** 98:18
**1301** 2:20
**15** 45:11,12
**1500** 2:20
**152** 32:18
**17** 77:13
**18** 2:17 101:2 102:8
**1994** 4:25
**1996** 5:6

**2**

**2** 28:24 32:9 33:17
80:22 81:4
**2,000** 44:2
**20** 45:11,12 63:4
101:19
**200** 3:13
**20001** 3:18
**2001** 5:7 62:4
**2004** 20:22 21:4 22:2
94:17
**2005** 52:21 66:13
68:9,11
**2006** 21:25 60:10
70:3 85:16,17
86:17 89:15
**2007** 22:19 25:2
77:13
**2009** 2:17 101:2
102:8
**202** 3:19
**216-9100** 3:4
**24** 98:13
**28** 3:3
**28th** 85:15
**29465** 3:3

**3**

**3** 63:21
**30** 90:8 91:15
**303** 3:8
**30308** 3:8
**32** 98:16
**346-4000** 3:19
**39201** 3:14

**4**

**4** 58:22 59:19,24
62:16 98:5
**4:04** 97:22
**4000** 3:7
**404** 3:9

**5**

**5-minute** 51:11
**54** 98:20 100:4
**58** 98:22

**6**

**60** 90:8 91:9,15 92:4
**601** 3:14
**614-7591** 3:9
**66** 99:4
**68** 99:6

**7**

Marc Strigel   February 18, 2009

| | | | | |
|---|---|---|---|---|
| **7** 70:3 75:21 | | | | |
| **74** 89:9,10,12,18 | | | | |
| **75** 99:8 | | | | |
| **76** 99:10 | | | | |
| **77** 99:12 | | | | |
| **78** 99:14 | | | | |
| **8** | | | | |
| **843** 3:4 | | | | |
| **875** 1:5 | | | | |
| **9** | | | | |
| **9** 68:9,10 91:8,21 | | | | |
| **9th** 66:12 | | | | |
| **9:40** 70:3 | | | | |
| **90** 90:8 91:15 | | | | |
| **901** 3:18 | | | | |
| **93** 99:17 | | | | |
| **94** 99:19 | | | | |
| **95** 99:21 | | | | |
| **973-8991** 3:14 | | | | |