Filed 7/9/09  Ransford v. Griffin Wheel CA1/2
### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALVA RANSFORD et al.,<br><br>   Plaintiffs and Appellants,<br>v.<br>GRIFFIN WHEEL COMPANY, INC.,<br>   Defendant and Respondent. | A121620<br><br>(San Francisco County<br>Super. Ct. No. CGC-07-274342) |

Plaintiff Alva Ransford is dying of mesothelioma he claims is caused by asbestos encountered in 39 years of repairing and replacing brakes on locomotives and rolling stock owned by the Union Pacific and Southern Pacific railroads. For 15 of those 39 years, plaintiff came into contact with a type of brake shoe containing asbestos that was manufactured by defendant Griffin Wheel Company, Inc. Joined by his wife, Ora Myrtle Ransford, plaintiff filed a complaint for damages against Griffin in August 2007. The trial court granted Griffin's motion for summary judgment after concluding that "pursuant to the Locomotive Boiler Inspection Act and the Safety Appliances Act, the plaintiffs' causes of action are preempted" by these federal statutes. We affirm.

Notwithstanding its singular noun, the Locomotive Boiler Inspection Act (BIA) is actually a number of statutes passed by Congress that are now collected at title 49 United States Code Sections 20701-20703. The BIA gives the Secretary of Transportation authority over "the condition of every locomotive and tender and its parts and appurtenances." (49 U.S.C. § 20702(a).) There was no dissent when, in 1926, the United States Supreme Court, speaking through Justice Brandeis, held that the BIA "extends to

1



the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." (*Napier v. Atlantic Coast Line* (1926) 272 U.S. 605, 611 (*Napier*).) Because Congress intended this power to be federally exclusive, "requirements by the states are precluded, however, commendable or however different their purpose." (*Id.* at p. 613.) In 2000, affirming a decision by this court, our Supreme Court held that the BIA precluded maintenance of state common law damage suits by former railroad workers against a locomotive manufacturer for personal injury allegedly caused by exposure to asbestos in the manufacturer's products. (*Scheiding v. General Motors Corp.* (2000) 22 Cal.4th 471, 474, cert. denied (2000) 531 U.S. 958 (*Scheiding*).)

The Safety Appliances Act (SAA) is also a number of statutes now codified at title 49 United States Code sections 20301-20306. The SAA has grown in scope and now governs "common carriers by railroad engaged in interstate commerce. The Act of 1893 applied only to vehicles used by them in moving interstate traffic. [Citation.] Its requirements were by the Act of 1903 extended to all their vehicles. [Citation.] So far as the safety equipment of such vehicles is concerned, these Acts operate to exclude state regulation, whether consistent, complimentary, additional or otherwise." (*Gilvary v. Cuyahoga Valley. Ry.* (1934) 292 U.S. 57, 60-61.) In 1999 our Supreme Court held that the SAA preempted state common law claims for defective design of safety equipment on railway rolling stock. (*Carrillo v. ACF Industries, Inc.* (1999) 20 Cal.4th 1158, 1160, cert. denied, *sub. nom.* (2000) 528 U.S. 1077 (*Carrillo*).)

Brakes on railroad cars clearly qualify under the BIA as an "appurtenant" to those cars, and as "safety equipment" under the SAA.[1] Thus, after *Scheiding* and *Carrillo*, this

---

[1] We confess to some surprise at plaintiffs' argument that the brake shoes manufactured by Griffin do not qualify as a "safety appliance" within the meaning of the SAA. If the means of stopping thousands of tons of train does not qualify as a safety appliance, we would be hard pressed to imagine what would. Plaintiffs' argument is based on statutory language, in that "The SAA lists specific safety equipment to be used on rail cars, including automatic couplers, secure sill steps, efficient *hand* brakes, secure ladders, running boards, handholds, grab irons, drawbars, and power brakes sufficient to stop the train. (49 U.S.C. § 20302(a).)" Even on this limited front, plaintiffs' argument must fail because the SAA specifies that "enough of the vehicles on the train" must have

2

appeal might appear to call for a routine application of the familiar principle of *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455: "Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. . . . The decisions of this court are binding upon and must be followed by all the state courts of California." It was so treated last year by Division Four of this district, in a case brought by the same counsel who represent plaintiffs here. That case is *Frastaci v. Vapor Corp.* (2007) 158 Cal.App.4th 1389 (*Frastaci*), which held that state common law tort claims against a locomotive manufacturer alleging that former railroad repairman died of mesothelioma caused by exposure to asbestos in locomotives during repair and maintenance are preempted by BIA as interpreted in *Scheiding*. Our Supreme Court denied review.

