| 110TH CONGRESS | | REPORT |
|---|---|---|
| 1st Session | HOUSE OF REPRESENTATIVES | 110–336 |

# FEDERAL RAILROAD SAFETY IMPROVEMENT ACT OF 2007

SEPTEMBER 19, 2007.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. OBERSTAR, from the Committee on Transportation and Infrastructure, submitted the following

# R E P O R T

[To accompany H.R. 2095]

[Including cost estimate of the Congressional Budget Office]

The Committee on Transportation and Infrastructure, to whom was referred the bill (H.R. 2095) to amend title 49, United States Code, to prevent railroad fatalities, injuries, and hazardous materials releases, to authorize the Federal Railroad Safety Administration, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Federal Railroad Safety Improvement Act of 2007".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.

TITLE I—FEDERAL RAILROAD SAFETY ADMINISTRATION

Sec. 101. Establishment of Federal Railroad Safety Administration.
Sec. 102. Railroad safety strategy.
Sec. 103. Reports.
Sec. 104. Rulemaking process.
Sec. 105. Authorization of appropriations.

TITLE II—EMPLOYEE FATIGUE

Sec. 201. Hours of service reform.
Sec. 202. Employee sleeping quarters.
Sec. 203. Fatigue management plans.
Sec. 204. Regulatory authority.
Sec. 205. Conforming amendment.

TITLE III—PROTECTION OF EMPLOYEES AND WITNESSES

Sec. 301. Employee protections.

59–006



27

sisting of representatives of such entities and families, representatives of passenger rail carrier employees, and representatives of such other entities as the Secretary considers appropriate.

(b) MODEL PLAN AND RECOMMENDATIONS.—The task force established pursuant to subsection (a) shall develop—

(1) a model plan to assist passenger rail carriers in responding to passenger rail accidents;

(2) recommendations on methods to improve the timeliness of the notification provided by passenger rail carriers to the families of passengers involved in a passenger rail accident;

(3) recommendations on methods to ensure that the families of passengers involved in a passenger rail accident who are not citizens of the United States receive appropriate assistance; and

(4) recommendations on methods to ensure that emergency services personnel have as immediate and accurate a count of the number of passengers onboard the train as possible.

(c) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall transmit to Congress a report containing the model plan and recommendations developed by the task force under subsection (b).

PURPOSE OF THE LEGISLATION

H.R. 2095 reauthorizes the Federal Railroad Administration and establishes safety measures to prevent railroad fatalities, injuries, and hazardous materials releases.

BACKGROUND AND NEED FOR LEGISLATION

The Subcommittee on Railroads, Pipelines, and Hazardous Materials has jurisdiction over rail safety and programs administered by the Federal Railroad Administration ("FRA"). The FRA is one of 10 modal agencies within the U.S. Department of Transportation ("DOT"). It was created in 1966 by the Department of Transportation Act, when all safety responsibilities of the Interstate Commerce Commission were transferred to the DOT.

The FRA's safety responsibilities were further enhanced by the Federal Railroad Safety Act of 1970, the Federal Railroad Safety Authorization Act of 1973, the Federal Railroad Safety and Hazardous Materials Transportation Amendments of 1974, the Federal Railroad Safety Authorization Act of 1976, the Federal Railroad Safety Amendments Act of 1978, the Federal Railroad Safety Authorization Act of 1980, the Railroad Safety and Service Improvement Act of 1982, the Rail Safety Improvement Act of 1988, the Railroad Safety Enforcement and Review Act of 1991, and the Federal Railroad Safety Authorization Act of 1994.

One of the main responsibilities of the FRA is to promulgate and enforce rail safety regulations. It also conducts research and development in support of improved rail safety. In addition, the FRA has a number of responsibilities relating to rail security, including assessing civil and criminal penalties for actions that impair or impede the operation of railroad equipment.

The FRA has the authority to issue regulations and orders pertaining to rail safety and security and to issue civil and criminal penalties to enforce those regulations and orders. Under current law, all laws, regulations, and orders related to rail safety and security must be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to rail safety or security until the Secretary of Transportation or the Secretary of Homeland Security prescribes a regulation or issues an order covering the subject matter of the State require-

28

ment. A State may adopt or continue in force an additional or more stringent law, regulation, or order only in instances where the law, regulation, or order is necessary to eliminate or reduce an essentially local safety or security hazard; is not incompatible with a law, regulation, or order of the United States Government; and does not unreasonably burden interstate commerce.

