Westlaw.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612      Page 1
(O.S.H.R.C.)

▷
10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612 (O.S.H.R.C.)

OCCUPATIONAL SAFETY HEALTH REVIEW COMMISSION

SECRETARY OF LABOR, COMPLAINANT
v.
CONSOLIDATED RAIL CORPORATION, RESPONDENT

OSHRC DOCKET NO. 79-1277

April 30, 1982

DECISION

Before: ROWLAND, Chairman; CLEARY and COTTINE, Commissioners.

BY THE COMMISSION:

The Secretary of Labor alleges that Respondent ('Conrail') violated OSHA standards requiring guarding of floor holes and platforms, and availability of first aid treatment for injured employees. Conrail contends that the floor hole and platform charges are preempted by a policy statement issued by the Federal Railroad Administration ('FRA'), and that it did not violate the first aid standard. Administrative Law Judge Paul L. Brady rejected Conrail's arguments and found that Conrail violated the standards as alleged. We reverse in part and affirm in part. We hold that the FRA policy statement of March 14, 1978 is an exercise of statutory authority within the meaning of Section 4(b)(1) of the Occupational Safety and Health Act of 1970[FN1] that preempts the floor hole and platform citations. However, we sustain Judge Brady's finding that Conrail failed to comply with 29 C.F.R. § 1910.151(b) by not having either persons adequately trained in first aid or an infirmary, clinic or hospital in near proximity to the workplace.

I

In February 1979, a compliance officer from the Occupational Safety and Health Administration conducted an inspection of Conrail's diesel repair shop in Walbridge, Ohio. During this inspection, the officer noted that a large drop table, which was used to remove heavy parts from diesel locomotive engines, was in a down position, creating a floor opening fifteen feet deep in the middle of the repair shop. The floor opening was not protected by a standard guardrail. Conrail was cited for violating 29 C.F.R. § 1910.23(a)(8).[FN2]

The Secretary also cited Conrail for violating 29 C.F.R. § 1910.23(c)(1).[FN3] The basis of this citation was that Conrail did not have the work ramps that it used

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT 13

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612 (O.S.H.R.C.)

Page 2

in inspecting and servicing locomotive entirely guarded by safety chains. At the time of the inspection, about ten percent of the chains were down, exposing the Conrail workers to a fall hazard of six to eight feet.

The compliance officer also asked management officials about any first aid program at the workplace. The officials indicated that first aid supplies were available, but no workers were trained in first aid. Because Conrail did not have employees trained in first aid and because the closest hospital was not within a fifteen-minute drive from the workplace according to the compliance officer, Conrail was cited for failing to comply with 29 C.F.R. § 1910.151(b).[FN4]

Judge Brady found that Conrail had violated all three standards. Following Judge Brady's decision, Conrail petitioned the Commission for review. Former Commissioner Barnako directed review on the following questions:
> 1) Whether the judge erred in concluding that [the] Federal Railroad Administration's policy statement, 43 Fed. Reg. 10583 (1978), does not constitute an exercise of statutory authority within the meaning of section 4(b)(1) of the Act, 29 U.S.C. § 653(b)(1).
> 2) Assuming the policy statement does constitute such an exercise, does the policy statement govern the particular working conditions at issue in the alleged violations of 29 C.F.R. §§ 1910.23(a)(8), 1910.23(c)(1), 1910.151(b) and 1910.309(a).
> 3) Assuming that the answer to either or both of the above questions is in the negative, did the judge err in finding that on the facts Respondent had violated 29 C.F.R. §§ 1910.23(a)(8), 1910.23(c)(1) and 1910.151(b).[FN5]

II

In arguing that section 4(b)(1) precludes the Secretary from enforcing OSHA standards with respect to the floor hole and platforms involved in this case, Conrail relies on a policy statement promulgated by the FRA on March 14, 1978.[FN6] In the policy statement, the FRA delineated the areas in which it believed OSHA standards should and should not apply in railroad operations. In the portion of the policy statement pertinent to this case, the FRA said:
> . . . as the agency which has exercised jurisdiction over railroad operations, FRA is responsible for the safe movement of rolling stock through railroad repair shops. OSHA requirements for general industry are in some respects inconsistent with the optimum safety of employees in this unique environment where hazards from moving equipment predominate. Therefore, OSHA regulations on guarding of open pits, ditches, etc., would not apply to inspection pits in locomotive or car repair facilities.[FN7] (emphasis added)

Conrail contends that, through the policy statement, the FRA has 'articulated a formal position' that pits and platforms associated with railroad rolling stock should go unregulated, and that this is sufficient to displace OSHA authority over the floor hole and platforms cited in this case.[FN8]

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612 (O.S.H.R.C.)