Despite that, plaintiffs advance a series of novel arguments to avoid that conclusion.

Plaintiffs first assert that "implied field preemption under the SAA and BIA *no longer exists*" because "Congress in 1970 passed a new, comprehensive act to govern *all* areas of railroad safety—including the subcategories that had been governed by the SAA (rail-car appliances) and the BIA (locomotives). This new act, the Federal Railroad Safety Act (FRSA), *expressly* applies to *all railroad-safety areas*—thus including rail-car appliances and locomotives. And the FRSA contains an *express* preemption provision, which preempts *only* those state laws addressing a subject matter on which federal

---

"power or train brakes so that the engineer on the locomotive . . . can control the train's speed without the necessity of brake operators using the common hand brakes for that purpose." (*Id.* § 20302(a)(5)(A).) Thus, notwithstanding plaintiffs' emphasis on hand brakes, it is clear beyond doubt that Congress intended the SAA to include the major, primary system for controlling train speed. Moreover, plaintiffs pay no attention to the BIA's "appurtenant" language, which would seem more than broad enough to cover brakes that are not hand held. The Secretary of Transportation certainly thought so when promulgating numerous regulations governing railroad brakes, citing the SAA as among the statutes authorizing such regulations. (See 49 C.F.R. §§ 232.1-232.505, 238.1-238.603.)

regulations exist."[2] "[B]ecause *Carrillo* and *Scheiding* did not consider the effect of the FRSA's express preemption provision, they do not stand for the proposition that former SAA and BIA field preemption still exists despite Congress's express, contrary intent in the FRSA. And thus *Carrillo* and *Scheiding* do not prevent this Court from considering the issue for the first time in California."

To hear plaintiffs frame the issues, one might conclude that the SAA and BIA had been repealed when Congress enacted the FRSA (49 U.S.C. §§ 20106-20167). However, Congress did no such thing, as was expressly noted in *Scheiding*: "[W]hen Congress enacted the Federal Railroad Safety Act in 1970, it specifically identified the BIA [and the SAA] as among the 'particular laws' governing railroad safety that 'have served well,' so well that the Committee on Interstate and Foreign Commerce reviewing the matter 'chose to continue them without change.' (H.R. Rep. No. 91-1194, 2d Sess. (1970), reprinted in 1970 U.S. Code Cong. & Admin. News, p. 4105.) ... Additionally, when Congress recodified the BIA in 1994, the House Report stated 'this bill makes no substantive change' and disclaimed any intent to 'impair the precedent value of earlier

---

[2] The particular language upon which plaintiffs rely—and which we have italicized—is in a provision that currently reads: "A State may adopt or continue in force a law, regulation, or order relating to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters) prescribes a regulation or issues an order covering the subject matter of the State requirement. *A state may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security* when the law, regulation, or order—[¶] (A) is necessary to eliminate or reduce an essentially local safety or security hazard; [¶] (B) is not incompatible with a law, regulation, or order of the United States Government ; and [¶] (C) does not unreasonably burden interstate commerce." (49 U.S.C § 20106(a)(2), italics added.)

Notwithstanding the literal language about a state's "law, regulation or order," it is accepted that federal preemption also extends to state common law tort causes of action. (E.g., *CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 664; *Scheiding, supra,* 22 Cal.4th 471, 476-477 & fn. 3, 480; *Carrillo, supra,* 20 Cal.4th 1158, 1162.) Plaintiffs do not contend otherwise.

judicial decisions . . . .' (H.R. Rep. No. 103-180, 1st. Sess. (1993) reprinted in 1994 U.S. Code Cong. & Admin. News, p. 822.)"[3] (*Scheiding, supra*, 22 Cal.4th 471, 478.)

Noting the same 1970 committee report, the *Carrillo* court stated: "Because Congress continued the SAA intact and unmodified within its historic regulatory area, our conclusion as to its preemptive effect is not affected by passage of the FRSA. Since the SAA preempts plaintiff's tort claim, we have no occasion to consider whether the FRSA does also." (*Carrillo, supra*, 20 Cal.4th 1158, 1169, fn. 3.) It is therefore clear beyond any reasonable doubt that both the SAA and the BIA continue to have an existence and potency that is completely independent of the FRSA[4]—a reality recognized by our Supreme Court in *Scheiding* and in *Carrillo*.