The preemption standard has been a concern among some states and localities that have tried to adopt regulations requiring trains to operate at slower speeds and railroads to re-route hazardous materials around heavily populated areas. (The routing of trains is subject to the jurisdiction of the Surface Transportation Board.) The preemption standard has also been an issue for rail accident victims who are seeking relief for injuries or damages from the railroads in court. A number of recent Federal court decisions surprisingly reached the conclusion that the standard does not just preempt state or local regulations that conflict with Federal regulations, but also preempts state tort liability law, thereby preventing the injured parties from bringing a state suit against the carrier. *See Lundeen* v. *Canadian Pacific Railway. Co.*, ___ F.3d ___ (No. 05–1918, 8th Cir., May 16, 2006); *Mehl* v. *Canadian Pacific Railway. Ltd.*, (No. 4–02–cv–009, D.N.D. March 6, 2006). Congress disagreed with the Federal court decisions related to the Minot, North Dakota accident and adopted a provision to clarify the intent and interpretations of the existing preemption statute in Public Law 110–259, the "Implementing Recommendations of the 9/11 Commission Act of 2007", which the President signed into law on August 3, 2007.

P.L. 110–259 clarifies that section 20106 of title 49, United States Code, does not preempt State law causes of action where a party has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation or the Secretary of Homeland Security, its own plan or standard that it created pursuant to a regulation or order issued by either of the Secretaries, or a State law, regulation, or order that is not incompatible with section 20106(a)(2). P.L. 110–259 also clarifies that section 20106 applies to all pending State law causes of action arising from activities or events occurring on or after January 18, 2002, the date of the Minot, North Dakota derailment.

The FRA relies on 421 Federal safety inspectors and 160 state safety inspectors to monitor the railroads' compliance with federally mandated safety standards. The Federal inspectors work in eight regional offices and are divided into five safety disciplines— Track and Structures, Signal and Train Control, Motive Power and Equipment, Operating Practices, Hazardous Materials, and Drug and Alcohol. They also promote numerous initiatives under the Highway-Rail Grade Crossing and Trespasser Prevention Programs.

Central to the success of the Federal rail safety program is the ability to understand the nature of rail-related accidents and to analyze trends in railroad safety. To do this, the FRA relies heavily on information that is reported by the railroads following accidents and incidents. Railroad accident reports attribute more than 90 percent of grade crossing collisions to motorists. According to the DOT Inspector General ("Inspector General"), the FRA does not routinely review locomotive event recorder data, police reports, and

29

other sources of information to determine the causes of the colli-
sions or the need for further investigation.

The Inspector General also found that the FRA investigated few
accidents and recommended few findings of critical safety defects
identified through inspections. The FRA investigates two-tenths of
one percent of all accidents and incidents involving railroads. With
regard to findings of violations, from 2002 through 2004, FRA in-
spectors identified 7,490 critical safety defects out of 69,405 total
safety defects related to automated grade crossing warning signals.
Yet, FRA recommended only 347 critical defects, or about five per-
cent, for findings of violations that carry a fine. According to the
Inspector General, the FRA's policy of inspectors using their discre-
tion in deciding whether to recommend a violation has resulted in
the small number of critical defects recommended for violations.
Furthermore, after violations are determined, Federal law allows
the FRA to negotiate-down the amount of civil penalties proposed,
resulting in the collection of lower penalties, despite the many crit-
ical safety defects found.

Over the past 30 years, the number of train accidents has been
reduced significantly. Since 1978, there has been a 71 percent de-
cline in train accidents. Total rail-related fatalities declined 46 per-
cent and total employee cases (fatal and nonfatal) have dropped 91
percent. According to the Bureau of Labor Statistics, the rail indus-
try is currently rated safer than trucking, construction, and avia-
tion.

However, in recent years, the total number of train accidents has
increased significantly. Since the FRA was last reauthorized in
1994, the total number of train accidents, including collisions and
derailments, increased from 2,504 in 1994 to 3,325 in 2005. In
2006, the number of train accidents decreased to 2,835. Although
train accidents declined in 2006, it is unclear if this one-year
progress will be sustained.