Page 3

The Secretary claims that he may enforce OSHA standards with respect to the conditions cited in this case under a previous Conrail case. <u>Consolidated Rail Corp.</u>, 81 OSAHRC 8/A2, 9 BNA OSHC 1258, 1981 CCH OSHD ¶25,172 (Nos. 78-3100 <u>et al.</u>, 1981) ('<u>Conrail I</u>').[FN9] In that case a divided Commission stated that the FRA's policy statement was not a sufficient exercise of authority within the meaning of section 4(b)(1) to preempt OSHA authority over working conditions in the railroad industry. Commissioner Cleary dissented on the basis that the FRA, by formally articulating that certain working conditions in the railroad industry should be unregulated, had preempted OSHA's authority to enforce its standards with respect to those working conditions.

We have reconsidered the Commission's holding in <u>Conrail I</u>. For the reasons that follow, we agree with Commissioner Cleary's dissenting view that the FRA policy statement is an exercise of the FRA's statutory authority that gives rise to an exemption under section 4(b)(1) of the OSH Act. Accordingly, we overrule <u>Conrail I</u> to the extent it is inconsistent with our decision in this case.

III

Two questions are relevant in any section 4(b)(1) case: (1) Does an agency other than OSHA have the statutory authority to regulate the health and safety of certain workers, and (2) has the other agency exercised its statutory authority in such a manner as to exempt the cited working condition from the Act. <u>Northwest Airlines, Inc.</u>, 80 OSAHRC 87/B5, 8 BNA OSHC 1982, 1980 CCH OSHD ¶24,751 (No. 13649, 1980).

There is no doubt that the FRA has the statutory authority to regulate the safety of employees in the railroad industry. The Federal Railroad Safety Act of 1970, U.S.C. §§ 421-444, states, 'the purpose of this Act is to promote safety in <u>all areas of railroad operations</u>.' 45 U.S.C. § 421 (emphasis added). Also, 45 U.S.C. § 431, provides:
> The Secretary of Transportation [or his agents] . . . shall (1) prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety supplementing provisions of law and regulations in effect on October 16, 1970. . . .

The FRA policy statement is the result of a long investigation into the subject of safety regulation throughout the railroad industry. On March 7, 1975, the FRA issued an advance notice of proposed rulemaking to encourage public participation in developing railroad occupational safety and health standards.[FN10] On July 14, 1976, the FRA issued a notice of proposed rulemaking saying that the FRA 'ha[d] decided to issue a comprehensive code of Railroad Occupational Safety and Health Standards.'[FN11]. The code would be accomplished by a series of proposed rulemakings.

In response to the comments received pursuant to its notice of proposed rulemak-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612   Page 4
(O.S.H.R.C.)

ing, the FRA issued a policy statement on March 14, 1978. In its March 14, 1978 policy statement, the FRA ended its proposed rulemaking and described the respective authority of the FRA and OSHA. Generally, the FRA said:

> Within the area of railroad operations, it is FRA which must decide what regulations are necessary and feasible . . . FRA has now exercised its statutory authority. . . . While it is expected that additional regulatory initiative may be undertaken as necessary, . . . it is the judgment of the agency that piecemeal regulation of individual hazards . . . by any other agency of government would be disruptive and contrary to the public interest. Should it be demonstrated that further specific regulatory action is required . . . FRA will not hesitate to employ its emergency powers or to initiate special-purpose proceedings directed to the solution of individual problems. Therefore, as the primary regulatory agency, _FRA has exercised and continues to exercise its jurisdiction over the safety of railroad operations._ [Emphasis added] [FN12]