---

[3] The 1970 committee report also stated: "The first of the Safety Appliance Acts dates back to 1893 . . . and the Locomotive Inspection Act to 1911. These and other rail safety statutes have been reasonably effective in their respective areas. They were enacted to protect employees against particular hazards and the enforcement of their provisions over the years has saved lives." (H.R. Rep. No. 91-1194, *supra*, reprinted in 1970 U.S. Code Cong. & Admin. News, p. 4106.) At a later point in its report, the committee reiterated its "intent that those existing statutes will continue to be enforced . . . in their respective areas . . . . In other words, it is the intent of the committee that the existing statutes continue to be administered and enforced *as if this legislation had not been enacted.* . . . It is the desire of the committee . . . that the Department [of Transportation] makes its best effort to carry out the new statute *in concert with the existing regulatory framework.*" (*Id.* at p. 4114, italics added.) The 1994 "House report"—actually from the Committee on the Judiciary—stated that the purpose of the measure was to "revise, codify, and enact *without substantive change* certain general and permanent laws relating to transportation." (H.R. Rep. No. 103-180, *supra*, reprinted in 1994 U.S. Code Cong. & Admin. News, p. 818, italics added.) In the 648 pages in the United States Code Congressional and Administrative News devoted to the subject of the bill—"Revision of Title 49, U.S.C."—there is only a single brief reference to section 20106, which does not even mention the "clarification" upon which plaintiffs' place so much emphasis. (See *id.* at p. 898.)

The SAA was also recodified in the same 1994 enactment that recodified the BIA. (Pub. Law 103-272 (July 5, 1994) 108 Stat. 745.)

[4] This conclusion defeats plaintiffs' corollary argument that there is no preemption because there is no specific federal regulation governing asbestos brake shoes on locomotives and rolling stock. On this point we note that the FRSA preemption provision upon which plaintiffs rely prohibits state input if it unreasonably burdens

5

Plaintiffs point to two old decisions by the Supreme Courts of Washington and Pennsylvania in support of their contention that the SAA and the BIA were effectively nullified by passage of the FRSA: *State v. Chicago, Milwaukee, St. Paul & Pacific R. Co.* (Wash. 1971) 484 P.2d 1146; *Norfolk & W. Ry. Co. v. Pa. Public Utility* (Pa. 1980) 413 A.2d 1037. Neither case has been followed by any other; indeed, the only reported decision to consider both of these state authorities peremptorily rejected them as marking a sea change in federal policy. (See *Missouri Pacific R. Co. v. Railroad Com'n of Texas* (5th Cir. 1987) 833 F.2d 570, 576, fn. 7.)[5]

Moreover, the Pennsylvania decision cited by plaintiffs was not followed by a Pennsylvania federal district court, a decision affirmed by the United States Supreme Court: *Consol. Rail Corp. v. Pennsylvania Pub. Util.* (E.D.Pa. 1982) 536 F.Supp. 653, affirmed (3d Cir. 1982) 696 F.2d 981, affirmed *sub nom. Pennsylvania Public Utility Commission et al. v. Consolidated Rail Corporation* (1983) 461 U.S. 912 (*Consolidated Rail*).) *Consolidated Rail* was discussed at length in *Scheiding*, the Supreme Court noting that in it the state of Pennsylvania contended that when Congress enacted the FRSA, it " 'redistributed railroad regulatory authority so that the total-preemption test of the [BIA] is no longer valid.' [Citation.] The district court rejected the state's argument and found *Napier* controlling." (*Scheiding, supra,* 22 Cal.4th 471, 477.) And, the *Scheiding* court observed, the United States Supreme Court's summary affirmance " 'should . . . be understood as . . . applying principles established by prior decisions to the particular facts involved.' [Citation.] We thus have strong, if indirect evidence *Napier* continues to control with respect to the scope of BIA preemption." (*Id.* at p. 478.)

---

interstate commerce (49 U.S.C. § 20106(a)(2) quoted at fn. 2, *ante*), and our Supreme Court in *Scheiding* endorsed our conclusion that imposing state tort liability for asbestos-related damages would have such a consequence. (*Scheiding, supra,* 22 Cal.4th 471, 476-477.)

[5] Respondent filed a request seeking judicial notice of other decisions from foreign states and other items, which request was opposed in part by appellants. Respondent's request is granted as to items numbered 3, 4, 5, and 6, and denied as to the balance.

Whatever the precise holding of the Pennsylvania district court—a point much discussed at oral argument—the bottom line is that the end result of that litigation has been construed by our Supreme Court, and we are bound by that construction. Thus, whatever persuasive impact the Washington and Pennsylvania state court decisions might otherwise offer—and we can discern none—our own state Supreme Court's contrary decisions in *Carrillo* and *Scheiding* foreclose the issue for us. (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d 450, 455.) Plaintiffs' initial argument must be rejected.