In addition, serious accidents continue to occur. On January 6,
2005, Norfolk Southern train 192 traveling through Graniteville,
South Carolina, encountered an improperly lined switch that di-
verted the train from the main line on to an industry track, where
it struck an unoccupied, parked train (P22). The collision derailed
both locomotives and 16 of the 42 freight cars of train 192, as well
as the locomotive and one of the two cars of train P22. Among the
derailed cars from train 192 were three tank cars containing chlo-
rine, one of which was breached, releasing chlorine gas. The train
engineer and eight other people died as a result of chlorine gas in-
halation. About 554 people complaining of respiratory difficulties
were taken to local hospitals. Of these people, 75 were admitted for
treatment. Because of the chlorine release, about 5,400 people
within a one-mile radius of the derailment site were evacuated for
several days. Total damages exceeded $6.9 million.

On June 28, 2004, a westbound Union Pacific ("UP") train trav-
eling on the same main line track as an eastbound BNSF train
near Macdona, Texas, struck the midpoint of the 123-car BNSF
train as it was leaving the main line to enter a parallel siding. The
collision derailed four locomotive units and the first 19 cars of the
UP train as well as 17 cars of the BNSF train. As a result of the
derailment, the sixteenth car of the UP train, a pressure tank car
loaded with liquefied chlorine, ruptured. Chlorine escaping from

30

the punctured car immediately vaporized into a cloud of chlorine gas that engulfed the accident area to a radius of 700 feet. Three people died, including the conductor of the UP train and two local residents, as a result of chlorine gas inhalation. The UP engineer, 23 civilians, and six emergency responders were treated for respiratory distress and other injuries.

On January 18, 2002, a Canadian Pacific freight train derailed 31 of its 112 cars about one-half mile west of the city limits of Minot, North Dakota. Five tank cars carrying anhydrous ammonia, a liquefied compressed gas, catastrophically ruptured, and a vapor plume covered the derailment site and surrounding area. One resident was fatally injured, 11 people sustained serious injuries, and 322 people, including the two train crewmembers, sustained minor injuries. Damages exceeded $2 million, and more than $8 million has been spent for environmental remediation.

### HUMAN FACTORS AND FATIGUE

Human factors are responsible for nearly 40 percent of all train accidents, and the FRA reports that fatigue plays a role in approximately one of four accidents caused by human factors. The National Transportation Safety Board's ("NTSB") in-depth investigations of accidents have also demonstrated that fatigue is a major factor in transportation accidents. According to the NTSB, "the current railroad hours-of-service laws permit, and many railroad carriers require, the most burdensome fatigue-inducing work schedule of any federally-regulated transportation mode in this country."

A commercial airline pilot (part 121) can work up to 100 hours per month; a commercial airline pilot (part 135) can work up to 120 hours per month; shipboard personnel (ocean going) can work up to 360 hours per month; and a truck driver can be on-duty up to 350 hours per month. Meanwhile, train crews can operate a train up to 432 hours per month. That equates to more than 14 hours a day for each of those 30 days.

On numerous occasions, the NTSB has recommended that the FRA establish within two years scientifically based hours-of-service regulations that set limits on hours-of-service, provide predictable work and rest schedules, and consider circadian rhythms and human sleep and rest requirements. However, the FRA is the only modal administration within DOT that has hours-of-service standards mandated by statute and, therefore, may not be adjusted or modified by administrative procedures.

The Hours of Service Act was first enacted in 1907; it was last substantially amended in 1969. Since that time, a number of serious train accidents have occurred as a result of operator fatigue. One of the issues of concern relating to fatigue is "limbo time". Limbo time is a term used to describe the period of time when a train operating crew's hours-of-service has expired, but the crew has not yet arrived at their point of final release, which is the off-duty location or terminal point where the crew can go home or obtain food and lodging at an away-from-home terminal. Limbo time also accrues for train operating crews whose trains are stopped on a line of track, frequently due to the expiration of their 12-hour on-duty time limit, before they reach their destination terminal (point of final release). Limbo time accrues from the time the train is stopped until the crew arrives at the final release point, and in-