Specifically, the FRA, as the experienced and expert agency in railroad safety matters, determined that the hazard of open pits and platforms in railroad repair facilities should go unregulated. The FRA explained that standard guardrails at these platforms and pits would create greater hazards than they would alleviate. Moreover, the FRA stated:

> FRA is responsible for the safe movement of rolling stock through railroad repair shops. . . . _OSHA regulations on guarding of open pits, ditches, etc., would not apply to inspection pits in locomotive or car repair facilities. . . . FRA is responsible for determining what additional regulatory steps, if any, may be necessary. . . . OSHA regulations would not apply to . . . platforms . . . turntables, and similar structures or to walkways beside the tracks. . . ._ [FN13] (Emphasis added.)

In issuing the policy statement, the FRA exercised its statutory authority over the cited working conditions, which concern the 'movement of rolling stock through repair shops' and 'the guarding of open pits . . . in repair facilities' in the railroad industry. Such an exercise preempts OSHA from enforcing its standards with respect to working conditions to which the FRA has said OSHA standards should not apply. As the Fifth Circuit in Southern Pacific Transportation Co. v. Usery, 539 F.2d 386 (5th Cir., 1976), cert. denied, 434 U.S. 874 (1977), stated:

> Our rejection of the railroads' position does not constitute an acceptance of the theory that every OSHA regulation remains operative until the FRA adopts a regulation of its own on that specific subject. . . . Neither OSHA itself nor the existence of OSHA regulations affects the ability of the primary regulatory agency, here the FRA, to articulate its regulations as it chooses. Much of their displacing effect will turn on that articulation. . . . _Furthermore, as the dominant agency in its limited area, the FRA can displace OSHA regulations by articulating a formal position that a given working condition should go unregulated or that certain regulations-and no others-should apply to a defined subject._ (Emphasis added.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612 (O.S.H.R.C.)

Page 5

This is precisely what the FRA has done through its policy statement: articulated a formal position that certain working conditions in the railroad industry should go unregulated. The statement appeared in the Federal Register and represents the informed judgment of the FRA on the subject of railroad safety. As such, we believe that the policy statement satisfies the requirements of section 4(b)(1) of the Act.

The FRA policy statement states that OSHA standards should not apply to inspection pits in locomotive or car repair facilities, noting that 'OSHA requirements for general industry are in some respects inconsistent with the optimum safety of employees in this unique environment where hazards from moving equipment predominate.' Because the conditions cited in this case involve perimeter guarding for openings associated with moving railroad we conclude that those conditions fall within the policy statement and are exempt from OSHA enforcement. Accordingly, the citations concerning alleged violations of 29 C.F.R. §§ 1910.23(a)(8) and 1910.23(c)(1) are vacated.

IV

Judge Brady concluded that Conrail violated 29 C.F.R. § 1910.151(b) in that it did not have a person or persons adequately trained in first aid and there was no infirmary, clinic, or hospital in near proximity to the workplace. We adopt the judge's findings and reasoning on this issue.[FN14]

Conrail argues that the Secretary had agreed, in a prior settlement agreement concerning another citation, that its emergency hospital arrangements were adequate to comply with section 1910.151(b). However, there is no evidence in the record to indicate the reasons why the previous citation was withdrawn. Accordingly, the disposition of the earlier citation has no bearing on the outcome of this case. See Columbian Art Works, Inc., 81 OSAHRC ___, 10 BNA OSHC 1132, 1981 CCH OSHD ¶25,737 (No. 78-29, 1981).

Therefore, Judge Brady's findings that Conrail violated 29 C.F.R. § 1910.23(a)(8) and 29 C.F.R. § 1910.23(c)(1) are reversed and those citations are vacated. The nonserious violation of 29 C.F.R. § 1910.151(b) is affirmed. The Secretary did not propose a penalty for the violation of 29 C.F.R. § 1910.151(b) and no penalty is imposed. SO ORDERED.

FOR THE COMMISSION:

Ray H. Darling, Jr.
Executive Secretary

DATED: APR 30, 1982

FN1 29 U.S.C. §§ 651-678 ('the Act' or 'the OSH Act'). Section 4(b)(1), 29 U.S.C. § 653(b)(1), provides in pertinent part:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612 (O.S.H.R.C.)