Plaintiffs also see significance in the fact that in 2007, after *Carrillo* and *Scheiding*, Congress reenacted the FRSA with the following language added to the preemptive language quoted at footnote 2, *ante*: "Clarification regarding State law causes of action.—(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

"(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

"(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

"(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2)." (49 U.S.C. § 20106(b).)

Plaintiffs argue that because this "clarification" involves language not considered in either *Carrillo* or *Scheiding*, we are no longer bound to follow these decisions. But plaintiffs assume a predicate—that the FRSA displaces either the SAA or the BIA— which has already been shown to be inapplicable. To accede to plaintiffs' argument would require us to conclude that Congress intended with this "clarification" to repeal by implication both the SAA and the BIA, something expressly denied. (See fn. 2 and accompanying text, *ante*.)

Plaintiffs see *Sprietsma v. Mercury Marine* (2002) 537 U.S. 51 (*Sprietsma*), as effecting a sea change in federal preemption analysis. We do not. *Sprietsma* involved neither the SAA nor the BIA, but the Federal Boat Safety Act (46 U.S.C. §§ 4301-4311). The United States Supreme Court held that a state tort action was neither expressly nor impliedly preempted by that measure. However, it seems clear that the reason the court acted was to resolve an extensive conflict in lower courts on the preemption issues. (See *Sprietsa, supra,* at p. 55 & fn. 3.) Nothing in the opinion hints at the fundamental shift in preemption analysis that plaintiffs discern. Moreover, plaintiffs can muster no authority recognizing that such a doctrinal shift occurred. For present purposes, *Sprietsma* is relevant only to the extent the Court held that the "structure and framework" of the federal act "do not convey a 'clear and manifest' intent" to preempt any supplementary efforts by state law. (*Id.* at pp. 69-70.) As already shown, the court concluded otherwise with respect to the SAA and the BIA.

In a similar vein, plaintiffs' argue that in *Terminal Assn. v. Trainmen* (1943) 318 U.S. 1, the United States Supreme Court "pulled back" from its earlier holdings about the preemptive impacts of federal railway laws. Our own Supreme Court rejected a similar argument in *Carrillo, supra,* 20 Cal.4th 1158, 1166. We also think it significant that the United States Supreme Court declined to review either *Carrillo* or *Scheiding*, and that in the more than 50 years after *Terminal Assn.* there is no authority plaintiffs have cited acknowledging the reading they attribute to that decision.[6]

Plaintiffs' second argument is that the SAA and the BIA confer immunity only when the train is actually "in use," but not the downtime when it is being repaired or refitted with new brakes. Counsel for plaintiffs candidly acknowledge that this argument

---

[6] Subsequent to the filing of their reply brief, plaintiffs advised us by letter that they "inadvertently omit[ted] reference" to *Wyeth v. Levine* (2009) __ U.S. __ [129 S.Ct. 1187], but they do not otherwise discuss the relevance or application of *Wyeth* to this appeal. We have examined *Wyeth*—where the United States Supreme Court found that a state tort action for inadequate warning of a drug was not preempted by reason of the Food and Drug Administration's authority over drug labeling—and found nothing which alters our analysis.

8

was rejected by Division Four when he presented it in *Frastaci*, but he re-presents it in the hope we will reach a different result. Division Four reasoned that "Scant authority discussing the 'in use' limitation vis-à-vis the preemptive scope of the BIA exists. What authority does exist suggests that the 'in use' limitation is immaterial to a BIA preemption analysis." (*Frastaci, supra*, 158 Cal.App.4th 1389, 1399.) After reviewing that authority, the court concluded: "The preemptive scope of the BIA 'extends to the design, the construction and the material of every part of the locomotive and tender and of all its appurtenances.' (*Napier, supra*, 272 U.S. at p. 611.) There is no indication Congress intended the BIA's broad preemptive scope to be circumscribed by the location of the locomotive. Rather, the BIA is directed at the *subject* of the locomotive equipment, which is 'peculiarly one that calls for uniform law . . . .' (*Penna. R.R. Co. v. Pub Service Comm.* (1919) 250 U.S. 566, 569); see also *Napier, supra*, 272 U.S. at p. 612.)" (*Id.* at p. 1402.) We agree with this reasoning.

The summary judgment is affirmed.

                                                                                                 Richman, J.

We concur:

Kline, P.J.

Haerle, J.