Page 6

Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies . . . exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.

FN2 29 C.F.R. § 1910.23(a)(8) provides
Every floor hole into which persons can accidentally walk shall be guarded by either:
(i) A standard railing with standard toeboard(sic,be,d070696) on all exposed sides, or
(ii) A floor hole cover of standard strength and construction that should be hinged in place. While the cover is not in place, the floor hole shall be constantly attended by someone or shall be protected by a removable standard railing.

FN3 The standard provides:
(c) Protection of open-sided floors, platforms, and runways. (1) Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a toeboard wherever, beneath open sides,
(i) Persons can pass,
(ii) There is moving machinery, or
(iii) There is equipment with which falling materials could create a hazard.

FN4 29 C.F.R. § 1910.151(b) provides:
In the absence of an infirmary, clinic, or hospital in near proximity to the workplace which is used for the treatment of all injured employees, a person or persons shall be adequately trained to render first aid. First aid supplies approved by the consulting physician shall be readily available.

FN5 Conrail's petition for discretionary review included the question whether the judge properly concluded that Conrail violated § 1910.309(a). However, because the direction for review did not include this issue, it is not on review. Henry C. Beck Co., 80 OSAHRC 91/E6, 8 BNA OSHC 1734, 1980 CCH OSHD ¶ 24,590 (No. 77-963, 1980).
Although the second issue stated in the direction for review included whether the policy statement governed the working conditions involved in the alleged violations of §§ 1910.151(b) and 1910.309(a), Conrail has never argued that these citations are preempted by the FRA policy statement. Inasmuch as that issue was not raised before the judge and is not argued on review, it is not before us. Commission Rule 92, 29 C.F.R. § 2200.92.

FN6 See 43 Fed. Reg. 10583-10590 (Mar. 14, 1978).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612                                   Page 7
(O.S.H.R.C.)

FN7 Id. at p. 10587.

FN8 In this regard, the Secretary's review brief refers to a December 22, 1978 letter written by John M. Sullivan, Administrator of the FRA. Mr. Sullivan expressed the opinion that by issuing the policy statement 'the FRA articulated its view that existing FRA regulations constitute a comprehensive exercise of authority over working conditions which are rooted in railroad operations.' Mr. Sullivan also said the practice of not guarding open pits was a long-standing procedure in railroad work based on safety considerations.

FN9 Appeal filed, No. 81-1210 (1st Cir. Apr. 2, 1981), transferred, No. 81-4192 (2d Cir. Oct. 2, 1981) (OSHRC No. 78-3100) & No. 81-2639 (3rd Cir. Oct. 2, 1981) (OSHRC No. 78-4881).

FN10 40 Fed. Reg. 10693.

FN11 41 Fed. Reg. 29153.

FN12 43 Fed. Reg. 10586.

FN13 Id. at 10587.

FN14 Chairman Rowland does not agree with the judge's reasoning, insofar as the judge followed the rationale in Love Box Co., 76 OSAHRC 45/D5, 4 BNA OSHC 1138, 1975-76 CCH OSHD ¶20,588 (1976) and Brennan v. OSHRC (Santa Fe Trail Transport Co.), 505 F.2d 869 (10th Cir. 1974). In Chairman Rowland's view, Love Box Co. and Santa Fe Trail Transport Co. incorrectly suggested that a hospital is never 'in near proximity' under the cited standard if the hospital is more than three minutes away from the workplace.

COTTINE, Commissioner, dissenting in part and concurring in part.

I

Last year, the Commission held that the policy statement published by the Federal Railway Administration on March 14, 1978, was not a sufficient exercise of the FRA's statutory power to regulate the occupational safety and health of railroad employees to preempt OSHA authority. Consolidated Rail Corp., 81 OSAHRC 8/A2, 9 BNA OSHC 1258, 1981 CCH OSHD ¶25,172 (Nos. 78-3100 et al., 1981), appeal filed, No. 81-1210 (1st Cir. Apr. 2, 1981), transferred, No. 81-4192 (2d Cir. Oct. 2, 1981) (OSHRC No. 78-3100) & No. 81-2639 (3d Cir. Oct. 2, 1981) (OSHRC No. 78-4881) (Conrail I). Today, The majority overrules that precedent by adopting the dissenting Commissioner's view. I would adhere to the Commission's decision of last year and accordingly I dissent.

Conrail I presented a recurrent issue in almost a decade of Commission litigation involving the transportation industries. E.g., Northwest Airlines, Inc., 80 OSAHRC 87/B5, 8 BNA OSHC 1982, 1980 CCH OSHD ¶24,751 (No. 13649, 1980), appeal dismissed,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612    Page 8
(O.S.H.R.C.)

No. 80-4222 (2d Cir. March 31, 1981); Southern Pacific Transportation Co., 74 OSAHRC 83/A2, 2 BNA OSHC 1313, 1974-75 CCH OSHD ¶19,054 (No. 1348, 1974), appeal denied, 539 F.2d 386 (5th Cir. 1976), cert. denied, 434 U.S. 874 (1977); Mushroom Transportation Co., Inc., 73 OSAHRC 51/E10, 1 BNA OSHC 1390, 1973-74 CCH OSHD ¶16,881 (No. 1588, 1973), appeal dismissed, No. 74-1014 (3d Cir. Apr. 17, 1974). The focal point of this continuing controversy has been section 4(b)(1) of the Act, which provides that OSHA is without authority to regulate working conditions covered by a sister agency when the other agency exercises its 'statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health,' 29 U.S.C. § 653(b)(1). Until now, the Commission has required that the standards and regulations promulgated by a sister agency have the 'force and effect of law' in order to preempt OSHA jurisdiction. E.g., Northwest Airlines, supra. This requirement was based on the conclusion that section 4(b)(1) preempted OSHA jurisdiction only when the actions of sister agencies had the same legal effect as OSHA standards promulgated under the authority of section 6 of the Act.

The Commission's interpretation of section 4(b)(1) has found wide support in the reviewing courts of appeals. In PBR v. Secretary of Labor, 643 F.2d 890 (1st Cir. 1981), the U.S. Court of Appeals for the First Circuit held that safety rules issued by an FRA contractor did not preempt OSHA jurisdiction. The First Circuit noted that,
   In promulgating rules and regulations for areas of railroad safety the Secretary of Transportation is required to comply with 5 U.S.C. § 553 and the public hearing requirements contained therein.
643 F.2d at 897. Similarly, several circuits have held that an FRA notice of proposed rulemaking is not a sufficient exercise of statutory authority to preempt OSHA authority. Baltimore & Ohio R.R. Co. v. OSHRC, 548 F.2d 1052 (D.C. Cir. 1976); Southern Pacific Transportation Co. v. OSHRC, 539 F.2d 386 (5th Cir. 1976), cert. denied, 434 U.S. 874 (1977); Southern Ry. Co. v. OSHRC, 539 F.2d 335 (4th Cir.), cert. denied, 429 U.S. 999 (1976). The Fifth Circuit in Southern Pacific stated,
   It seems unlikely that this same Congress could have meant for existing and operative OSHA regulations to be displaced without more conclusive action than a mere statement to do something in the future.
539 F.2d at 392-3 (emphasis in original). Thus, the pivotal issue in this case is the same issue presented in the earlier railroad transportation cases: Whether the FRA policy statement has the force and effect of law so that it preempts OSHA jurisdiction? The answer to that legal question has not changed in the past year since Conrail I was decided.

To elevate this policy statement to the status of a rule or regulation is to ignore its procedural history and the substantive realities of its text. First, this publication terminated an FRA initiative to promulgate occupational safety and health standards. 41 Fed. Reg. 29153 (1976). Second, the FRA recognized the limited substantive effect of its policy statement when it stated in reference to the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612       Page 9
(O.S.H.R.C.)

applicability or nonapplicability(sic,be,d070696) of OSHA standards:
    This discussion cannot be regarded as definitive, since considerable experience
    in adjusting the relationship of FRA and OSHA standards will likely be required
    before an optimum Federal regulatory program can be achieved. All statements
    concerning OSHA and FRA authority and the applicability of individual regula-
    tions should be regarded as statements of general principles.
    . . . As the primary regulatory agency concerned with railroad safety, FRA will
    not hesitate to adopt its own standards to assure a safe environment for rail-
    road operations and to promote regulatory consistency.
43 Fed. Reg. 10583, 10587 (1978) (emphasis added). This policy statement is noth-
ing more than an announcement of an 'agency's tentative intentions for the fu-
ture,' that 'does not establish a binding norm' and 'is not finally determinative
of the issues or rights to which it is addressed.' See Pacific Gas and Electric
Co. v. FPC, 506 F.2d 33, 38 (D.C. Cir. 1974). See also Brown Express, Inc. v.
U.S., 607 F.2d 695, 701 (5th Cir. 1979); Guardian Fed. Savings and Loan v. Fed.
Savings and Loan Ins. Corp., 589 F.2d 658 (D.C. Cir. 1978).

The majority points to the following language in Southern Pacific Transportation
Co. v. Usery to support its claim that the policy statement is a sufficient exer-
cise of FRA authority to preempt OSHA jurisdiction:
    Furthermore, as the dominant agency in its limited area, the FRA can displace
    OSHA regulations by articulating a formal position that a given working condi-
    tion should go unregulated or that certain regulations-and no others-should ap-
    ply to a defined subject.
539 F.2d at 392. The majority's reliance on this statement is misplaced for sever-
al reasons. First, the statement was clearly dicta. Second, the statement was made
in the context of the court's rejection of the railroad's argument that section
4(b)(1) was intended to establish industry-wide exemptions. Throughout that dis-
cussion, the court assumed that only a formal regulation could preempt OSHA au-
thority. In the same paragraph as the statement relied upon by the majority, the
court stated,
    Our rejection of the railroads' position does not constitute an acceptance of
    the theory that every OSHA regulation remains operative until the FRA adopts a
    regulation of its own on that particular subject. . . . Neither OSHA itself nor
    the existence of OSHA regulations affects the ability of the primary regulatory
    agency, here the FRA, to articulate its regulations as it chooses.
539 F.2d at 391 (emphasis added). Finally, the court stated that the FRA would
have to 'articulate a formal position.' A regulation, with opportunities for no-
tice and comment, is a formal procedure. Despite the majority's legal fiction, the
policy statement remains an informal procedure.

Congress did not envision a perfunctory preemption of the Act's application under
section 4(b)(1). It was well aware that there were other federal agencies con-
cerned with safety and intimately familiar with the regulated industry. Nonethe-
less, Congress delegated authority for safety and health to OSHA in the absence of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612 (O.S.H.R.C.)

Page 10

an exercise by a sister agency. Congress also provided the Commission with a statutory rule to assess the existence of another agency's exercise.* This was not to be a competition between agencies of their 'experience and expertise' as the majority intimates but the adjudication of a legal issue. Certainly, other mechanisms exist in the Executive branch for the reconciliation of mullet-agency(sic,be,d070696) jurisdiction, but regrettably they have rarely resolved these controversies. See 29 U.S.C. § 653(b)(3); Pennsuco Cement & Aggregrates, Inc., 80 OSAHRC 47/A2, 8 BNA OSHC 1378, 1980 CCH OSHD ¶24, 478 (No. 15462, 1980) (OSHA-MESA Memorandum of Understanding). I will not trivialize the Act's obligations by relaxing the Act's clear preconditions for preemption.

Accordingly, I dissent from the majority's conclusion that the FRA Policy Statement operates to preempt OSHA authority under section 4(b)(1).

II

With respect to the Secretary's allegation that Conrail failed to comply with the first aid standard, 29 C.F.R. § 1910.151(b), I would affirm the citation for the reasons stated in the majority opinion.

Accordingly, I concur in affirming this citation item.

FN* Congress recently reiterated its understanding of section 4(b)(1):
  OSHA's standards do not apply when another agency issues standards which affect occupational safety and health and which have the force and effect of law. House Comm. on Gov't Operations, Occupational Safety and Health Protection for Aviation Industry Employees-The Conflict Between FAA and OSHA, H.R. REP. No. 393, 97th Cong., 1st Sess. 2 (1981) (Emphasis added).

10 O.S.H. Cas. (BNA) 1577, 1982 O.S.H.D. (CCH) P 26044, 1982 WL 22612 (O.S.H.R.C.)
END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.