## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:  ASBESTOS PRODUCTS | : | |
| LIABILITY LITIGATION (NO. VI) | : | Civil Action No. MDL-875 |

| | |
|---|---|
| **Plaintiffs On Exhibit 1** | : |
| | : |
| **v.** | : |
| | : |
| **Griffin Wheel Company**, *et al.* | : |
| | : |
| | : |

## PLAINTIFF'S INTERROGATORIES TO DEFENDANT
## GRIFFIN WHEEL COMPANY

1      When was the first date that you were required to comply with any regulation concerning the use of asbestos on any brakeshoes you manufactured?

ANSWER:


2.      Fully set forth the regulation identified in Interrogatory No. 1.

ANSWER:


3.      Identify any regulation that you contend concerns the use of asbestos on any brakeshoes you ever manufactured.

ANSWER:


4.      If you contend that any federal regulation concerning brakeshoes ever required or prohibited the use of asbestos, identify all such regulations.

ANSWER:



5.      If you contend that any federal regulation concerning brakeshoes ever mentioned asbestos, identify all such regulations.

ANSWER:


6.      During the time you made asbestos-containing brakeshoes, were there instances that your decision to use asbestos containing materials was based upon − or in any way related to − a federal regulation?  If so, identify all such instances and the specific federal regulation.

ANSWER:


7.      Has any federal agency ever communicated to you that a federal regulation governs the use of asbestos on brakeshoes?  If so, identify all such communications and set forth the general content of such communications.

ANSWER:


8.      Identify any and all brakeshoes that you ever manufactured for which you submitted for approval to any federal agency a design or specification for the use of asbestos.

ANSWER:


9.      Has any federal agency ever inspected any Griffin Wheel Company ("GW") brakeshoes for the purpose of determining whether asbestos had been utilized?  If so, list all brakeshoes that have been subjected to any such inspection.

ANSWER:

10.     Has any federal agency ever inspected any GW brakeshoe with regard to any material or substance used in its composition?  If so, list all brakeshoes that have been subjected to any such inspection.

ANSWER:


11.     Has any federal agency ever inspected any GW brakeshoe with regard to dust produced by usage or handling of the brakeshoe?  If so, list all brakeshoes that have been subjected to any such inspection.

ANSWER:


12.     Identify your most knowledgeable person with respect to the regulation of your brakeshoes by any federal agency, including but not limited to the regulation, if any, of the use of asbestos.

ANSWER:


13.     Has GW ever sold a brakeshoe with a warranty, express or implied?  If so, has GW ever refuted such a warranty based upon preemption by the Boiler Inspection Act?  Describe each instance.

ANSWER:

14. Has GW purchased brakeshoe components or materials under warranty, express or implied? If so, has GW ever claimed that a component or material was in breach of such warranty? Describe each instance.

ANSWER:


15. Identify, including name, address and current phone number, all individuals that assisted and/or otherwise participated in the preparation of the Defendant's answers to these Interrogatories.

ANSWER:


Respectfully Submitted

By:

Kip A. Harbison, Esquire
GLASSER & GLASSER, P.L.C.
Crown Center, Suite 600
580 East Main Street
Norfolk, Virginia 23510

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via U.S. Mail to counsel for Defendant Griffin Wheel Company, Larry D. Ottaway, on this _____23rd_____ day of _____April_____, 2010.


Kip A. Harbison, Esquire

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | |
| LIABILITY LITIGATION (NO. VI) | : | Civil Action No. MDL-875 |

| | |
|---|---|
| Plaintiffs On Exhibit 1 | : |
| | : |
| v. | : |
| | : |
| Griffin Wheel Company, *et al.* | : |
| | : |
| | : |

## PLAINTIFF'S REQUEST FOR PRODUCTION TO DEFENDANT GRIFFIN WHEEL COMPANY

1.     Produce any regulations identified in Answers to Plaintiff's Interrogatories to Defendant Griffin Wheel Company Numbers 1 through 6.

RESPONSE:


2.     Produce any document reflecting your interactions with any federal agency identified in Plaintiff's Interrogatories to Defendant Griffin Wheel Company Numbers 7 through 11.

RESPONSE:


3.     Produce any document reflecting preemption of warranty claims identified in Plaintiff's Interrogatories to Defendant Griffin Wheel Company Numbers 13 and 14.

RESPONSE:


4.     Any documents the Defendant relied upon when answering any interrogatories propounded by the Plaintiff.



EXHIBIT

2

RESPONSE:

Respectfully Submitted

By: _____

Kip A. Harbison, Esquire
GLASSER & GLASSER, P.L.C.
Crown Center, Suite 600
580 East Main Street
Norfolk, Virginia 23510

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via U.S. Mail to counsel for Defendant Griffin Wheel Company, Larry D. Ottaway, on this _____23rd_____ day of _____April_____, 2010.

_____

Kip A. Harbison, Esquire



## TERMS & CONDITIONS

HOME

FREIGHT CAR

LOCOMOTIVE

M976

BENEFITS & ADVANTAGES

RESEARCH & DEVELOPMENT

CAREERS

CONTACT US

SEARCH

AAR CIRCULARS

TECH SHEETS

TERMS & CONDITIONS

1.  All goods, products or materials shall be suitably packed, loaded, stored, marked and shipped as required by common carriers and in a manner to secure lowest transportation costs. Prepaid transportation costs must be shown on Seller's invoice and a receipted expense bill attached thereto. No additional charges shall be made to Buyer therefore or for boxing or drayage unless stated herein, and title and risk of loss shall not pass from Seller to Buyer until said goods, products or materials have actually been received by Buyer or its consignee. Any expenses incurred by reason of Seller's failure to follow shipping instructions will be charged to Seller. On carload shipments, notice showing contents, car numbers, gross, tare and net weights, must be sent promptly to Buyer's facility to which such carload shipments are consigned. Also, gross, tare and net weights must be shown on invoices. Carload shipments arriving at Buyer's facility before receipt of carload shipment information will be refused. Seller expressly agrees to notify Buyer if Seller is unable to meet Buyer's delivery requirements. If Seller fails to meet Buyer's delivery schedules for any reason, including without limitation, any reason beyond Seller's control, then Buyer may at its option in addition to and not in lieu of any remedy provided by law, cancel this purchase order in whole or in part, obtain elsewhere the goods, products, materials or services covered by this purchase order and may then charge to Seller all costs of such substitution or "cover," and / or charge Seller for all compensatory and consequential damages caused by such failure to meet delivery schedules. Prices and terms contained in this order include all taxes unless otherwise indicated. Unless specified herein, Seller will not fill this order at a price higher than last charged or quoted without first advising Buyer and receiving Buyer's consent in writing signed by Buyer's authorized representative.

2.  All goods, products, materials and services (hereinafter referred to interchangeably in this purchase order as "good") shall be received at their destination subject to Buyer's final inspection and acceptance, but such inspection or acceptance shall not relieve Seller from any liability arising out of or under this purchase order. In the case of carload shipments, when the goods have arrived at their destination the weights of such goods will govern settlement between the Buyer and Seller. Buyer will have no obligation, however, to pay for goods which are in excess of the quantities specified herein or specified on Buyer's delivery schedules. Because goods may be put in inventory or storage or used without examination and no inspection made until after such goods are to be employed or resold, such inspection and implied acceptance by Buyer may take place at any reasonable time after physical receipt of such goods by Buyer. No reasonable delay in return or rejection of such goods shall be considered as acceptance or waiver of Buyer's right to return, reject, or retain them as provided herein or by law, whether or not the goods are utilized within that period. Payment for goods prior to final inspection shall not constitute acceptance thereof, and acceptance after inspection shall not waive any remedies available to Buyer arising out of or as a result of a



EXHIBIT

3

ALL-STATE LEGAL®

breach of Seller's warranties. Any goods not in precise conformity to Buyer's specifications or Seller's warranties may be rejected, returned, or retained by Buyer at seller's risk and expense, including the following expenses where applicable: the cost of substitution or "cover"; transportation both way; labor; administrative expenses; and reloading and trucking. If Buyer elects to retain the non-conforming goods, then Seller shall pay Buyer for all necessary costs and expenses incurred in correcting such defective or unsuitable goods. Buyer will not be responsible for any goods delivered without a purchase order to any of its facilities or employees.

3. SELLER EXPRESSLY WARRANTS TO BUYER THAT ALL GOODS COVERED BY THIS PURCHASE ORDER: (1) are merchantable and free from defect in material, design and workmanship; (2) are fit and safe for any purpose for which they are foreseeably to be used by Buyer, by Buyer's customers and by the ultimate consumer of the goods and shall have been shown to be in the warranted condition, insofar as is reasonably practical, by reasonable and representative tests under procedures provided in any relevant legislation; (3) as supplied, comply in all respects with all specifications, drawings, samples or other descriptions provided by Buyer or agreed to in writing by the Buyer's Purchasing Agent (shown on the face hereof), and are in accordance with Seller's specifications, drawings or samples which are contained in Seller's catalogs or sales materials; and (4) comply with any applicable governmental law (local, state, federal or foreign) and the rules, regulations, standards or orders that are promulgated thereunder (including without limitation, laws governing weights, measures, sources, content, labeling and origin disclosure trademark and copyright, the Fair Labor Standards Act, Occupational Safety and Health Act, Hazardous Substances Act, Toxic Substances Control Act, Hazardous Materials Transportation Act, Transportation Safety Act of 1974, Consumer Product Safety Act, Civil Rights Act, Rehabilitation Act of 1973, Veteran's Employment and Readjustment Act of 1974 and Executive Orders 11246, 11375, 11625 and 11701) and that their provisions, as appropriate, are incorporated herein by specific reference. To the extent that this order is subject thereto, the "Equal Opportunity Clause" set forth in 41 CFR 60-1.4 and the "Affirmative Action Clauses" set forth in 41 CFR 60-250.4 and 41 CFR 60-741.4 are incorporated herein by reference. Seller further warrants that the normal use of any such goods by Buyer in its manufacturing processes will result in no violation of any such law, order, rule, regulation or standard.

4. Seller hereby agrees to indemnify and save harmless the Buyer (including any of Buyer's divisions, subsidiaries, lessors, lessees, or affiliates) and any of Buyer's customers against all liabilities, claims (founded or unfounded), losses, damages, costs and expenses of any kind (including without limitation, consequential damages and reasonable professional fees) arising out of: (1) imperfect material or adulteration or foreign matter in any goods purchased hereunder; (2) imperfect workmanship in or construction of any such goods, or their containers, or application of skill contracted for; (3) any "infringement", trademark, copyright or other litigation or threatened litigation of any kind in connection with any of the goods; (4) any breach or alleged breach of any representation, covenant, or warranty of Seller to Buyer contained herein; (5) any action or claim or suit or prosecution or threat of the foregoing for alleged injury to or death of persons or alleged damage to property resulting from the contemplated or foreseeable handling or use of the goods. In connection with the foregoing, Buyer (as defined above) shall have the right to control the

conduct of any litigation instituted against it, as well as control of any settlement thereof or of any threatened litigation against it without affecting or reducing Buyer's right to be indemnified by Seller hereunder. Seller further agrees to indemnify, defend and hold Buyer harmless against any costs or liability resulting from infringement of United States patents on goods furnished by Seller except Buyer-designed goods. Seller further agrees that any money due to the Seller may be retained by the Buyer until all such claims, actions, suits or prosecutions shall have been settled and evidence to that effect furnished to the satisfaction of the Buyer. Indemnities contained in this paragraph shall survive delivery of goods or performance of service hereunder.

5. If goods are to be fabricated, assembled or installed in whole or in part, on Buyer's premises, Seller shall defend, indemnify and hold Buyer harmless against any and all claims, demands, debts, obligations or liabilities resulting directly or indirectly, from any death, personal injury or property damage which occurs in connection with the work covered by this purchase order. If goods are to be fabricated, assembled or installed, in whole or in part, on Buyer's premises, Seller shall keep such premises free and clear of all mechanics' liens arising in connection with this order and shall execute or cause to be executed such lien waivers, guarantees and related forms and Seller shall furnish or cause to be furnished such evidence of insurance as Buyer shall reasonably request.

6. Data, drawings, specifications or any other technical information directly or indirectly furnished to Seller in writing or otherwise by Buyer and relating to this order shall be treated as confidential and in no event become the property of Seller and shall be used only in fulfilling the obligations imposed by this order and shall not be duplicated by Seller or disclosed by him to others or used by him in whole or in part for any other purpose. Buyer's actions in the furnishing of data, drawings, specifications or other technical information shall in no way be construed as granting any express or implied rights whatsoever under any of Buyer's patents. Any and all molds, tools, dies, jigs, fixtures or similar items ordered herein or delivered to Seller by Buyer shall become and remain the property of Buyer, and shall be used in the manufacture of articles for Buyer exclusively and shall be delivered to Buyer forthwith upon Buyer's request and without additional cost to Buyer.

7. Seller expressly consents to in personam jurisdiction of Seller in any court where any action, claim or suit arising hereunder is prosecuted. Seller further agrees that service of process may be made upon Seller by mail, postage prepaid, addressed to Seller's last known address. Seller and Buyer each expressly agree to promptly notify the other of any action, suit, claim or threat of action of any kind arising hereunder which their respective home offices or legal departments or attorneys in any way obtain actual knowledge.

8. Buyer shall at any time have the right to make changes in: (1) specifications, drawings and data; (2) methods of shipment or packaging; (3) place of deliver; and (4) time of delivery. Buyer and Seller shall make an equitable adjustment in the purchase price to reflect cost differences arising out of any such changes. Buyer shall have the right at any time to cancel the undelivered portion of this purchase order in whole or in part by written or telegraphic notice to Seller. Upon receipt of such notice, Seller shall immediately discontinue any and all work on the canceled portion of

this purchase order except such work as may be necessary to preserve and protect the work and materials then in process. Further, Seller shall use its best efforts to cancel and terminate all existing orders placed or entered into by Seller which are chargeable to the canceled portion of this purchase order. In the event of such cancellation, Buyer shall make payments to Seller in full settlement of all justified claims arising out of such cancellation. In the case of such claims, Seller shall retain any work done or any material which is a part of any such claim for disposition in accordance with Buyer's instructions. If Seller breaches any of the terms of this purchase order, including any of the warranties given by the Seller, then Buyer may forthwith cancel this order or any part thereof and Buyer will then be entitled to recover from Seller the cost of substitution or "cover".

9. THIS ORDER EXPRESSLY LIMITS ACCEPTANCE TO THE TERMS, CONDITIONS AND SPECIFICATIONS CONTAINED HEREIN AND ON THE FRONT SIDE HEREOF. ANY ADDITIONAL TERMS, CONDITIONS OR SPECIFICATIONS PROPOSED BY SELLER, WHETHER STATED IN SELLER'S FORM OF ACKNOWLEDGEMENT TO THE ORDER OR ELSEWHERE, ARE REJECTED AND BUYER EXPRESSLY OBJECTS TO EACH OF THEM UNLESS SUCH ADDITIONAL OR DIFFERENT TERMS, CONDITIONS OR SPECIFICATIONS ARE EXPRESSLY ASSENTED TO IN A WRITING SIGNED BY BUYER'S AUTHORIZED REPRESENTATIVE.

This order constitutes the entire agreement between the parties. There are no other representations, understandings or agreements, express or implied between the Seller and Buyer. Waiver by either party shall not be considered a waiver by such party of any defaults on this order or any other order by the other party which may thereafter occur. This purchase order or monies payable hereunder may not be assigned in whole or in part without permission in a writing signed by Buyer's authorized representative. The individual remedies reserved in this purchase order shall be cumulative and additional to any other or further remedies provided at law or in equity.

The foregoing terms and conditions shall be construed in accordance with the law of the State of Illinois. The rights and obligations of the Buyer and Seller shall be governed by the law of the State of Illinois.

© 2010 Amsted Rail • Amsted Industries • All Rights Reserved • Claims of Copyright Infringement
Web Design and Hosting by BolderImage Division of MIS, Inc.

Westlaw.

H.R. REP. 91-1194, H.R. Rep. No. 1194, 91ST Cong., 2ND Sess. 1970, 1970 U.S.C.C.A.N. 4104, 1970 WL 5692 (Leg.Hist.)

**\*4104** P.L. 91-458, FEDERAL RAILROAD SAFETY AND HAZARDOUS MATERIALS TRANSPORTA-
TION CONTROL ACT OF 1970
SENATE REPORT (COMMERCE COMMITTEE) NO. 91-619,
DEC. 18, 1969 (TO ACCOMPANY S. 1933)
HOUSE REPORT (INTERSTATE AND FOREIGN COMMERCE COMMITTEE) NO. 91-1194,
JUNE 15, 1970 (TO ACCOMPANY S. 1933)
CONFERENCE REPORT NO. 91-1467,
SEPT. 24, 1970 (TO ACCOMPANY S. 1933)
CONG. RECORD VOL. 115 (1969)
CONG. RECORD VOL. 116 (1970)
DATES OF CONSIDERATION AND PASSAGE
SENATE DECEMBER 19, 1969; OCTOBER 1, 1970
HOUSE AUGUST 6, SEPTEMBER 28, 1970
THE HOUSE REPORT AND THE CONFERENCE REPORT ARE SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR IN-
FORMATION ABOUT OMITTED MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOC-
UMENT ON WESTLAW.)

HOUSE REPORT NO. 91-1194
JUNE 15, 1970
THE COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE, TO WHOM WAS REFERRED THE
BILL (S. 1933), TO PROVIDE FOR FEDERAL RAILROAD SAFETY, HAZARDOUS MATERIALS CON-
TROL AND FOR OTHER PURPOSES, HAVING CONSIDERED THE SAME, REPORT FAVORABLY
THEREON WITH AN AMENDMENT AND RECOMMEND THAT THE BILL AS AMENDED DO PASS.

PURPOSE OF LEGISLATION

THE PRIMARY PURPOSE OF THIS LEGISLATION AS SET FORTH IN TITLE I IS TO PROMOTE
SAFETY IN ALL AREAS OF RAILROAD OPERATIONS, TO REDUCE RAILROAD

**\*4105** BACKGROUND AND NEED FOR LEGISLATION

SAFETY FIRST. THE ORIGIN OF THIS SLOGAN HAS BEEN ATTRIBUTED TO A RAILROADER OF
AN EARLIER DAY. THERE IS NO QUESTION THAT THOSE CONNECTED WITH RAILROADING
HAVE HAD AN INTEREST IN AND RECOGNIZED THE NEED FOR SAFETY SINCE THE VERY INCEP-
TION OF THIS FORM OF TRANSPORTATION. HOWEVER, THERE HAS BEEN A WIDENING GAP
BETWEEN THE DESIRABILITY OF SAFETY AND THE ACHIEVEMENT OF RECOMMENDATIONS TO
THE FULL COMMITTEE. THE FULL COMMITTEE, IN EXECUTIVE SESSION, CONSIDERED THE SUB-
COMMITTEE RECOMMENDATIONS IN THE FORM OF THE SUBSTITUTE AMENDMENT CON-
TAINED IN THE REPORTED BILL AND, ON MAY 27, 1970, UNANIMOUSLY ORDERED THE SUBSTI-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT
4
ALL-STATE LEGAL®

TUTE AMENDMENT REPORTED TO THE HOUSE.

COMMITTEE ACTION

SAFETY. THE RECORD PRESENTED IN THE HEARINGS ON THIS LEGISLATION

LEADS TO THE UNQUALIFIED

CONCLUSION THAT THERE CAN BE, SHOULD BE AND MUST BE A SUBSTANTIAL

UPGRADING OF THE LEVEL OF RAILROAD

SAFETY. THE RAILROADS ARE AN EXTREMELY VITAL LIFELINE OF THE UNITED

STATES. THEY PROVIDE A BASIC

FOR OF FREIGHT TRANSPORTATION, MOVING ABOUT 767 BILLION TON-MILES OF

FREIGHT IN 1069. THE ACCIDENT

RATE FOR THIS VOLUME WAS ABOUT 11 ACCIDENTS PER BILLION TON-MILES.

FROM THIS RATIO THERE MIGHT NOT

APPEAR A GREAT CAUSE FOR CONCERN. BUT, EXPRESSED IN ANOTHER WAY THIS

WOULD BE 8,437 ACCIDENTS, AND

SCORES OF RAILROAD CARS, OTHER VEHICLES AND EVEN HOMES ARE INVOLVED IN

SOME OF THE

ACCIDENTS. ADDITIONALLY, AND OF ALARMING IMPORTANCE, VOLATILE AND

EXPLOSIVE SUBSTANCES ARE ALSO

CONTAINED IN THE CARS AND INVOLVED IN MANY OF THE ACCIDENTS. FURTHER,

THE TREND OF ACCIDENTS IS

INCREASING AND THE COMMITTEE FULLY ENDORSES THE VIEW THAT SUCH A TREND

SHOULD BE REVERSED.

OVER THE YEARS THERE HAVE BEEN SEVERAL ENACTMENTS OF LEGISLATION DEALING WITH CERTAIN PHASES OF RAILROAD SAFETY. THESE INCLUDE, AMONG OTHERS, SAFETY AP-PLIANCE ACTS, SIGNAL INSPECTION ACT, ASH PAN ACT, LOCOMOTIVE INSPECTION ACT, ACCI-DENT REPORTS ACT, AND THE HOURS OF SERVICE ACT.

THERE ARE SET FORTH IN DETAIL IN APPENDIX B OF THIS REPORT. THESE PARTICULAR LAWS HAVE SERVED WELL. IN FACT THE COMMITTEE CHOSE TO CONTINUE THEM WITHOUT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

CHANGE. IT IS RECOGNIZED, HOWEVER, THAT THEY MEET ONLY CERTAIN AND SPECIAL TYPES OF RAILROAD SAFETY HAZARDS. THERE ARE VIRTUALLY NO UNIFORM STATE REGULATIONS. THERE HAS NOT BEEN A SIZABLE OR PARTICULARLY ACTIVE RESEARCH PROGRAM ON ANYTHING APPROACHING A NATIONAL SCALE, AND TRACK, ROADBED, AND EQUIPMENT SAFETY HAVE DETERIORATED EITHER AS A DIRECT OR INDIRECT RESULT OF THE FINANCIAL DIFFICULTIES OF MANY OF THE CARRIERS SINCE BEFORE WORLD WAR II. CONSEQUENTLY, THERE IS A STRONG CONSENSUS WHICH MAKES IT APPEAR CLEARLY THAT THE TIME IS NOW HERE FOR BROADSCALE FEDERAL LEGISLATION WITH PROVISIONS FOR ACTIVE STATE PARTICIPATION TO ASSURE A MUCH HIGHER DEGREE OF RAILROAD SAFETY IN THE YEARS AHEAD.

ALL SIGNS POINT TO A CONTINUATION AND GROWTH OF THE RAILROAD INDUSTRY AS A PRIMARY FREIGHT TRANSPORTER. IN SEPARATE LEGISLATION ACTIVE WORK IS UNDERWAY TO REVITALIZE AND, INDEED, TO SAVE AT LEAST A BASIC RAILROAD PASSENGER SERVICE AND TO IMPROVE THAT SERVICE. IF HIGH-SPEED TRAINS ARE TO COME, THEY SHOULD ENTER INTO SERVICE ONLY IF CONSONANT WITH THE HIGHEST DEGREE OF SAFETY ATTAINABLE.

**\*4106** A VAST NUMBER OF DERAILMENTS, EXPLOSIONS, GRADE-CROSSING, AND OTHER ACCIDENTS COULD BE SET FORTH HERE. THE PRINTED HEARINGS CONTAIN DESCRIPTIONS OF PARTICULAR ACCIDENTS. SEE THE TESTIMONY OF THE NATIONAL TRANSPORTATION SAFETY BOARD. SOME OF THE EXAMPLES GIVEN BY THE NATIONAL TRANSPORTATION SAFETY BOARD APPEAR BELOW IN THIS REPORT. AS INDICATED THE NEED FOR SAFETY IMPROVEMENT AND LEGISLATION TO ASSURE SUCH IMPROVEMENT IS WELL ESTABLISHED AND IS UNQUESTIONED BY ALL THE PARTIES INTERESTED - LABOR, MANAGEMENT, STATE REPRESENTATIVES, FOR EXAMPLE.

THE COMMITTEE UNANIMOUSLY AGREES LEGISLATION SHOULD BE PASSED AND ENACTED NOW.

THE RAILROAD FREIGHT TRANSPORTED CONSTITUTES ABOUT 40 PERCENT OF ALL INTERCITY FREIGHT IN THE COUNTRY INCLUDING THAT MOVED BY MOTOR VEHICLE, INLAND WATERWAY, OIL PIPELINES, AND AIRWAYS.

THIS VAST TRANSPORTATION NETWORK WHICH COMPRISES OUR NATION'S RAIL SYSTEM HAS SERVED AS WELL FOR OVER A CENTURY IN PEACE AND IN WAR. IT IS ESSENTIAL THAT IT CONTINUE TO DO SO, FOR RAILROADS HAVE ESTABLISHED THE CAPACITY TO MOVE THE HUGE TONNAGES NEEDED BY THE COUNTRY WELL AND EFFICIENTLY.

THE BILL WHICH THE COMMITTEE HAS REPORTED IS THE MOST COMPREHENSIVE RAIL SAFETY LEGISLATION EVER REPORTED TO THE CONGRESS. IT IS TRUE THAT A VARIETY SAFETY APPLIANCE ACTS DATES BACK TO 1893, THE SIGNAL INSPECTION ACT AND THE ACCIDENT REPORTS ACT TO 1910, THE HOURS OF SERVICE ACT TO 1907, AND THE LOCOMOTIVE INSPECTION ACT TO 1911. THESE AND OTHER RAIL SAFETY STATUTES HAVE BEEN REASONABLY EFFECTIVE IN THEIR RESPECTIVE AREAS. THEY WERE ENACTED TO PROTECT EMPLOYEES AGAINST PARTICULAR HAZARDS AND THE ENFORCEMENT OF THEIR PROVISIONS OVER THE YEARS HAS SAVED LIVES.

IN RECENT YEARS, HOWEVER, A COMBINATION OF FACTORS HAVE CONTRIBUTED TO A STEADY DECLINE IN THE RAIL SAFETY PICTURE. THE TRANSPORTATION REVOLUTION OF THE POST-WORLD WAR II PERIOD, INCLUDING THE DEVELOPMENT, WITH FEDERAL SUPPORT, OF VAST AIR, HIGHWAY, AND WATER SYSTEMS, HAS GREATLY AFFECTED THE COMPETITIVE POSITION OF THE RAILROADS. OVER THE YEARS THE INDUSTRY HAS BEEN PLAGUED WITH MULTIPLE FINANCIAL PROBLEMS.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TRAIN ACCIDENTS, THAT IS THOSE INVOLVING MOVEMENT OF TRAINS, LOCOMOTIVES, OR CARS WHERE MORE THAN $750 DAMAGE WAS DONE TO RAILROAD EQUIPMENT OR TRACK, HAVE INCREASED FOR THE 12TH CONSECUTIVE YEAR. TOTALS FOR 1969 SURPASS THE PREVIOUS YEAR BY MORE THAN 500 ACCIDENTS. THERE WERE 8,543 SUCH ACCIDENTS IN 1969, A 6-PERCENT INCREASE OVER THE 1968 TOTAL OF 8,028 AND A 60-PERCENT RISE OVER THE LAST 5 YEARS. OF THE TOTAL, 485 ACCIDENTS RESULTED IN 16,758 INJURED.

IN 1968 THE COMPARABLE FIGURES WERE 146 KILLED AND 17,600 INJURED. FOR ALL CLASSES OF PERSONS, INCLUDING HIGHWAT-GRADE-CROSSING AND TRESPASSERS, THERE WERE 2,299 KILLED AND 23,356 INJURED IN TRAIN ACCIDENTS DURING THE PAST YEAR. WE CANNOT AFFORD THE CONTINUATION OF THESE LOSSES.

COUPLED WITH THE ACCIDENT SITUATION IS THE TREMENDOUS GROWTH IN USE, AND RESULTING TRANSPORTATION OF, A VARIETY OF VOLATILE, HIGHLY TOXIC, AND SOMETIMES FRIGHTENING HAZARDOUS MATERIALS. THE RESULTS WERE INEVITABLE. *4107 ACCIDENTS INVOLVING THESE HAZARDOUS MATERIALS, MANY OF AN ALARMING NATURE HAVE FRIGHTENED THE PUBLIC, THE INDUSTRY, AND PUBLIC OFFICIALS EVERYWHERE. THE PROSPECT OF A MAJOR CATASTROPHE IS A CONTINUING THREAT.

DURING THE HEARINGS GRAPHIC EVIDENCE WAS PRESENTED TO THE COMMITTEE OF THE POTENTIAL FOR DESTRUCTION WHICH THESE HAZARDOUS MATERIALS ACCIDENTS HAVE FOR THE PUBLIC AND RAILROAD EMPLOYEES. PICTORIAL EVIDENCE PRESENTED TO THE COMMITTEE OF ACCIDENTS INVESTIGATED BY THE NATIONAL TRANSPORTATION SAFETY BOARD INCLUDED--

1. A DERAILMENT AT DUNREITH, IND., ON JANUARY 1, 1968, WHERE SPILLAGE OF HIGHLY INFLAMMABLE AND POISONOUS CARGO, AN INTENSE FIRE, AND EXPLOSION OF A TANK CAR OCCURRED. THE EXPLOSION AND FIRE DESTROYED A CANNERY, THE TOWN'S MAJOR INDUSTRY, AND DESTROYED AND DAMAGED MANY OTHER BUSINESSES AND HOMES. THE TOWN WAS EVACUATED FOR 2 DAYS. CYANIDE POLLUTION OF AREA WATER REQUIRED HEALTH PROTECTION MEASURE FOR MONTHS AFTER THE ACCIDENT. FORTUNATELY THERE WERE NO FATALITIES AND ONLY MINOR INJURIES.

IT WAS DETERMINED THAT THE ACCIDENT WAS CAUSED BY A BROKEN RAIL AND INADEQUATE TRACK AND ROADBED MAINTENANCE. THE SECRETARY OF TRANSPORTATION HAS NO AUTHORITY UNDER EXISTING LAW TO PROVIDE STANDARDS WITH RESPECT TO QUALITY OF RAIL, AND TRACK AND ROADBED MAINTENANCE. THE BILL REPORTED BY THE COMMITTEE, HOWEVER, WILL GIVE HIM AUTHORITY WITH RESPECT TO THEM.

2. A GRADE-CROSSING ACCIDENT BETWEEN A COMMUTER TRAIN AND A FUEL TANK TRUCK AT EVERETT, MASS., ON MARCH 7, 1968. ELEVEN PASSENGERS AND TWO CREWMEN LOST THEIR LIVES WHEN UNABLE TO EVACUATE A CAR WHICH HAD BECOME ENGULFED IN FLAMES AFTER THE COLLISION.

THE SECRETARY HAS NO AUTHORITY TO PRESCRIBE STANDARDS REQUIRING EMERGENCY MEANS OF EVACUATION FROM THESE CARS. THE COMMITTEE BILL WILL REMEDY THIS SITUATION.

3. A DERAILMENT OF 15 TANK CARS OF PROPANE GAS AT LAUREL, MISS., ON JANUARY 25, 1969. EXPLOSION AND FIRE FATALLY INJURED TWO RESIDENTS, HOSPITALIZED 33 OTHERS, DESTROYED 60 HOMES, AND CAUSED WIDESPREAD PROPERTY DAMAGE. IN ADDITION, EVACUATION OF OVER 1,000 TOWNSPEOPLE WAS MADE NECESSARY.

THE BOARD'S REPORT DEALT WITH SUCH CASUAL AREAS AS DESIGN, AND MANUFACTURE

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

OF TRAIN WHEELS, MAINTENANCE OF TRACK AND ROADBED, AND INDUSTRY STANDARDS. AGAIN, NONE OF THESE AREAS ARE SUBJECT TO FEDERAL REGULATORY CONTROL. THEY WILL BE COVERED BY THE COMMITTEE BILL.

WE GET A FURTHER IDEA OF THE DANGERS TO PUBLIC BYSTANDERS IN THESE TYPES OF AC-CIDENTS WHEN WE REALIZE THAT SOME OF THESE TANK CARS OR PARTS OF CARS ARE HURLED HUNDREDS OF FEET WHEN RUPTURED. AT BATTELLE, ALA., FOR INSTANCE, THE GREATER PART OF A TANK WAS HURLED 1,900 FEET, AND AT LAUREL, MISS., NUMEROUS LARGE PIECES OF CARS SPEWING BURNING PROPANE DURING FLIGHT WERE HURLED HUN-DREDS OF FEET. IT IS NO WONDER THAT OVER THE PAST 6 YEARS OVER 60 COMMUNITIES HAVE BEEN FORCED TO EVACUATE AS A RESULT OF THESE ACCIDENTS. OF THESE, 26 OC-CURRED IN 1969.

MONETARY LOSSES TO THOSE CONCERNED HAVE BEEN DIFFICULT TO ESTIMATE. HOWEVER, BASED ON OFFICIAL FIGURES OF THE INTERSTATE COMMERCE COMMISSION AND THE DE-PARTMENT OF TRANSPORTATION, AS WELL AS ESTIMATES OF THE ASSOCIATION OF AMERIC-AN RAILROADS, ONE WITNESS CALCULATED THAT IN 1967 *4108 THE DIRECT DAMAGE TO EQUIPMENT AND TRACK WAS OVER $96 MILLION, THE COST OF CLEARING WRECKS EXCEEDED $25 MILLION, INJURIES TO EMPLOYEES EXCEEDED $115 MILLION, DAMAGE TO FREIGHT EX-CEEDED $29 MILLION, AND LOST WAGES TO EMPLOYEES EXCEEDED $50 MILLION, FOR A TOTAL OF OVER $315 MILLION. NO MONETARY FIGURE CAN, OF COURSE, TRULY MEASURE THE HUMAN TOLL.

TO COPE WITH THE GROWING PROBLEM THE DEPARTMENT OF TRANSPORTATION IN 1968 PROPOSED RAIL SAFETY LEGISLATION. HEARINGS WERE HELD BEFORE THIS COMMITTEE IN MAY AND JUNE 1968. TESTIMONY DEVELOPED AT THESE HEARINGS DEMONSTRATED TO THE COMMITTEE THAT, WHILE CAUSE FOR CONCERN WAS MOUNTING, INSUFFICIENT COORDINA-TION HAD BEEN DEVELOPED BETWEEN THE NEW CREATED DEPARTMENT OF TRANSPORTA-TION AND THE CARRIERS, THEIR EMPLOYEE REPRESENTATIVES, AND THE STATES. SEVERAL MEMBERS OF THE COMMITTEE RECOMMENDED THAT THE PARTIES GET TOGETHER TO ACHIEVE A MORE COORDINATED APPROACH.

IN RESPONSE TO THESE SUGGESTIONS THE SECRETARY OF TRANSPORTATION, EARLY IN 1969, APPOINTED A RAIL SAFETY TASK FORCE UNDER THE CHAIRMANSHIP OF THE FEDERAL RAILROAD ADMINISTRATOR. THE TASK FORCE, WHICH INCLUDED REPRESENTATIVES OF RAIL MANAGEMENT, RAIL LABOR, AND STATE REGULATORY COMMISSIONS, WAS CHARGED WITH THE RESPONSIBILITY OF STUDYING THE RAIL SAFETY PROBLEM AND RECOMMENDING SOLU-TIONS.

THE TASK FORCE MADE A UNANIMOUS REPORT ON JUNE 30, 1969. FOR COMPLETE TEXT OF THAT REPORT, SEE APPENDIX F OF THIS REPORT. THE TASK FORCE REPORTED CONCLUDED THAT CAUSES OF TRAIN ACCIDENTS ARE ALMOST EVENLY DIVIDED AMONG DEFECTS IN OR FAILURE OF TRACK AND ROADBED, DEFECTS IN OR FAILURE OF EQUIPMENT, AND HUMAN ER-ROR. IT ALSO CONCLUDED THAT EXISTING FEDERAL AND STATE RAIL SAFETY REGULATIONS DO NOT IN MOST INSTANCES PROVIDE STANDARDS FOR TRACK, ROADBED, EQUIPMENT, EM-PLOYEE TRAINING AND QUALIFICATIONS, OR RULED GOVERNING SAFE RAILROAD OPERA-TIONS. IN ADDITION, IT FOUND THAT ACCIDENT REPORTING AND INVESTIGATION PRACTICES ARE DEFICIENT, AND THAT AVAILABLE STATISTICS ARE INSUFFICIENT TO DETERMINE THE PRIMARY OR CONTRIBUTING CAUSES OF ACCIDENTS. THE TASK FORCE ALSO FOUND THAT RAIL SAFETY RESEARCH IS INADEQUATE, SPORADIC, AND UNCOORDINATED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

THE UNANIMOUS RECOMMENDATION WAS THAT BROAD FEDERAL REGULATORY AUTHOR-ITY OVER ALL AREAS OF RAILROAD SAFETY -E ENACTED.

OTHER RECOMMENDATIONS WERE THAT ADMINISTRATION OF THE RAIL SAFETY PROGRAM BE THROUGH A FEDERAL-STATE PARTNERSHIP, THAT ADEQUATE RESEARCH AND EMPLOYEE TRAINING PROGRAMS BE DEVELOPED, AND THAT A STUDY BE MADE OF WAYS TO IMPROVE SAFETY AT GRADE CROSSINGS.

## THE ROLE OF THE STATES IN RAIL SAFETY

THE MOST EFFECTIVE ROLE FOR THE STATE REGULATORY COMMISSIONS IN THE RAIL SAFETY FIELD HAS BEEN MOST DIFFICULT TO DETERMINE IN THE DEVELOPMENT OF THIS LE-GISLATION. AT THE PRESENT TIME WHERE THE FEDERAL GOVERNMENT HAS AUTHORITY, WITH RESPECT TO RAIL SAFETY, IT PREEMPTS THE FIELD. WITH RESPECT TO THE REPORTED BILL, THE TASK FORCE RECOMMENDED THAT EXISTING STATE REQUIREMENTS REMAIN IN EF-FECT UNTIL PREEMPTED BY FEDERAL ACTION. IT ALSO PROPOSED A STATE CERTIFICATION PROGRAM SIMILAR TO THAT OF THE NATURAL GAS PIPELINE SAFETY ACT OF 1968.

THE DEPARTMENT OF TRANSPORTATION, IT ITS PROPOSAL, FOLLOWED THE TASK FORCE RE-COMMENDATION WITH RESPECT TO EXISTING STATE STATUTES AND RECOMMENDED*4109 THAT STATES STATUTES THEN IN EFFECT CONTINUE UNTIL PREEMPTED BY FEDERAL ACTION. IT MODIFIED THE PROPOSAL WITH RESPECT TO STATE CERTIFICATION, HOWEVER, AND PRO-POSED STATE PARTICIPATION BY MEANS OF AGREEMENTS ENTERED INTO WITH THE SECRET-ARY OF TRANSPORTATION. THE SECRETARY PROPOSED REPEAL OF EXISTING FEDERAL RAIL SAFETY STATUTES AND PROPOSED THAT HE CONTINUE THEM IN EFFECT BY REGULATION UN-DER THIS LEGISLATION.

THE BILL AS PASSED BY THE SENATE PRESERVED EXISTING STATE STATUTES UNTIL PREE-MPTED. IT ALSO PERMITTED THE STATES TO REGULATE IN NEW AREAS UNTIL PREEMPTED. IN ADDITION, IT ADOPTED A MODIFIED VERSION OF THE CERTIFICATION PROVISIONS OF THE NATURAL GAS PIPELINE SAFETY ACT OF 1968.

IN THAT ACT A DISTINCTION WAS MADE BETWEEN THOSE INTERSTATE TRANSMISSION FA-CILITIES REGULATED BY THE FEDERAL POWER COMMISSION UNDER THE NATURAL GAS ACT AND THOSE GATHERING AND DISTRIBUTION LINES NOT SO REGULATED. IF THAT DISTINCTION IS FOLLOWED IN THE RAIL FIELD, ALL COMMON CARRIERS WHICH ARE PART OF THE GENERAL RAIL SYSTEM AND ARE REGULATED BY THE INTERSTATE COMMERCE COMMISSION UNDER THE INTERSTATE COMMERCE ACT WOULD REMAIN UNDER EXCLUSIVE FEDERAL JURISDIC-TION WHILE PRIVATE STEEL AND PLANT RAILROADS, LOGGING ROADS, SUBWAYS, AND STREET RAILWAYS AND THE LIKE WOULD BE SUBJECT TO THE CERTIFICATION PROVISIONS OF THE BILL. NO SUCH DISTINCTION IS MADE IN THE BILL AS PASSED BY THE SENATE AND ALL RAILROADS INCLUDING COMMON CARRIERS ARE MADE SUBJECT TO THE CERTIFICATION PRO-CESS. HOWEVER, ENFORCEMENT OF REGULATIONS OVER ROLLING STOCK AND EMPLOYEE QUALIFICATIONS REMAIN EXCLUSIVELY FEDERAL.

THE COMMITTEE DOES NOT BELIEVE THAT SAFETY IN THE NATION'S RAILROADS WOULD BE ADVANCED SUFFICIENTLY BY SUBJECTING THE NATIONAL RAIL SYSTEM TO A VARIETY OF ENFORCEMENT IN 50 DIFFERENT JUDICIAL AND ADMINISTRATIVE SYSTEMS. ACCORDINGLY, WHILE IT HAS PRESERVED THE FRAMEWORK OF CERTIFICATION, IT HAS MODIFIED THE CONCEPT INSOFAR AS IT APPLIES TO THE NATION'S RAIL SYSTEM TO MAKE ALL ENFORCE-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MENT FEDERAL IN NATURE. THE SECRETARY WILL HAVE EXCLUSIVE AUTHORITY TO ASSESS AND COMPROMISE PENALTIES AND TO RECOMMEND COURT ACTION FOR RECOVERY OF SUCH PENALTIES. IN ADDITION, FOR 180 DAYS AFTER A VIOLATION HAS OCCURRED, HE WILL HAVE EXCLUSIVE AUTHORITY TO SEEK INJUNCTION RELIEF. THEREAFTER, PARTICIPATING STATES WILL HAVE AUTHORITY TO ASSESS AND COMPROMISE PENALTIES OR TO SEEK STATE JUDICIAL ACTION. IN ADDITION, IF THE SECRETARY FINDS, IN WRITING, THAT NO VIOLATION OCCURRED, STATES CANNOT ACT. IT SHOULD BE NOTED HERE THAT THE VITAL ELEMENT IN CERTIFICATION WHEREBY A STATE HAS THE CLEAR RIGHT TO PARTICIPATE IN THE ADMINISTRATION OF THE ACT IS RETAINED.

THE COMMITTEE ACTION IS IN SUBSTANTIAL ACCORD WITH BUT, BY RETAINING CERTIFICATION, GOES BEYOND THE ADMINISTRATION PROPOSAL CONTAINED IN H.R. 14417.

COMPARISON OF RAIL AND GAS PIPELINE SAFETY FOR PURPOSES OF STATE PARTICIPATION

REPRESENTATIVES OF STATE REGULATORY COMMISSIONS RECOMMENDED THAT THE RESPECTIVE STATES BE PERMITTED TO ENFORCE FEDERAL REGULATIONS IN THE AREA OF RAIL SAFETY. THEY RECOMMENDED THAT A PROVISION SIMILAR TO THAT CONTAINED IN SECTION 106 OF S. 1933 AS APPROVED BY THE SENATE BE INCLUDED IN **4110** THE BILL. SECTION 106 OF S. 1933 WAS ADOPTED, WITH MODIFICATIONS, FROM THE NATURAL GAS PIPELINE SAFETY ACT OF 1968. THIS COMMITTEE IS OF THE OPINION THAT THE PROVISION THAT STATES BE PERMITTED TO ENFORCE FEDERAL STANDARDS DOES NOT LEND ITSELF TO THE REGULATION OF THE RAILROAD INDUSTRY; EXCEPT TO THE LIMITED DEGREE PERMITTED UNDER SECTION 207.

AS NOTED EARLIER, UNDER THE NATURAL GAS PIPELINE SAFETY ACT OF 1968, A DISTINCTION WAS MADE BETWEEN INTERSTATE TRANSMISSION FACILITIES AND LOCAL GATHERING OR DISTRIBUTION LINES. WHILE FEDERAL STANDARDS ARE ESTABLISHED FOR BOTH TYPES OF FACILITIES, STATES ARE PERMITTED TO ADOPT AS STATE STANDARDS THE FEDERAL STANDARDS PERTAINING TO LOCAL LINES AND TO ENFORCE THEM IN THEIR OWN RIGHT. THIS PROVISION FOR STATE CERTIFICATION AND ENFORCEMENT OF STANDARDS WITH RESPECT TO LOCAL GATHERING AND DISTRIBUTION LINES RECOGNIZED THE CAPABILITIES OF THE STATES TO HANDLE THE SPECIAL ASPECTS OF LOCAL PIPELINE SAFETY WHICH ARE PARTICULARLY APPLICABLE TO THAT COMMUNITY. FEDERAL PREEMPTION WAS RETAINED WITH RESPECT TO INTERSTATE TRANSMISSION FACILITIES BECAUSE IT WAS RECOGNIZED THAT THE INTERSTATE CHARACTER OF THE MOVEMENT REQUIRED A SINGLE UNIFORM TREATMENT.

THE CHARACTERISTICS OF THE DISTRIBUTION OF GAS THROUGH PIPELINES, HOWEVER, IS QUITE DIFFERENT FROM THAT OF THE TRANSPORTATION OF GOODS AND MATERIALS BY RAILROADS. AS COMPARED TO GAS DISTRIBUTION, THE TRANSPORTATION OF GOODS BY RAILROADS IS NOT SUSCEPTIBLE TO A CLEAR DEMARCATION BETWEEN INTERSTATE AND LOCAL ASPECTS. FURTHERMORE, OF THE APPROXIMATELY 800,000 MILES OF GAS PIPELINE IN THE UNITED STATES, ONLY 224,000 MILES ARE TRANSMISSION LINES. THE BALANCE, WHILE IN INTERSTATE COMMERCE (BECAUSE ALL NATURAL GAS IS INTERSTATE), IS PRIMARILY GATHERING AND DISTRIBUTION LINES OPERATED BY LOCAL COMPANIES, HIGHLIGHTING THE LOCAL NATURE OF THIS COUNTRY'S GAS DISTRIBUTION SYSTEM. TO FURTHER ILLUSTRATE THIS DISTINCTION, WE NOTE THAT WHILE THERE ARE APPROXIMATELY 200 GAS TRANSMISSION COMPANIES, THERE ARE OVER 1,600 LOCAL DISTRIBUTION COMPANIES. IN ADDITION, THE NATURE OF THE GAS PIPELINE DISTRIBUTION SYSTEM IS SUCH THAT ONCE THE PIPELINE HAS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

BEEN INSTALLED UNDERGROUND, IT REMAINS INERT AND UNDISTURBED AND FOR ALL PRACTICAL PURPOSES UNREGULATED FOR A SUBSTANTIAL PERIOD OF TIME. THE MOST IMPORTANT ASPECT OF PIPELINE REGULATION IS IN THE INITIAL INSTALLATION. THEREAFTER, THE PROBLEM IS ONE OF CHECKING AND TESTING TO GUARD AGAINST FAULTS OR WEAKNESSES IN THE SYSTEM.

WITH THE EXCEPTION OF INDUSTRIAL OR PLANT RAILROADS, THE RAILROAD INDUSTRY HAS VERY FEW LOCAL CHARACTERISTICS. RATHER, IN TERMS OF ITS OPERATIONS, IT HAS A TRULY INTERSTATE CHARACTER CALLING FOR A UNIFORM BODY OF REGULATION AND ENFORCEMENT. IT IS A NATIONAL SYSTEM. UNLIKE THE GAS PIPELINES, THE VAST BULK OF RAILROAD MILEAGE, AND OPERATIONS THEREOVER, ARE BY COMPANIES WHOSE OPERATIONS EXTEND OVER MANY STATE LINES. ILLUSTRATIVE OF THIS IS THE NEWLY FORMED BURLINGTON NORTHERN, WHICH INCLUDING ITS SUBSIDIARIES, OPERATED IN 19 STATES. OTHER EXAMPLES ARE PENN CENTRAL, 14 STATES AND THE DISTRICT OF COLUMBIA; SOUTHERN RAILWAY, 13 STATES AND THE DISTRICT OF COLUMBIA; JUST TO NAME A FEW. THE INTEGRAL OPERATING PARTS OF THESE COMPANIES CROSS MANY STATE LINES. IN ADDITION TO THE OBVIOUS AREAS OF ROLLING STOCK AND EMPLOYEES, SUCH ELEMENTS AS OPERATING RULES, SIGNAL SYSTEMS, POWER SUPPLY SYSTEMS, AND COMMUNICATION SYSTEMS OF A SINGLE COMPANY NORMALLY CROSS NUMEROUS STATE LINES. TO SUBJECT A CARRIER TO ENFORCEMENT*4111 BEFORE A NUMBER OF DIFFERENT STATE ADMINISTRATIVE AND JUDICIAL SYSTEMS IN SEVERAL AREAS OF OPERATION COULD WELL RESULT IN AN UNDUE BURDEN ON INTERSTATE COMMERCE.

CONSEQUENTLY, IT IS THE JUDGMENT OF THE COMMITTEE THAT THE NATURE OF RAILROAD OPERATIONS REQUIRES A DIFFERENT SYSTEM OF REGULATION AND ENFORCEMENT FROM THAT WHICH WAS EFFECT FOR NATURAL GAS PIPELINE SAFETY.

### COST OF THE PROGRAM

THE COMMITTEE OBTAINED ESTIMATES FROM THE DEPARTMENT OF TRANSPORTATION THAT INITIALLY THE PROPOSED FEDERAL AUTHORITY OVER RAIL SAFETY MATTERS WILL REQUIRE A TOTAL ANNUAL APPROPRIATION AUTHORIZATION OF $22 MILLION. AT PRESENT LEVELS ABOUT $4.5 MILLION OF THIS WOULD GO TO THE ADMINISTRATION AND ENFORCEMENT OF THE FEDERAL INSPECTION AND ENFORCEMENT CAPABILITY; CONDUCT OF RAILROAD SAFETY RESEARCH; AND REIMBURSEMENT TO THOSE STATES WHICH ARE CERTIFIED TO CONDUCT THE SAFETY PROGRAM OR ENTER INTO AGREEMENTS TO ASSIST THE FEDERAL PROGRAM.

#### A. FEDERAL INSPECTION AND ENFORCEMENT PROGRAM, $11 MILLION

1. BUREAU OF RAILROAD SAFETY (FRA):
(A) OPERATING EXPENSE: $9.5 MILLION, INCLUDING BRS REGULAR FISCAL YEAR 1971 BUDGET REQUEST OF $4.55 MILLION.
(B) MANPOWER: 495 POSITIONS, FIELD AND HEADQUARTERS INCLUDES BRS PRESENT AUTHORIZED STRENGTH OF 246.
2. TRAINING PROGRAMS: $500,000, FEDERAL AND STATE FIELD INSPECTORS.
3. HAZARDOUS MATERIALS: $1 MILLION, DEVELOPMENT AND STAFFING OF HAZARDOUS MATERIALS CONTROL CENTER.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### B. FEDERAL RAILROAD RESEARCH PROGRAM, $6 MILLION

1. MAJOR RESEARCH PROGRAM AREAS:
   (A) DERAILMENT CAUSES: TRACK AND EQUIPMENT FAILURES.
   (B) COLLISIONS: HUMAN FACTORS AFFECTING RAIL SAFETY, TRAIN CONTROL, AND COMMU-
NICATIONS. PROBLEM.

### C. FEDERAL ASSISTANCE TO STATE PROGRAMS, $5 MILLION

AN ACCURATE ACCOUNT OF THE PRESENT LEVEL OF STATE INVOLVEMENT (MANPOWER AND FUNDING) IN RAIL SAFETY MATTERS IS NOT AVAILABLE. HOWEVER, IT IS ESTIMATED THAT THE STATES EMPLOY APPROXIMATELY 100 PERSONS ON RAIL SAFETY PROGRAMS. THE APPROPRIATION AUTHORIZATION REQUESTED WILL PERMIT FEDERAL ASSISTANCE AT THE PRESENT LEVEL OF STATE ACTIVITY AND WILL PERMIT EXPANSION OF THAT ASSISTANCE AS THE STATES BECOME MORE INVOLVED.

### D. COST SUMMARY

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

### *4112 SUMMARY OF THE REPORTED BILL

THE PURPOSE OF THE BILL IS TO PROMOTE SAFETY IN ALL AREAS OF RAILROAD OPERA-TIONS, TO REDUCE RAILROAD RELATED ACCIDENTS, AND TO REDUCE DEATHS AND INJURIES TO PERSONS AND DAMAGE TO PROPERTY CAUSED BY ACCIDENTS INVOLVING ANY CARRIER OF HAZARDOUS MATERIALS.
TO PROVIDE THE LEGISLATIVE FRAMEWORK TO ACHIEVE THIS PURPOSE, THE REPORTED BILL INCLUDES

### 1. RAIL SAFETY REGULATIONS

SECTION 202 AUTHORIZES THE SECRETARY OF TRANSPORTATION TO PRESCRIBE REGULA-TIONS FOR ALL AREAS OF RAILROAD SAFETY (SUPPLEMENTING EXISTING RAIL SAFETY STAT-UTES AND REGULATIONS) AND TO CONDUCT NECESSARY RESEARCH, DEVELOPMENT, TEST-ING, EVALUATION, AND TRAINING.

### 2. EMERGENCY POWERS

SECTION 203 AUTHORIZES THE SECRETARY TO PROHIBIT THE USE OF ANY FACILITY OR PIECE OF EQUIPMENT WHICH HE DETERMINES TO BE UNSAFE.

### 3. STUDY OF GRADE CROSSINGS AND OF RAILROAD RIGHTS-OF-WAY

SECTION 204 PROVIDES FOR A 1-YEAR STUDY AND REPORT TO CONGRESS BY THE SECRET-ARY OF THE PROBLEM OF ELIMINATING AND PROTECTING GRADE CROSSINGS AND PROTECT-ING RIGHTS-OF-WAY IN DENSELY POPULATED AREAS.

### 4. STATE REGULATION

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

SECTION 205 AUTHORIZES STATES TO REGULATE IN ANY AREA OF RAILROAD SAFETY UNTIL THE SECRETARY ACTS WITH RESPECT TO THE PARTICULAR SUBJECT MATTER. IN ADDITION, AFTER THE SECRETARY HAS ACTED, STATES MAY REGULATE WITH RESPECT TO ESSENTIALLY LOCAL SAFETY HAZARDS NOT OF A STATEWIDE CHARACTER.

### 5. STATE PARTICIPATION

SECTION 206 AUTHORIZES STATES TO ASSIST THE SECRETARY IN CARRYING OUT THE ACT BY CONDUCTING INVESTIGATIVE AND SURVEILLANCE ACTIVITIES ON HIS BEHALF. STATES MAY CARRY OUT THIS RESPONSIBILITY BY MEANS OF CERTIFICATION OR AGREEMENT WITH THE SECRETARY. THE SECRETARY IS AUTHORIZED TO PROVIDE UP TO 50 PERCENT OF THE COST OF THE STATE PROGRAM AND WILL RETAIN THE EXCLUSIVE AUTHORITY TO ASSESS AND COMPROMISE PENALTIES.

### 6. STATE ENFORCEMENT

IF THE SECRETARY HAS NOT ACTED WITHIN 180 DAYS OF A VIOLATION, SECTION 207 AU-THORIZES STATES PARTICIPATING UNDER SECTION 206 TO SEEK COMPLIANCE WITH FEDERAL REGULATIONS (BUT NOT ASSESSMENT OF PENALTIES IN U.S. DISTRICT COURTS).

### 7. GENERAL POWERS

SECTION 208 PROVIDES THE SECRETARY (AND THE NATIONAL TRANSPORTATION SAFETY BOARD) WITH THE NECESSARY ADMINISTRATIVE POWERS TO CARRY OUT THE ACT.

### *4113 8. PENALTIES

SECTION 209 PROVIDES FOR CIVIL PENALTIES RANGING FROM $250 TO $2,500 FOR VIOLATION OF ANY FEDERAL REGULATION.

### 9. INJUNCTIVE RELIEF

SECTION 210 PROVIDES THE SECRETARY AND, TO A LIMITED DEGREE, PARTICIPATING STATES WITH INJUNCTIVE RELIEF.

### 10. ANNUAL REPORT

SECTION 211 PROVIDES FOR AN ANNUAL REPORT TO THE CONGRESS BY MAY 1 OF EACH YEAR.

### 11. AUTHORIZATION FOR APPROPRIATIONS

SECTION 212 AUTHORIZES UP TO $21 MILLION FOR EACH OF THE FISCAL YEARS 1971, 1972, AND 1973 TO CARRY OUT TITLE II.

### 1. GENERAL AUTHORITY

SECTION 302 PROVIDES FOR A HAZARDOUS MATERIALS TECHNICAL STAFF AND A CENTRAL-IZED REPORTING SYSTEM FOR HAZARDOUS MATERIALS ACCIDENTS WITH THE DEPARTMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

OF TRANSPORTATION. THIS SECTION ALSO PROVIDES FOR A REVIEW BY THE SECRETARY OF ALL ASPECTS OF HAZARDOUS MATERIALS TRANSPORTATION.

IN ADDITION, THIS SECTION PROVIDES FOR AN ANNUAL REPORT TO THE CONGRESS BY MAY 1 OF EACH YEAR.

### 2. AUTHORIZATION FOR APPROPRIATIONS

SECTION 303 AUTHORIZES UP TO $1 MILLION FOR EACH OF THE FISCAL YEARS 1971, 1972, AND 1973 TO CARRY OUT THE PROVISIONS OF TITLE III.

### EXPLANATION OF THE REPORTED BILL BY SECTION

SECTION 101 OF THE REPORTED BILL SETS OUT THE POLICY OF CONGRESS THAT THE ACT IS TO PROMOTE SAFETY IN ALL AREAS OF RAILROAD OPERATIONS AND TO REDUCE RAILROAD-RELATED ACCIDENTS, AND TO REDUCE DEATHS AND INJURIES TO PERSONS AND TO REDUCE DAMAGE TO PROPERTY CAUSED BY ACCIDENTS INVOLVING ANY CARRIER OF HAZARDOUS MATERIALS.

### SHORT TITLE

SECTION 201 PROVIDES THAT TITLE II MAY BE CITED AS THE 'FEDERAL RAILROAD SAFETY ACT OF 1970'.

### RAIL SAFETY REGULATIONS

SECTION 202(A) PROVIDES THAT THE SECRETARY OF TRANSPORTATION SHALL PRESCRIBE APPROPRIATE FEDERAL REGULATIONS FOR ALL AREAS OF RAILROAD SAFETY. THE COMMITTEE ADDED THE WORDS 'SUPPLEMENTING PROVISIONS OF LAW AND REGULATIONS IN EFFECT ON THE DATE OF ENACTMENT OF THIS TITLE' TO THE SECRETARY'S RULEMAKING AUTHORITY TO MAKE CLEAR THAT THIS GRANT OF JURISDICTION DOES NOT REPLACE THE EXISTING RAIL SAFETY STATUTES AND IMPLEMENTING REGULATIONS*4114 TRANSFERRED TO THE DEPARTMENT OF TRANSPORTATION WHEN IT WAS ESTABLISHED. FOR COMPLETE TEST OF EXISTING RAILROAD SAFETY LAWS SEE APPENDIX B OF THIS REPORT. IT IS THE COMMITTEE'S INTENT THAT THOSE EXISTING STATUTES WILL CONTINUE TO BE ENFORCED AND ADMINISTERED BY THE DEPARTMENT IN THEIR RESPECTIVE AREAS AND THAT THE NEW AUTHORITY WILL BE IMPLEMENTED WITH RESPECT TO THOSE AREAS OF RAIL SAFETY NOT NOW SUBJECT TO FEDERAL JURISDICTION. IN OTHER WORDS, IT IS THE INTENT OF THE COMMITTEE THAT THE EXISTING STATUTES CONTINUE TO BE ADMINISTERED AND ENFORCED AS IF THIS LEGISLATION HAD NOT BEEN ENACTED. THE COMMITTEE IS AWARE THAT IS SOME INSTANCES PROBLEMS WILL ARISE WHICH CUT ACROSS THE EXISTING STATUTES AND THE NEW LAW. IN THOSE SITUATIONS, THE SECRETARY WILL BE EXPECTED, IF NECESSARY, TO ISSUE RULES UNDER TWO OR MORE STATUTES. FOR EXAMPLE, CERTAIN SELF-PROPELLED UNITS ARE NOW IN PART, SUBJECT TO THE LOCOMOTIVE INSPECTION ACT. THE REMAINING PART WILL NOW BE SUBJECT TO THE NEW LAW. THE COMMITTEE IS AWARE THAT SOME ADMINISTRATIVE PROBLEMS MAY BE PRESENTED. IT IS THE DESIRE OF THE COMMITTEE, HOWEVER, AT THIS TIME, THAT THE DEPARTMENT MAKE ITS BEST EFFORT TO CARRY OUT THE NEW STATUTE IN CONCERT WITH THE EXISTING REGULATORY FRAMEWORK.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

THE SECRETARY'S AUTHORITY TO REGULATE EXTENDS TO ALL AREAS OF RAILROAD SAFETY. THIS LEGISLATION IS INTENDED TO ENCOMPASS ALL THOSE MEANS OF RAIL TRANSPORTATION AS ARE COMMONLY INCLUDED WITHIN THE TERM. THUS, 'RAILROAD' IS NOT LIMITED TO THE CONFINES OF 'COMMON CARRIER BY RAILROAD' AS THAT LANGUAGE IS DEFINED IN THE INTERSTATE COMMERCE ACT. THE SECRETARY WILL HAVE JURISDICTION UNDER THE BILL TO REGULATE ALL AREAS OF RAILROAD SAFETY IN ADDITION TO THOSE AREAS CURRENTLY REGULATED. IT SHOULD BE NOTED THAT THIS NEW GRANT OF AUTHORITY WILL ENABLE THE SECRETARY, IF NECESSARY, TO REGULATE INTRASTATE CARRIERS IN SUCH AREAS AS SAFETY APPLIANCES, POWER BRAKES AND THE LIKE, IN THE SAME MANNER AS INTERSTATE CARRIERS ARE NOW REGULATED UNDER EXISTING STATUTES. IN ADDITION, THE SECRETARY'S JURISDICTION WOULD EXTEND TO RAIL OPERATIONS IN AREAS PRESENTLY GOVERNED BY COMPACTS AND BY OTHER MUNICIPAL AUTHORITIES SUCH AS THE METROPOLITAN TRANSIT AUTHORITY IN NEW YORK. THE SECRETARY, AFTER AFFORDING AN OPPORTUNITY FOR ORAL HEARING, HAS DISCRETIONARY AUTHORITY UNDER SECTION 202(C), DISCUSSED BELOW, TO EXEMPT THOSE RAILROADS AND THOSE ACTIVITIES NOT NOW INVOLVED IN OR AFFECTED BY THE RAIL SAFETY PROBLEM.

UNDER SECTION 202(A) THE SECRETARY WILL ALSO HAVE AUTHORITY TO CONDUCT RESEARCH, DEVELOPMENT, TESTING, EVALUATION, AND TRAINING. RAIL SAFETY RESEARCH AND DEVELOPMENT IS ONE OF THE MOST NEGLECTED AREAS OF THE RAIL SAFETY PICTURE AND IT IS THE INTENT OF THE COMMITTEE THAT THE SECRETARY'S AUTHORITY IN THIS AREA BE AS COMPREHENSIVE AS POSSIBLE TO ACHIEVE THE TECHNOLOGICAL, MANPOWER, AND OTHER IMPROVEMENTS NECESSARY TO BRING ABOUT AN ADEQUATE LEVEL OF SAFETY ON THE NATION'S RAILROADS.

THIS SECTION EXPRESSLY PROVIDES THAT THE SECRETARY'S AUTHORITY OVER ALL AREAS OF RAILROAD SAFETY IS NOT TO BE CONSTRUED TO PREVENT MANAGEMENT AND LABOR FROM BARGAINING COLLECTIVELY UNDER THE RAILWAY LABOR ACT INCLUDING AGREEMENTS RELATING TO QUALIFICATIONS OF EMPLOYEES, PROVIDED THAT SUCH AGREEMENTS ARE NOT INCONSISTENT WITH FEDERAL SAFETY REQUIREMENTS. THE EXTENT TO WHICH COLLECTIVE BARGAINING RELATING TO QUALIFICATIONS*4115 OF EMPLOYEES HAS NOT BEEN CONSIDERED SUBJECT TO THE RAILWAY LABOR ACT, THIS SECTION IS INTENDED TO MAKE IT APPLICABLE TO THE RAILWAY ACT.

THE COMMITTEE ADDED A PROVISION THAT THE SECRETARY'S AUTHORITY, WITH RESPECT TO QUALIFICATIONS OF EMPLOYEES, IS LIMITED TO THOSE QUALIFICATIONS SPECIFICALLY RELATED TO SAFETY. IT IS THE INTENT OF THE COMMITTEE THAT THE PHRASE 'EXCEPT SUCH QUALIFICATIONS AS ARE SPECIFICALLY RELATED TO SAFETY' BE CONSTRUED TO MEAN THAT WITH RESPECT TO PHYSICAL QUALIFICATIONS THE SECRETARY SHOULD CONSIDER ONLY CONDITIONS THAT CAN BE DESCRIBED AS PHYSICAL OR MEDICAL DISABILITIES SPECIFICALLY RELATED TO SAFETY AND THAT SUCH PHRASE NOT BE CONSTRUED TO GIVE THE SECRETARY ANY AUTHORITY TO PRESCRIBE A REGULATION OR STANDARD WHICH MIGHT DISQUALIFY AN EMPLOYEE FOR SAFETY REASONS SOLELY BY REASON OF AGE.

SECTION 202(B) PROVIDES THAT RULEMAKING SHALL BE SUBJECT TO SECTION 553 OF TITLE 5 OF THE UNITED STATES CODE. IN ADDITION, THIS SECTION SPECIFICALLY PROVIDES THAT OPPORTUNITY TO COMMENT ON THE PROPOSED RULEMAKING MUST INCLUDE RIGHT TO AN ORAL PRESENTATION. THEREFORE, SECTION 202(B) MAKES INAPPLICABLE THE PROVISIONS OF SECTION 553 OF TITLE 5, U.S.C. WHICH PROVIDES THAT NOTICE AND HEARING PROCEDURES

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

NEED NOT BE FOLLOWED WHEN THE AGENCY FOR GOOD CAUSE FINDS THAT NOTICE AND PUBLIC PROCEDURE THEREON ARE IMPRACTICABLE, UNNECESSARY, OR CONTRARY TO THE PUBLIC INTEREST. THE OPPORTUNITY FOR ORAL PRESENTATIONS SHALL BE HELD IN EVERY SITUATION. FOR COMPLETE TEXT OF EXISTING ADMINISTRATIVE PROCEDURAL PROVISIONS SEE APPENDIX A OF THIS REPORT.

SECTION 202(C) AUTHORIZES THE SECRETARY TO WAIVE, IN WHOLE OR IN PART, COMPLIANCE WITH FEDERAL REQUIREMENTS. THIS SECTION SPECIFICALLY PROVIDES, HOWEVER, THAT THE PROCEDURES OF SECTION 202(B) WILL BE APPLICABLE AND THAT OPPORTUNITY FOR ORAL PRESENTATIONS WILL BE GRANTED IN THE SAME MANNER. THE SECRETARY IS REQUIRED TO MAKE PUBLIC HIS REASONS FOR GRANTING ANY WAIVER.

SECTION 202(D) PROVIDES THAT THE SECRETARY WILL CONSIDER EXISTING RAILROAD SAFETY DATA AND STANDARDS IN PRESCRIBING RULES.

SECTION 202(E) DIRECTS THE SECRETARY TO ISSUE INITIAL RAILROAD SAFETY REQUIREMENTS WITHIN 1 YEAR OF THE DATE OF ENACTMENT OF THE TITLE. THE BILL, AS ORIGINALLY CONSIDERED BY THE COMMITTEE, REQUIRED THE SECRETARY TO ISSUE INITIAL RULES BY SEPTEMBER 1, 1970, AND NEW AND REVISED RULES WITHIN 18 MONTHS AFTER ENACTMENT OF THE ACT. THE COMMITTEE BELIEVES THE MORE PRACTICAL APPROACH IS TO GIVE THE SECRETARY 1 YEAR FROM DATE OF ENACTMENT TO ISSUE INITIAL RULES. IT IS WELL AWARE, HOWEVER, THAT THESE INITIAL RULES WILL NOT BE COMPLETE. THERE WILL BE MANY AREAS REMAINING TO BE REGULATED. THE COMMITTEE HAS SET A 1-YEAR TARGET DATE, HOWEVER, FOR INITIAL RULES IN THOSE AREAS NEEDING THE MOST ATTENTION. IT SHOULD BE ADDED, HOWEVER, THAT THE COMMITTEE HAS NO INTENTION TO INDUCE THE DEPARTMENT TO PRESCRIBE REGULATIONS WHICH WILL LATER TURN OUT TO BE IMPRACTICAL OR IMPOSSIBLE. IN THOSE AREAS WHERE FURTHER STUDY IS NEEDED AND WHERE ADEQUATE RESEARCH AND DEVELOPMENT MUST BE PERFORMED, THE COMMITTEE EXPECTS THE DEPARTMENT TO DO THE NECESSARY PRELIMINARY WORK BEFORE ISSUING RULES. IT SHOULD BE NOTED ALSO THAT IT IS THE COMMITTEE'S INTENT THAT THESE INITIAL RULES WILL BE PERMANENT RULES AND NOT SOME TEMPORARY EXPEDIENCY TO COMPLY WITH THE 1-YEAR REQUIREMENT.

**4116 SECTION 202(F) PROVIDES THAT ANY FINAL AGENCY ACTION TAKEN UNDER SECTION 202 WILL BE SUBJECT TO JUDICIAL REVIEW IN ACCORDANCE WITH CHAPTER 7 OF TITLE 5 OF THE UNITED STATES CODE. FOR COMPLETE TEXT OF JUDICIAL REVIEW PROVISIONS SEE APPENDIX A OF THIS REPORT. IT SHOULD BE NOTED HERE THAT UNDER EXISTING LAW (SEC. 6(F) (3) (C) OF THE DEPARTMENT OF TRANSPORTATION ACT; 49 U.S.C. 1655(F) (3) (C) FINAL AGENCY ACTION IN THE DEPARTMENT OF TRANSPORTATION IS VESTED IN THE ADMINISTRATORS OF THE RESPECTIVE AGENCIES. IT IS THE COMMITTEE'S UNDERSTANDING THAT THE SECRETARY MAY DELEGATE FINAL ACTION TO THE FEDERAL RAILROAD ADMINISTRATOR FOR PURPOSES OF THIS PROVISION. THIS WOULD CONFORM THE NEW STATUTE TO THE EXISTING SITUATION WITHIN THE DEPARTMENT.

### EMERGENCY POWERS

SECTION 203 AUTHORIZES THE SECRETARY TO ORDER OUT OF SERVICE ANY FACILITY OR PIECE OF EQUIPMENT DETERMINED BY HIM TO BE IN AN UNSAFE CONDITION AND THEREBY CREATING AN EMERGENCY SITUATION INVOLVING A HAZARD OF DEATH OR INJURY TO PER-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

SONS AFFECTED BY IT. SUCH ORDERS OF THE SECRETARY WOULD NOT BE SUBJECT TO THE RULEMAKING PROVISIONS OF SECTION 202(B) PRIOR TO ISSUANCE. SUBSEQUENTLY, HOWEVER, OPPORTUNITY FOR REVIEW MUST BE PROVIDED IN ACCORDANCE WITH SECTION 554 OF TITLE 5 OF THE UNITED STATES CODE. FOR COMPLETE TEXT OF SUCH SECTION 554, SEE APPENDIX B OF THIS REPORT.

## GRADE CROSSINGS AND RAILROAD RIGHTS-OF-WAY STUDY

SECTION 204(A) PROVIDES FOR A STUDY OF THE PROBLEM OF ELIMINATING AND PROTECT-ING RAILROAD GRADE CROSSINGS AND OF PROTECTING PEDESTRIANS IN DENSELY POPU-LATED AREAS ALONG RAILROAD RIGHTS-OF-WAY. THE SECRETARY HAS 1 YEAR FROM DATE OF ENACTMENT OF THE ACT TO SUBMIT HIS REPORT TO THE PRESIDENT FOR TRANSMITTAL TO THE CONGRESS. THE REPORT MUST INCLUDE THE SECRETARY'S RECOMMENDATION FOR EQUITABLE ALLOCATION OF THE ECONOMIC COSTS OF ANY PROGRAM PROPOSED AS A RES-ULT OF THE STUDY.

THE COMMITTEE IS AWARE THAT GRADE CROSSING ACCIDENTS CONSTITUTE ONE OF THE MAJOR CAUSES OF FATALITIES CONNECTED WITH RAIL OPERATIONS. THE NEED TO DO SOMETHING ABOUT THESE TERRIBLE ACCIDENTS WHICH HAVE ONE OF THE HIGHEST INCID-ENTS OF DEATH AND SERIOUS INJURY PER ACCIDENT, NECESSITATES AN IMMEDIATE ATTACK ON THE GRADE CROSSING PROBLEM AS SOON AS POSSIBLE. FOR THIS REASON, SECTION 204(B) OF THE BILL DIRECTS THE SECRETARY PURSUANT TO HIS AUTHORITY UNDER THIS ACT AND PURSUANT TO HIS AUTHORITY OVER HIGHWAY, TRAFFIC, AND MOTOR VEHICLE SAFETY, AND HIGHWAY CONSTRUCTION, TO UNDERTAKE A COORDINATED EFFORT TOWARD THE OBJECT-IVE OF DEVELOPING AND IMPLEMENTING SOLUTIONS TO THE GRADE CROSSING PROBLEM, AS WELL AS MEASURES TO PROTECT PEDESTRIANS IN DENSELY POPULATED AREAS ALONG RAIL-ROAD RIGHTS-OF-WAY.

## STATE REGULATION

SECTION 205 OF THE BILL DECLARES THAT IT IS THE POLICY OF CONGRESS THAT RAIL SAFETY REGULATIONS BE NATIONALLY UNIFORM TO THE EXTENT PRACTICABLE. IT PROVIDES, HOWEVER, THAT UNTIL THE SECRETARY ACTS WITH RESPECT TO A PARTICULAR SUBJECT MATTER, A STATE MAY CONTINUE TO REGULATE IN THAT AREA. ONCE THE SECRET-ARY HAS PRESCRIBED A UNIFORM NATIONAL STANDARD THE STATE WOULD NO LONGER HAVE AUTHORITY TO ESTABLISH STATEWIDE STANDARDS WITH *4117 RESPECT TO RAIL SAFETY. THE STATE MAY, HOWEVER, ADOPT OR CONTINUE IN FORCE AN ADDITIONAL OR MORE STRINGENT REQUIREMENT WHEN NECESSARY TO ELIMINATE OR REDUCE AN ESSEN-TIALLY LOCAL SAFETY HAZARD, PROVIDED IT IS NOT INCOMPATIBLE WITH FEDERAL RE-QUIREMENTS AND DOES NOT CREATE AN UNDUE BURDEN ON INTERSTATE COMMERCE.

THE PURPOSE OF THIS LATTER PROVISION IS TO ENABLE THE STATES TO RESPOND TO LOC-AL SITUATIONS NOT CAPABLE OF BEING ADEQUATELY ENCOMPASSED WITHIN UNIFORM NA-TIONAL STANDARDS. THE STATES WILL RETAIN AUTHORITY TO REGULATE INDIVIDUAL LOC-AL PROBLEMS WHERE NECESSARY TO ELIMINATE OR REDUCE ESSENTIALLY LOCAL RAIL-ROAD SAFETY HAZARDS. SINCE THESE LOCAL HAZARDS WOULD NOT BE STATEWIDE IN CHAR-ACTER, THERE IS NO INTENT TO PERMIT A STATE TO ESTABLISH STATEWIDE STANDARDS SU-PERIMPOSED ON NATIONAL STANDARDS COVERING THE SAME SUBJECT MATTER.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

## STATE PARTICIPATION

SECTION 206 IS ONE OF THE KEY SECTIONS OF THE BILL. AS ORIGINALLY CONSIDERED BY THE COMMITTEE, THIS SECTION ALLOWED CERTIFYING STATES TO ADOPT ALL FEDERAL STANDARDS AND, EXCEPT FOR THOSE INVOLVING ROLLING STOCK AND EMPLOYEE QUALIFICATIONS, ENFORCE THEM AT THE STATE LEVEL. VIOLATIONS INVOLVING ROLLING STOCK AND EMPLOYEE QUALIFICATIONS WERE RESERVED TO THE SECRETARY FOR ENFORCEMENT AT THE FEDERAL LEVEL. THE COMMITTEE BELIEVES, HOWEVER, THAT SUCH A VITAL PART OF OUR INTERSTATE COMMERCE AS RAILROADS SHOULD NOT BE SUBJECT TO THIS MULTIPLICITY OF ENFORCEMENT BY VARIOUS CERTIFYING STATES AS WELL AS THE FEDERAL GOVERNMENT. SEE DISCUSSION EARLIER IN THIS REPORT UNDER 'THE ROLE OF THE STATES IN RAIL SAFETY' AND UNDER 'COMPARISON OF RAIL AND GAS PIPELINE SAFETY FOR PURPOSES OF STATE PARTICIPATION.' AT THE SAME TIME, THE VALUABLE ASSISTANCE OF THE STATES WILL BE VERY MUCH NEEDED TO CARRY OUT THIS ACT. ACCORDINGLY, THE COMMITTEE HAS REVISED THE SECTION AS FOLLOWS:

SECTION 206(A) PERMITS A STATE TO PARTICIPATE IN CARRYING OUR INVESTIGATIVE AND SURVEILLANCE ACTIVITIES ON BEHALF OF THE SECRETARY. IN ORDER TO PARTICIPATE, THE APPROPRIATE STATE AGENCY WHICH HAS JURISDICTION OVER RAIL SAFETY WITHIN THE STATE SUBMITS TO THE SECRETARY AN ANNUAL CERTIFICATION THAT SUCH STATE AGENCY--

(1) HAS REGULATORY JURISDICTION OVER THE SAFETY PRACTICES APPLICABLE TO RAILROAD FACILITIES, EQUIPMENT, ROLLING STOCK, AND OPERATIONS WITHIN THE STATE;

(2) HAS BEEN FURNISHED A COPY OF EACH APPLICABLE FEDERAL SAFETY REGULATION; AND

(3) IS CONDUCTING THE INVESTIGATIVE AND SURVEILLANCE ACTIVITIES PRESCRIBED BY THE SECRETARY AS NECESSARY TO ASSIST HIM IN ENFORCING FEDERAL REQUIREMENTS.

THE SECRETARY WOULD RETAIN THE EXCLUSIVE AUTHORITY TO ASSESS AND COMPROMISE PENALTIES AND (EXCEPT AS PROVIDED IN SECTION 207) TO REQUEST INJUNCTIVE RELIEF FOR VIOLATIONS AND TO RECOMMEND COURT ACTION BY THE DEPARTMENT OF JUSTICE OR THE APPROPRIATE U.S. ATTORNEY UNDER SECTIONS 209 AND 210.

*4118 SECTION 206(B) SETS OUT IN DETAIL THE CONTENTS OF THE REPORT WHICH EACH CERTIFYING STATE WOULD BE REQUIRED TO INCLUDE WITH ITS CERTIFICATION. THESE REPORTS MUST INCLUDE:

(1) THE NAME AND ADDRESS OF EACH RAILROAD SUBJECT TO THE SAFETY JURISDICTION OF THE STATE AGENCY.

(2) ALL ACCIDENTS OR INCIDENTS REPORTED DURING THE PRECEDING YEAR BY EACH RAILROAD INCLUDING PERSONAL INJURY REQUIRING HOSPITALIZATION, FATALITY, OR PROPERTY DAMAGE EXCEEDING $750, OR SUCH HIGHER AMOUNT AS THE SECRETARY MAY PRESCRIBE, TOGETHER WITH THE SUMMARY OF THE STATE AGENCY'S INVESTIGATION AS TO THE CAUSE OR CIRCUMSTANCES SURROUNDING EACH SUCH ACCIDENT OR INCIDENT. IT SHOULD BE NOTED THAT THE ACCIDENT REPORTS ACT AUTHORIZES THE DEPARTMENT OF TRANSPORTATION AND THE NATIONAL TRANSPORTATION SAFETY BOARD TO INVESTIGATE ALL SUCH ACCIDENTS AND TO DETERMINE THE PROBABLE CAUSE. IT IS THE INTENT OF THE COMMITTEE THAT WHERE SUCH ACCIDENTS ARE INVESTIGATED BY THE DEPARTMENT AND THE NATIONAL TRANSPORTATION SAFETY BOARD, IT WOULD NOT BE NECESSARY TO REQUIRE THE STATE

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

AGENCY TO CONDUCT AN INVESTIGATION.

(3) THE RECORD MAINTENANCE REPORTING AND INSPECTION PRACTICES CONDUCTED BY THE STATE AGENCY TO ASSIST THE SECRETARY IN HIS ENFORCEMENT OF FEDERAL REGULATIONS.

(4) SUCH OTHER INFORMATION AS THE SECRETARY MAY REQUIRE.

THE REPORT INCLUDED WITH THE FIRST ANNUAL CERTIFICATION NEED NOT SHOW INFORMATION UNAVAILABLE AT THAT TIME. IN ADDITION, IF AFTER RECEIPT OF ANNUAL CERTIFICATION, THE SECRETARY DETERMINES THAT THE STATE AGENCY IS NOT SATISFACTORILY COMPLYING WITH ITS RESPONSIBILITIES, HE MAY, AFTER NOTICE AND OPPORTUNITY FOR HEARING, REJECT THE CERTIFICATION IN WHOLE OR IN PART TO< TAKE SUCH OTHER ACTION HE DEEMS APPROPRIATE. THE SECTION SPECIFICALLY PROVIDES THAT THE BURDEN WOULD BE ON THE STATE AGENCY TO SHOW THAT IT IS SATISFACTORILY CARRYING OUT SUCH INVESTIGATIVE AND SURVEILLANCE ACTIVITIES AS PRESCRIBED BY THE SECRETARY.

SECTION 206(E) AUTHORIZES THE SECRETARY TO ENTER INTO AGREEMENTS WITH NONCERTIFYING STATES AUTHORIZING SUCH STATES TO CONDUCT ALL OR ANY PART OF THE INVESTIGATIVE AND SURVEILLANCE ACTIVITIES NECESSARY TO ASSIST HIM IN CARRYING OUT HIS RESPONSIBILITIES UNDER THE ACT. SUCH AGREEMENTS MAY BE TERMINATED IN WHOLE OR IN PART BY THE SECRETARY AFTER NOTICE AND OPPORTUNITY FOR HEARING WHERE HE FINDS THAT THE STATE AGENCY HAS FAILED TO PROVIDE ALL OR ANY PART OF THE INVESTIGATIVE AND SURVEILLANCE ACTIVITIES REQUIRED BY HIM. WHERE SUCH AGREEMENTS OR PARTS THEREOF WERE TERMINATED, THE SECRETARY MUST MAKE A FINDING AND DETERMINATION PUBLISHED IN THE FEDERAL REGISTER TO BECOME EFFECTIVE NO SOONER THAN 15 DAYS AFTER THE DATE OF PUBLICATION.

SECTION 206(D) AUTHORIZES THE SECRETARY TO PAY UP TO 50 PERCENT OF THE COST OF A STATE PROGRAM. THE STATE WOULD BE REQUIRED TO ASSURE THE SECRETARY THAT IT WOULD PROVIDE THE REMAINING FUNDS FOR THE PROGRAM AND THAT THE LEVEL OF EXPENDITURES BY THE STATE WOULD NOT BE REDUCED BELOW THE AVERAGE LEVEL OF SUCH EXPENDITURES FOR THE LAST 2 FISCAL YEARS PRECEDING THE DATE OF ENACTMENT OF THIS TITLE.

SECTION 206(E) AUTHORIZES THE SECRETARY TO MONITOR STATE ACTIVITIES TO ASSURE COMPLIANCE WITH THE ACT.

**\*4119** SECTION 206(F) PROVIDES THAT WHERE A NEW OR AMENDED FEDERAL RULE IS PUT INTO EFFECT A CERTIFYING STATE WOULD NOT BE RESPONSIBLE FOR ENFORCEMENT OF SUCH NEW OR AMENDED FEDERAL REGULATION UNTIL SUCH TIME AS THE STATE AGENCY HAS SUBMITTED AN APPROPRIATE CERTIFICATION IN ACCORDANCE WITH THE PROVISIONS OF SECTION 206(A). IT IS THE COMMITTEE'S VIEW THAT A STATE COULD AMEND ITS CERTIFICATION TO PICK UP A NEW OR AMENDED FEDERAL RULE WITHOUT MAKING A NEW CERTIFICATION WITH RESPECT TO THE ENTIRE PROGRAM.

STATE ENFORCEMENT

SECTION 207 HAS BEEN ADDED BY THE COMMITTEE TO AUTHORIZE PARTICIPATING STATES TO SEEK ENFORCEMENT OF FEDERAL REGULATIONS UNDER LIMITED CIRCUMSTANCES. THE SECTION PROVIDES THAT IF THE SECRETARY HAS NOT ACTED TO ASSESS A CIVIL PENALTY UNDER SECTION 209 OR TO SEEK INJUNCTIVE RELIEF UNDER SECTION 210 WITHIN 180 DAYS OF

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

A VIOLATION, A STATE AGENCY PARTICIPATING IN INVESTIGATIVE AND SURVEILLANCE ACTIVITIES UNDER SECTION 206 MAY APPLY TO THE U.S. DISTRICT COURT WHERE THE VIOLATION OCCURRED FOR THE ENFORCEMENT OF THE APPROPRIATE FEDERAL RULE, REGULATION, OR STANDARD INVOLVED. THE COURT WILL HAVE JURISDICTION TO ENFORCE COMPLIANCE BY INJUNCTION OR OTHER APPROPRIATE PROCESS TO RESTRAIN FURTHER VIOLATIONS OR TO ENJOIN COMPLIANCE. IT SHOULD BE NOTED THAT THIS SECTION DOES NOT APPLY TO THE ASSESSMENT OF PENALTIES OR IN ANY CASE WHERE THE SECRETARY DETERMINES IN WRITING THAT NO VIOLATION HAS OCCURRED.

## GENERAL POWERS

SECTION 208(A) PROVIDES THE SECRETARY WITH THE NECESSARY ADMINISTRATIVE POWERS TO CARRY OUT HIS DUTIES UNDER THE ACT. THESE WOULD INCLUDE, BUT WOULD NOT BE LIMITED TO, CONDUCTING INVESTIGATIONS, MAKING REPORTS, ISSUING SUBPENAS, REQUIRING PRODUCTION OF DOCUMENTS, TAKING DEPOSITIONS, PRESCRIBING RECORDKEEPING AND REPORTING REQUIREMENTS, AND CARRYING OUT AND CONTRACTING FOR RESEARCH, DEVELOPMENT, TESTING, EVALUATION, AND TRAINING. THE SECRETARY IS ALSO EXPRESSLY AUTHORIZED TO DELEGATE TO ANY PUBLIC BODY OR QUALIFIED PERSON FUNCTIONS RESPECTING EXAMINATION, INSPECTING, AND TESTING OF RAILROAD FACILITIES, EQUIPMENT, ROLLING STOCK, OPERATIONS, OR PERSONS AS HE DEEMS NECESSARY TO CARRY OUT THE PROVISIONS OF THE ACT.

SECTION 208(B) PLACES DETERMINATION OF CAUSE OR PROBABLE CAUSE AND REPORTING OF THE FACTS AND CIRCUMSTANCES RELATING TO ACCIDENTS INVESTIGATED BY THE SECRETARY UNDER SUBSECTION (A) IN THE NATIONAL TRANSPORTATION SAFETY BOARD. THIS IS IN ACCORD WITH THE EXISTING SITUATION UNDER THE ACCIDENTS REPORTS ACT AND THE DEPARTMENT OF TRANSPORTATION ACT.

SECTION 208(C) PROVIDES THAT FEDERAL AND, IN THE CASE OF PARTICIPATING STATES, STATE SAFETY INSPECTORS AND INVESTIGATORS WILL HAVE ACCESS TO PROPERTY, RECORDS, AND OPERATIONS OF RAILROADS AT REASONABLE TIMES AND IN A REASONABLE MANNER. HOWEVER, THEY WOULD BE REQUIRED TO PROVIDE PROPER IDENTIFICATION ON REQUEST. IT SHOULD BE NOTED THAT THERE IS NO INTENT HERE TO CHANGE THE PRESENT PRACTICE FOLLOWED UNDER THE EXISTING SAFETY STATUTES AND REGULATIONS. THE USE OF THE TERM 'REASONABLE TIME' SHALL BE CONSTRUED TO MEAN AT ANY TIME WHEN TRAINS ARE OPERATING ON THE RAILROAD PROPERTY.

SECTION 208(D) PROVIDES THAT REGULATIONS OF THE SECRETARY UNDER THE ACT AND REGULATIONS OF PARTICIPATING STATES SHALL HAVE THE FORCE AND EFFECT OF LAW FOR PURPOSES OF SECTIONS 3 AND 4 OF THE FEDERAL EMPLOYERS' LIABILITY*4120 ACT. FOR COMPLETE TEXT OF THESE SECTIONS SEE APPENDIX C OF THIS REPORT. THESE SECTIONS ELIMINATE THE DEFENSES OF CONTRIBUTORY NEGLIGENCE AND ASSUMPTION OF THE RISK WHERE AN EMPLOYEE IS INJURED AS A RESULT OF A VIOLATION OF A STATUTE ENACTED FOR THE SAFETY OF EMPLOYEES. THIS PROVISION MAKES CLEAR WHAT THE SUPREME COURT HAS STATED ON A NUMBER OF OCCASIONS WHERE VIOLATIONS OF FEDERAL REQUIREMENTS OCCUR. IN ADDITION, IT ESTABLISHES SIMILAR PROTECTION FOR INJURED EMPLOYEES WHERE VIOLATIONS OF REGULATIONS OF PARTICIPATING STATES ARE INVOLVED.

## PENALTIES

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

SECTION 209(A) MAKES IT UNLAWFUL FOR ANY RAILROAD TO DISOBEY, DISREGARD, OR FAIL TO ADHERE TO ANY REGULATION OF THE SECRETARY UNDER THIS TITLE.

SECTION 209(B) DIRECTS THE SECRETARY TO INCLUDE IN OR MAKE APPLICABLE TO ANY RAILROAD SAFETY REGULATION ISSUED UNDER TITLE II A CIVIL PENALTY FROM $250 TO $2,500 FOR VIOLATION OF SUCH REGULATIONS. THE SECRETARY WOULD HAVE THE FLEXIBILITY TO FIX PENALTIES WITHIN THE RANGE PROVIDED IN ACCORDANCE WITH THE SERIOUSNESS OF THE VIOLATION.

SECTION 209(C) DIRECTS THE SECRETARY TO ASSESS A CIVIL PENALTY IN THE AMOUNT PROVIDED IN, OR APPLICABLE TO, THE REGULATION FOR ANY VIOLATION OF A REGULATION BY A RAILROAD. EACH DAY OF SUCH VIOLATION WOULD BE A SEPARATE OFFENSE. HOWEVER, THE SECRETARY WOULD BE AUTHORIZED TO COMPROMISE ANY SUCH PENALTY FOR AN AMOUNT NOT LESS THAN $250. IF NO COMPROMISE IS REACHED THE PENALTY MAY BE RECOVERED IN A CIVIL SUIT IN THE U.S. DISTRICT COURT FOR THE DISTRICT WHERE THE VIOLATION OCCURRED.

IT IS THE COMMITTEE'S UNDERSTANDING THAT PENALTIES NOW PROVIDED FOR UNDER EXISTING STATUTES ARE COMPROMISED BY THE SECRETARY THROUGH AN INFORMAL PROCEDURE UNDER THE FEDERAL CLAIMS COLLECTION ACT OF 1966 AND IMPLEMENTING REGULATIONS. IT IS THE COMMITTEE'S INTENTION THAT THE ASSESSMENT AND COMPROMISE OF PENALTIES UNDER THIS LEGISLATION WILL BE CARRIED OUT IN THE SAME MANNER AND WITH SIMILAR INFORMAL PROCEDURES; EXCEPT THAT THE REQUIREMENT OF NO COMPROMISE BELOW $250 IS SUPERIMPOSED UPON THE FEDERAL CLAIMS COLLECTION ACT PROCEDURES. FOR COMPLETE TEXT OF THE RECENTLY ENACTED FEDERAL CLAIMS COLLECTION ACT, SEE APPENDIX E OF THIS REPORT.

SECTION 209(D) PROVIDES THAT PROCESS MAY BE SERVED IN ANY DISTRICT IN CONNECTION WITH ANY CIVIL ACTION FILED UNDER THIS TITLE.

INJUNCTIVE RELIEF

SECTION 210(A) VESTS IN THE U.S. DISTRICT COURT JURISDICTION TO RESTRAIN VIOLATION OF ANY FEDERAL REGULATION UPON THE REQUEST OF THE SECRETARY AND UPON PETITION BY THE ATTORNEY GENERAL ON BEHALF OF THE UNITED STATES, OR UPON APPLICATION BY A STATE AGENCY UNDER SECTION 207. THE PROCEEDING IS SUBJECT TO THE PROVISIONS OF RULES 65(A) AND (B) OF THE FEDERAL RULES OF CIVIL PROCEDURE. RULE 65(A) PROVIDES THAT NO PRELIMINARY INJUNCTION SHALL BE ISSUED WITHOUT NOTICE TO THE ADVERSE PARTY. IN ADDITION, IT PROVIDES THAT WHERE A HEARING ON AN APPLICATION OR A PRELIMINARY INJUNCTION IS INVOLVED, THE COURT MAY ORDER THE TRIAL OF THE ACTION ON THE MERITS TO BE ADVANCED AND CONSOLIDATED WITH THE HEARING ON THE APPLICATION. RULE 65(B) ESTABLISHES PROCEDURES FOR THE GRANTING OF TEMPORARY *4121 RESTRAINING ORDERS. THESE PROCEDURES COVER SUCH MATTERS AS NOTICE, HEARING, AND DURATION OF SUCH ORDERS.

SECTION 210(B) AUTHORIZES TRIAL BY JURY ON DEMAND OF THE ACCUSED IN ANY CASE INVOLVING CRIMINAL CONTEMPT FOR VIOLATION OF AN INJUNCTION OR RESTRAINING ORDER ISSUED UNDER SECTION 210. SUCH PROCEEDING SHALL BE IN ACCORD WITH RULE 42(B) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE. RULE 42(B) PROVIDES FOR DISPOSITION OF CRIMINAL CONTEMPT UPON NOTICE AND HEARING. IT INCLUDES THE RIGHT TO TRIAL BY

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

JURY IN ANY CASE IN WHICH AN ACT OF CONGRESS SO PROVIDES.
   FOR COMPLETE TEXT OF THE RULES OF PROCEDURE SEE APPENDIX D OF THIS REPORT.

## ANNUAL REPORT

   SECTION 211 PROVIDES FOR AN ANNUAL REPORT TO THE CONGRESS ON THE ADMINISTRA-
TION OF THIS TITLE BY MAY 1 OF EACH YEAR. THE REPORT WOULD INCLUDE (1) A THOROUGH
STATISTICAL COMPILATION OF THE ACCIDENTS AND CASUALTIES BY CAUSE OCCURRING IN
SUCH YEAR, (2) A LIST OF FEDERAL RAILROAD SAFETY REGULATIONS ISSUED UNDER THIS
TITLE DURING THE YEAR, (3) A SUMMARY OF THE REASONS FOR EACH WAIVER GRANTED UN-
DER SECTION 202(C) OF THIS TITLE, (4) AN EVALUATION OF THE DEGREE OF OBSERVANCE OF
APPLICABLE RAILROAD SAFETY REGULATIONS, (5) A SUMMARY OF OUTSTANDING PROBLEMS
CONFRONTING THE ADMINISTRATION OF THE ACT, (6) AN ANALYSIS AND EVALUATION OF RE-
SEARCH AND RELATED ACTIVITY COMPLETED DURING THE YEAR, (7) A LIST OF COMPLETED
AND PENDING JUDICIAL ACTIONS FOR THE ENFORCEMENT OF ANY FEDERAL RAILROAD
SAFETY REGULATION ISSUED UNDER THIS TITLE, (8) THE EXTENT TO WHICH TECHNICAL IN-
FORMATION WAS DISSEMINATED TO THE SCIENTIFIC COMMUNITY AND CONSUMER INFORMA-
TION WAS MADE AVAILABLE TO THE PUBLIC, (9) A COMPILATION OF THE CERTIFICATIONS
FILED BY THE VARIOUS STATES PARTICIPATING UNDER SECTION 206, (10) A LIST OF THE CER-
TIFICATIONS REJECTED IN WHOLE OR IN PART DURING THE YEAR TOGETHER WITH THE SUM-
MARY OF THE REASONS FOR EACH SUCH REJECTION, (11) A LIST OF THE AGREEMENTS
ENTERED INTO WITH STATE AGENCIES AND A LIST OF THE AGREEMENTS TERMINATED IN
WHOLE OR IN PART TOGETHER WITH A SUMMARY OF THE REASONS FOR SUCH TERMINATION.
   SUBSECTION (B) OF SECTION 211 DIRECTS THAT THE REPORT SHALL CONTAIN SUCH RECOM-
MENDATIONS FOR ADDITIONAL LEGISLATION AS THE SECRETARY DEEMS NECESSARY.

## AUTHORIZATION FOR APPROPRIATIONS

   SECTION 212 OF TITLE II AUTHORIZES APPROPRIATIONS OF $21 MILLION FOR EACH OF THE
NEXT 3 FISCAL YEARS FOR THE PURPOSE OF CARRYING OUT TITLE II OF THIS ACT.

## SHORT TITLE

   SECTION 301 PROVIDES THAT TITLE III MAY BE CITED AS THE 'HAZARDOUS MATERIALS
TRANSPORTATION CONTROL ACT OF 1970'.

## GENERAL AUTHORITY

   SECTION 302(A) REQUIRES THE SECRETARY OF TRANSPORTATION TO ESTABLISH A HAZARD-
OUS MATERIALS TECHNICAL STAFF, AND CENTRAL REPORTING SYSTEM FOR HAZARDOUS MA-
TERIALS ACCIDENTS, TO EVALUATE HAZARDS AND PROVIDE INFORMATION*4122 TO LAW EN-
FORCEMENT AND FIREFIGHTING PERSONNEL AND TO CARRIERS AND SHIPPERS, IN CONNEC-
TION WITH THE TRANSPORTATION OF HAZARDOUS MATERIALS, WITHIN 6 MONTHS AFTER THE
DATE OF ENACTMENT OF TITLE III. THIS SECTION ALSO REQUIRES THE SECRETARY, WITHIN
THE SAME 6-MONTH PERIOD, TO CONDUCT A REVIEW OF HAZARDOUS MATERIALS TRANS-
PORTATION TO DETERMINE AND RECOMMEND IMMEDIATE STEPS TO PROVIDE FOR THE SAFE
MOVEMENT OF SUCH MATERIALS.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

SECTION 302(B) SPECIFICALLY PROVIDES THAT THE AUTHORITY OF THE SECRETARY UNDER TITLE III IS IN ADDITION TO HIS AUTHORITY UNDER SECTIONS 831 THROUGH 835 OF TITLE 18, UNITED STATES CODE. FOR THE COMPLETE TEXT OF SUCH SECTIONS, SEE APPENDIX B OF THIS REPORT.

SECTION 302(C) REQUIRES THE SECRETARY TO TRANSMIT TO THE CONGRESS BY MAY 1 OF EACH YEAR A COMPREHENSIVE REPORT COVERING THE TRANSPORTATION OF HAZARDOUS MATERIALS DURING THE PRECEDING CALENDAR YEAR. THE REPORT MUST INCLUDE A STATISTICAL COMPILATION OF ACCIDENTS AND CASUALTIES OCCURRING IN SUCH YEAR IN CONNECTION WITH THE TRANSPORTATION OF HAZARDOUS MATERIALS; A LIST OF FEDERAL STANDARDS IN EFFECT DURING SUCH YEAR; A SUMMARY OF THE REASON FOR EACH WAIVER OR EXEMPTION GRANTED UNDER SECTIONS 831 THROUGH 835 OF TITLE 18, UNITED STATES CODE; AN EVALUATION OF THE DEGREE OF OBSERVANCE OF SAFETY STANDARDS RELEVANT TO THE TRANSPORTATION OF HAZARDOUS MATERIALS; AND A SUMMARY OF OUTSTANDING PROBLEMS CREATED BY SUCH TRANSPORTATION.

SECTION 302(D) PROVIDES THAT THE ANNUAL REPORT SHALL CONTAIN RECOMMENDATIONS FOR ADDITIONAL LEGISLATION DEEMED NECESSARY BY THE SECRETARY.

### AUTHORIZATION FOR APPROPRIATIONS

SECTION 303 AUTHORIZES APPROPRIATIONS IN AN AMOUNT NOT TO EXCEED $1 MILLION FOR EACH OF THE FISCAL YEARS 1971, 1972, AND 1973 TO CARRY OUT THE PROVISIONS OF TITLE III.

### SEPARABILITY

SECTION 401 CONTAINS A USUAL PROVISION RELATING TO THE SEPARABILITY OF THE PROVISIONS OF THE ACT IN CASE ANY PORTION THEREOF IS HELD INVALID.

### AGENCY COMMENTS

OFFICE OF THE SECRETARY OF TRANSPORTATION,
WASHINGTON, D.C., NOVEMBER 7, 1969.

HON. HARLEY O. STAGGERS,
CHAIRMAN, COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
U.S. HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.

DEAR MR. CHAIRMAN: YOUR REQUESTED THE VIEWS OF THE DEPARTMENT ON H.R. 14417, A BILL TO AUTHORIZE THE SECRETARY OF TRANSPORTATION TO PRESCRIBE RULES, REGULATIONS, AND PERFORMANCE AND OTHER STANDARDS AS HE FINDS NECESSARY FOR ALL AREAS OF RAILROAD SAFETY AND TO CONDUCT RAILROAD SAFETY RESEARCH.

THIS BILL IS A DEPARTMENT OF TRANSPORTATION PROPOSAL WHICH WAS SUBMITTED TO THE CONGRESS ON OCTOBER 15, 1969. IT WAS DEVELOPED ON THE BASIS OF RECOMMENDATIONS MADE BY THE SECRETARY'S RAILROAD SAFETY TASK FORCE, WHICH INCLUDED REPRESENTATIVES OF RAILROAD MANAGEMENT, RAILROAD LABOR, AND THE STATE REGULATORY COMMISSIONS. THE DEPARTMENT STRONGLY *4123 RECOMMENDS ENACTMENT OF THE LEGISLATION, AND WILL WELCOME THE OPPORTUNITY TO APPEAR BEFORE THE COMMITTEE TO PRESENT ORAL TESTIMONY IN SUPPORT OF THE MEASURE.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

SINCERELY,

CHARLES D. BAKER.
OFFICE OF THE SECRETARY OF TRANSPORTATION,
WASHINGTON, D.C., DECEMBER 1, 1969.

HON. HARLEY O. STAGGERS,
CHAIRMAN, COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
U.S. HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.

DEAR MR. CHAIRMAN: BY LETTER DATED NOVEMBER 7, 1969, THIS DEPARTMENT CONVEYED TO YOU OUR VIEW ON H.R. 14417, A BILL TO AUTHORIZE THE SECRETARY OF TRANSPORTATION TO PRESCRIBE RULES, REGULATIONS, AND PERFORMANCE AND OTHER STANDARDS AS HE FINDS NECESSARY FOR ALL AREAS OF RAILROAD SAFETY AND TO CONDUCT RAILROAD SAFETY RESEARCH.

OUR LETTER REFERRED TO H.R. 14417 AS A DEPARTMENT OF TRANSPORTATION PROPOSAL WHICH WAS SUBMITTED TO THE CONGRESS ON OCTOBER 15, 1969, AND WE RECOMMENDED ITS ENACTMENT.

HOWEVER, WE NOTE THAT THE BILL IS IDENTICAL TO OUR PROPOSAL EXCEPT FOR SECTION 12, WHICH AUTHORIZES SPECIFIC APPROPRIATIONS FOR THE FISCAL YEARS ENDING JUNE 30, 1970, 1971, AND 1972. THIS DEPARTMENT'S PROPOSAL DOES NOT AUTHORIZE SPECIFIC APPROPRIATIONS, BUT MERELY AUTHORIZES SUCH SUMS AS MAY BE NECESSARY TO CARRY OUT THE PROVISIONS OF THE ACT.

CONSEQUENTLY, WHILE WE ARE IN AGREEMENT WITH THE OTHER PROVISIONS OF THE BILL AND WOULD FAVOR THEIR ENACTMENT, WE DO NOT WISH TO BE ON RECORD AS ENDORSING THE AUTHORIZATIONS SPECIFIED IN SECTION 12. THE APPROPRIATIONS WHICH WILL BE REQUESTED WILL BE DETERMINED IN THE NORMAL BUDGETARY PROCESS AND MAY VARY FROM THE AMOUNTS INDICATED BY H.R. 14417.

SINCERELY,
CHARLES D. BAKER.

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
WASHINGTON, D.C., FEBRUARY 17, 1970.

HON. HARLEY O. STAGGERS,
CHAIRMAN, COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
HOUSE OF REPRESENTATIVES, RAYBURN HOUSE OFFICE BUILDING,
WASHINGTON, D.C.

DEAR MR. CHAIRMAN: THIS IS IN REPLY TO YOUR REQUEST FOR THE VIEWS OF THE BUREAU OF THE BUDGET ON H.R. 14417, A BILL TO AUTHORIZE THE SECRETARY OF TRANSPORTATION TO PRESCRIBE RULES, REGULATIONS, AND PERFORMANCE AND OTHER STANDARDS AS HE FINDS NECESSARY FOR ALL AREAS OF RAILROAD SAFETY AND TO CONDUCT RAILROAD SAFETY RESEARCH.

THE BUREAU OF THE BUDGET RECOMMENDS THE ENACTMENT OF H.R. 14417, WHICH INCORPORATES IN MOST RESPECTS A LEGISLATIVE PROPOSAL SUBMITTED BY THE DEPARTMENT OF TRANSPORTATION. WE WOULD RECOMMEND, HOWEVER, THAT SECTION 12 BE REVISED TO 'OPEN-END' THE APPROPRIATION AUTHORIZATION IN ORDER TO PROVIDE DESIRABLE FLEXIBILITY IN THE FUNDING OF THE PROGRAM.

SINCERELY,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

WILFRED H. ROMMEL,
ASSISTANT DIRECTOR FOR LEGISLATIVE REFERENCE.
**4124** OFFICE OF THE DEPUTY ATTORNEY GENERAL,
WASHINGTON, D.C., MARCH 20, 1970.
HON. HARLEY O. STAGGERS,
CHAIRMAN, COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.
DEAR MR. CHAIRMAN: THIS IS IN RESPONSE TO YOUR REQUEST FOR THE VIEWS OF THE DE-
PARTMENT OF JUSTICE ON VARIOUS BILLS WHICH WOULD AUTHORIZE THE SECRETARY OF
TRANSPORTATION TO PRESCRIBE RULES, REGULATIONS, AND PERFORMANCE AND OTHER
STANDARDS AS HE FINDS NECESSARY FOR RAILROAD SAFETY AND TO CONDUCT RAILROAD
SAFETY RESEARCH.
THE INTEREST OF THE DEPARTMENT OF JUSTICE IN THIS LEGISLATION IS PRIMARILY DIREC-
TED TOWARD THE ROLE OF THE ATTORNEY GENERAL IN THE CONTROL OF LITIGATION. IN
THIS RESPECT, THE ADMINISTRATION BILL (H.R. 14417) IS PREFERABLE TO PROVISIONS RELAT-
ING TO THIS SUBJECT CONTAINED IN OTHER BILLS UNDER CONSIDERATION, NOTABLY, H.R.
7068. SECTION 10 OF H.R. 14417 PROVIDES THAT CIVIL PENALTIES SET FORTH IN THAT SECTION
WOULD BE RECOVERED IN SUITS BROUGHT BY THE ATTORNEY GENERAL ON BEHALF OF THE
UNITED STATES IN THE U.S. DISTRICT COURT HAVING JURISDICTION IN THE LOCALITY WHERE
SUCH VIOLATIONS OCCURRED. THIS PROVISION CARRIES OUT THE ESTABLISHED FEDERAL
POLICY OF HAVING THE ATTORNEY GENERAL IN PRIMARY CONTROL OF LITIGATION WHEREIN
A FEDERAL DEPARTMENT OR AGENCY IS A PARTY. SECTION 11 OF H.R. 14417 LIKEWISE RE-
FLECTS THIS POLICY BY PROVIDING THAT INJUNCTIVE RELIEF WOULD BE PURSUED IN AN AP-
PROPRIATE DISTRICT COURT AT THE REQUEST OF THE SECRETARY OF TRANSPORTATION AND
UPON PETITION BY THE ATTORNEY GENERAL ON BEHALF OF THE UNITED STATES.
H.R. 14417 PROVIDES THAT CIVIL PENALTIES MAY BE COMPROMISED BY THE SECRETARY
PRIOR TO REFERRAL TO THE ATTORNEY GENERAL. IN THIS RESPECT, H.R. 14417 AGAIN FOL-
LOWS ESTABLISHED POLICY AND IS TO BE PREFERRED OVER PROVISIONS, SUCH AS THOSE
FOUND IN H.R. 7068, WHICH WOULD LODGE COMPROMISE POWERS IN THE SECRETARY EVEN
AFTER A CASE HAD BEEN REFERRED TO THE ATTORNEY GENERAL FOR APPROPRIATE ACTION.
THE DEPARTMENT HAS CONSISTENTLY TAKEN THE POSITION THAT ONCE A CASE HAS BEEN
REFERRED TO THE ATTORNEY GENERAL, WHETHER OR NOT TO COMPROMISE IS A MATTER
COMMITTED TO HIS DISCRETION.
ACCORDINGLY, AS TO THOSE MATTERS DISCUSSED ABOVE, THE DEPARTMENT OF JUSTICE
RECOMMENDS ENACTMENT OF THE PROVISIONS OF H.R. 14417; AS TO OTHER QUESTIONS RE-
LATING TO THIS LEGISLATION WE DEFER TO THE DEPARTMENT OF TRANSPORTATION.
THE BUREAU OF THE BUDGET HAS ADVISED THAT THERE IS NO OBJECTION TO THE SUBMIS-
SION OF THIS REPORT FROM THE STANDPOINT OF THE ADMINISTRATION'S PROGRAM.
SINCERELY,
RICHARD G. KLEINDIENST,
DEPUTY ATTORNEY GENERAL.
EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
WASHINGTON, D.C., MARCH 17, 1970.
HON. HARLEY O. STAGGERS,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

CHAIRMAN, COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
HOUSE OF REPRESENTATIVES, RAYBURN HOUSE OFFICE BUILDING,
WASHINGTON, D.C.
DEAR MR. CHAIRMAN: THIS IS IN REPLY TO YOUR REQUESTS FOR THE VIEWS OF THE BUR-
EAU OF THE BUDGET ON H.R. 7068, PROVIDING FOR FEDERAL RAILROAD SAFETY, AND S. 1933,
TO PROVIDE FOR FEDERAL RAILROAD SAFETY, HAZARDOUS MATERIALS CONTROL AND FOR
OTHER PURPOSES, AS PASSED BY THE SENATE ON DECEMBER 19, 1969.
    *4125 THE SECRETARY OF TRANSPORTATION, IN HIS TESTIMONY BEFORE YOUR COMMITTEE,
SUPPORTS THE SENATE PASSED BILL, S. 1933, WITH VARIOUS MODIFICATIONS. THE BUREAU OF
THE BUDGET SUPPORTS THAT POSITION AND, SUBJECT TO ADOPTION OF THE SUGGESTED
AMENDMENTS, RECOMMENDS THE ENACTMENT OF S. 1933.
    SINCERELY,
                          WILFRED H. ROMMEL,
                          ASSISTANT DIRECTOR FOR LEGISLATIVE REFERENCE.
                          U.S. ATOMIC ENERGY COMMISSION,
                          WASHINGTON, D.C., MARCH 18, 1970.
HON. HARLEY O. STAGGERS,
CHAIRMAN, COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
HOUSE OF REPRESENTATIVES
    DEAR MR. STAGGERS: THANK YOU FOR THE OPPORTUNITY TO COMMENT ON S. 1933, A BILL
TO PROVIDE FOR FEDERAL RAILROAD SAFETY, HAZARDOUS MATERIALS CONTROL AND FOR
OTHER PURPOSES.
    THE AEC ENDORSES THE PURPOSES OF S. 1933; HOWEVER, WE DEFER TO THE VIEWS OF THE
DEPARTMENT OF TRANSPORTATION ON THIS PROPOSED LEGISLATION.
    THE BUREAU OF THE BUDGET HAS ADVISED THERE IS NO OBJECTION TO THE PRESENTATION
OF THIS REPORT FROM THE STANDPOINT OF THE ADMINISTRATION'S PROGRAM.
    CORDIALLY,
                          GLENN T. SEABORG,
                          CHAIRMAN.

APPENDIX F

REPORT OF THE TASK FORCE ON RAILROAD SAFETY

                          DEPARTMENT OF TRANSPORTATION,
                          FEDERAL RAILROAD ADMINISTRATION,
                          OFFICE OF THE ADMINISTRATOR,
                          WASHINGTON, D.C., JUNE 30, 1969.
HON. JOHN A. VOLPE,
SECRETARY OF TRANSPORTATION,
WASHINGTON, D.C.
    DEAR MR. SECRETARY: I AM PLEASED TO TRANSMIT THE REPORT AND RECOMMENDATIONS
OF THE TASK FORCE ON RAILROAD SAFETY, WHICH YOU ESTABLISHED ON APRIL 18, 1969. AS
CHAIRMAN OF THE TASK FORCE, I WISH TO COMMEND TO YOU THE OUTSTANDING SPIRIT OF
COOPERATION AND DEDICATION ON THE PART OF ALL THE MEMBERS WHICH MADE THIS RE-
PORT POSSIBLE.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

SINCERELY,

R.N. WHITMAN.

AT THE REQUEST OF THE SECRETARY OF TRANSPORTATION, WE, THE REPRESENTATIVES OF THE RAILROAD INDUSTRY, RAILROAD LABOR ORGANIZATIONS, AND STATE REGULATORY COMMISSIONS, MET AS A TASK FORCE TO EXAMINE RAILROAD SAFETY AND TO ADVISE THE SECRETARY. THE TASK FORCE BEGAN MEETING MAY 1, 1969, AND CONCLUDES WITH THIS REPORT. THERE HAS BEEN A FREE EXCHANGE OF INFORMATION AND OPEN DISCUSSION. DATA SUPPLIED BY THE FEDERAL RAILROAD ADMINISTRATION AND ITS BUREAU OF RAILROAD SAFETY WERE USED FOR PURPOSES OF ANALYSIS OF PROBLEM AREAS. THE AGREED UPON TIME LIMIT DID NOT PERMIT ADDITIONAL OUTSIDE RESEARCH.

**\*4126** REVIEW OF THE PROBLEM

RAILROAD OPERATIONS INVOLVE INHERENT DANGERS. MOVEMENT OF LARGE, HEAVY EQUIPMENT AT HIGH SPEEDS CHARACTERIZES THE INDUSTRY. DAILY, SOME 2 BILLION TON-MILES OF FREIGHT OF ALL TYPES MOVE ON THE NATION'S RAILROADS. HUNDREDS OF RAILROAD YARDS RECEIVE, CLASSIFY, AND DISPATCH THE 1.8 MILLION FREIGHT CAR FLEET ON AN AROUND-THE-CLOCK, 7-DAY-A-WEEK SCHEDULE. ABOUT 600,000 PASSENGERS DAILY COMMUTE TO WORK AND 200,000 TRAVEL INTERCITY BY RAIL; 630,000 RAILROAD WORKERS AVERAGE 3.5 MILLION MAN-HOURS OF WORK PER DAY.

IT IS LOGICAL TO ASSUME THAT OPERATIONS OF SUCH MAGNITUDE WILL GENERATE ACCIDENTS. THUS, STANDARDS, PROCEDURES, AND RULES ARE NECESSARY TO PROVIDE FOR SAFETY. THE BULK OF EXISTING RAILROAD SAFETY PRACTICES WERE DEVELOPED OVER THE YEARS BY THE INDUSTRY ITSELF.

FOR MANY YEARS THEY MET THE SAFETY REQUIREMENTS AND PRODUCED THE PRESENT SAFETY RECORD.

GRADE-CROSSING ACCIDENTS RANK AS THE MAJOR CAUSE OF FATALITIES IN RAILROAD OPERATIONS. THEY ACCOUNT FOR 65 PERCENT OF THE FATALITIES RESULTING FROM ALL TYPES OF RAILROAD ACCIDENTS, AND RANK SECOND ONLY TO AVIATION MISHAPS IN SEVERITY. ANNUALLY, ABOUT 4,000 ACCIDENTS PRODUCE APPROXIMATELY 1,6000 DEATHS, WHICH IS ALSO A MATTER OF MAJOR PUBLIC CONCERN.

THE YEARLY TOTALS OF CROSSING ACCIDENTS, AND ACCIDENT CASUALTIES, IN THE 1920-67 PERIOD, CAN BE RELATED VERY CLOSELY TO THE COMBINED AMOUNT OF RAIL AND HIGHWAY MILES TRAVELED AND TO THE EFFECTS OF MAJOR CROSSING SAFETY IMPROVEMENT PROGRAMS. THE TREND IN BOTH ACCIDENTS AND CASUALTIES UP TO 1958 WAS GENERALLY DOWNWARD. THE SITUATION HAS BEEN REVERSED SINCE 1958, HOWEVER, WITH A DISTURBING GENERAL TREND UPWARD IN BOTH CATEGORIES. ONLY 20 PERCENT OF THE TOTAL 225,000 GRADE CROSSINGS ARE PROTECTED WITH AUTOMATIC DEVICES.

GRADE-CROSSING SAFETY RECEIVES ATTENTION FROM HIGHWAY AUTHORITIES AS WELL AS RAILROAD ORGANIZATIONS. UNDER EXISTING LAW, FEDERAL-AID HIGHWAY FUNDS MAY BE USED ON GRADE CROSSINGS ON THE FEDERAL-AID HIGHWAY SYSTEM. THIS INCLUDES INTERSTATE, PRIMARY, AND SECONDARY ROADS WHICH TOGETHER ACCOUNT FOR SLIGHTLY MORE THAN 20 PERCENT OF THE TOTAL NUMBER OF CROSSINGS. HOWEVER, FEDERAL FUNDS MAY NOT BE USED TO REDUCE HAZARDS AT RAILROAD CROSSINGS OF CITY STREETS AND ON MANY STATE SUPPLEMENTARY HIGHWAYS AND LOCAL ROADS WHICH ARE NOT ON THE FED-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ERAL-AID SYSTEM AND WHICH REPRESENT THE REMAINING 80 PERCENT OF THE TOTAL. A CERTAIN NUMBER OF SAFETY IMPROVEMENTS ARE BEING MADE CURRENTLY BY THE CARRIERS AND STATE AND LOCAL AGENCIES ON CROSSINGS NOT ON THE FEDERAL-AID SYSTEM. THERE IS AN IMPERATIVE NEED FOR AN EXPANDED PUBLIC PROGRAM TO COVER THESE CROSSINGS IN ORDER TO REDUCE IMMEDIATELY THIS EXTREMELY HIGH FATALITY RATE.

THE MOST OBVIOUS TREND IN ANY RECENT EXAMINATION OF RAILROAD SAFETY IS THE LARGE AND STEADY INCREASE IN THE NUMBER OF TRAIN ACCIDENTS. THE 8,028 TRAIN ACCIDENTS RECORDED IN 1968 REPRESENTS A SIGNIFICANT INCREASE, BY ANY YARDSTICK, OVER THE 4,148 RECORDED IN 1961. DERAILMENTS ACCOUNT FOR TWO-THIRDS OF THE TOTAL.

GENERAL CAUSES OF TRAIN ACCIDENTS ARE ALMOST EVENLY DIVIDED AMONG HUMAN ERROR, DEFECTS IN OR FAILURE OF EQUIPMENT, AND DEFECTS IN OR IMPROPER **4127** MAINTENANCE OF TRACT AND ROADBED. DERAILMENTS ARE LARGELY ATTRIBUTABLE TO TRACK AND EQUIPMENT PROBLEMS WHILE COLLISIONS ARE MOSTLY CAUSED BY HUMAN ERROR.

EMPLOYEE SAFETY IN RAILROAD OPERATIONS IS OF CONTINUING CONCERN. IN 1968, THERE WERE 146 EMPLOYEES KILLED AND 17,993 INJURED. EMPLOYEES INVOLVED IN RAIL OPERATIONS AND TRACK AND ROADBED MAINTENANCE ARE MORE EXPOSED TO THE INHERENT HAZARDS OF THE INDUSTRY AND, THEREFORE, REPRESENT A MAJOR PORTION OF THE EMPLOYEE CASUALTY FIGURE. CONTRIBUTING FACTORS TO THE EMPLOYEE CASUALTY RATE INCLUDE INADEQUATE TRAINING PROGRAMS, HUMAN ERRORS, EQUIPMENT DEFECTS, POOR HOUSEKEEPING, AND NONCOMPLIANCE WITH SAFETY AND OPERATING RULES.

THE NEED FOR TRANSPORTING EVER-INCREASING QUANTITIES AND VARIETIES OF POSSIBILITY OF SERIOUS ACCIDENTS THAT HAVE BECOME A MATTER OF MAJOR PUBLIC WHEN DANGEROUS COMMODITIES ARE TRANSPORTED.

## RAILROAD SAFETY REGULATIONS

GOVERNMENT INVOLVEMENT IN RAILROAD SAFETY REGULATION CAME EARLY. IN 1893, CONGRESS PASSED THE FIRST SAFETY APPLIANCE ACT. THEN AND IN LATER YEARS VARIOUS FEDERAL STATUTES GRANTED VARYING DEGREES OF FEDERAL AUTHORITY OVER LOCOMOTIVES, SIGNALING SYSTEMS, HOURS OF SERVICE LIMITATIONS ON CERTAIN EMPLOYEES, AIR-BRAKES, COUPLERS, HANDBRAKES, GRAB GRAB IRONS, RUNNING BOARDS, STILL STEPS, AND DRAFT GEARS ON ROLLING STOCK, AND ACCIDENT REPORTING. THE FEDERAL AUTHORITY TO REGULATE SHIPMENT OF HAZARDOUS MATERIALS IS APPLIED LARGELY TO THE PACKAGING OF THESE COMMODITIES, ALTHOUGH SOME RULES GOVERNING HANDLING IN TRANSIT HAVE BEEN ADOPTED.

FEDERAL STATUTES DO NOT COVER THE TRUCKS, WHEELS, AND AXLES OF RAILROAD CARS NOR THEIR DESIGN, CONSTRUCTION, OR MAINTENANCE. BRIDGES AND TUNNELS ARE NOT SUBJECT TO FEDERAL REGULATIONS AND NO FEDERAL AUTHORITY GOVERNS TRACK AND ROADBED. THERE IS NO GENERAL AUTHORITY TO PROMULGATE STANDARDS FOR EMPLOYEE QUALIFICATIONS, PHYSICAL REQUIREMENTS, AND TRAINING, NOR TO PRESCRIBE UNIFORM RAILROAD OPERATING RULES.

ALMOST ALL STATES HAVE ENTERED THE FIELD OF RAIL SAFETY REGULATION.

HOWEVER, THERE IS NO UNIFORM PATTERN OF INVOLVEMENT. SOME ARE QUITE ACTIVE IN GENERAL RAIL SAFETY MATTERS, BUT MOST CONSIDERATION IS ON GRADE-CROSSING SAFETY REGULATION. CERTAIN STATES FEEL THEY ARE ADEQUATELY EQUIPPED BY STATUTE

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

OR EXISTING REGULATIONS TO DEAL WITH ANY RAIL SAFETY PROBLEM THAT MAY ARISE.

RULES AND REGULATIONS ISSUED UNDER PRESENT FEDERAL AND STATE AUTHORITY COVER ONLY THE SPECIFIC AREAS REACHED BY THE LEGISLATIVE ACTS. THE LIMITATION IMPOSED ON THE REGULATORY PROCESS BY SPECIFIC, RATHER THAN GENERAL SCOPE, LEGISLATIVE AUTHORITY RESULTS IN ONLY MINIMAL PUBLIC AGENCY INVOLVEMENT IN SOME PROBLEM AREAS OF SAFETY.

## PRIORITIES

RAILROAD SAFETY IS WIDE IN SCOPE AND REQUIRES A MORE COMPREHENSIVE NATIONAL APPROACH. OF FIRST PRIORITY IS TREATMENT OF TOTAL RAIL SAFETY BY *4128 RELATING ALL ITS VARIOUS FACETS TO DEFINITE GOALS. THIS DEMANDS A COORDINATED APPROACH BY INDUSTRY, LABOR, STATE, AND FEDERAL GOVERNMENTS.

TO CONTINUE AS THE MAJOR TRANSPORTATION MODE, RAILROADS WILL REQUIRE MORE INNOVATION, ADVANCED EQUIPMENT, AND HIGHER SPEED CAPABILITIES. ACHIEVEMENT OF THESE ADVANCED CAPABILITIES CALLS FOR PARALLEL ADVANCEMENT IN SAFE, DEPENDABLE, OPERATION. THEREFORE, MAJOR SAFETY RESEARCH IS ESSENTIAL TO GUARANTEE THAT TOMORROW'S RAILROADS WILL NOT ONLY BE MORE EFFICIENT BUT MORE SAFE.

RAILROAD OPERATING PERSONNEL WILL CONTINUE TO BE THE GROUP MOST INVOLVED WITH RAIL SAFETY, OR THE LACK OF IT. NEW EQUIPMENT AND HIGHER SPEEDS WILL PLACE GREAT DEMANDS ON EMPLOYEE SKILLS AND RAILROAD OPERATING PRACTICES. IT IS RECOGNIZED THAT EMPLOYEE TRAINING IS INADEQUATE TODAY, AND COULD BECOME MORE CRITICAL AS NEW TECHNOLOGY RESHAPES THE INDUSTRY. IT SEEMS IMPERATIVE THAT FORMAL, INTENSIVE TRAINING PROGRAMS BE GIVEN HIGH PRIORITY ALONG WITH HUMAN FACTORS RESEARCH. AT THE SAME TIME, RAILROAD RULES AND PRACTICES MUST BE KEPT RESPONSIVE TO CHANGE SO THAT A HIGH LEVEL OF SAFETY MAY BE MAINTAINED.

THE MODERN INDUSTRIAL ECONOMY IS DEPENDENT UPON HAZARDOUS MATERIALS THAT ARE SHIPPED THROUGHOUT THE COUNTRY. CONSEQUENTLY, THE ENTIRE TRANSPORTATION NETWORK, PARTICULARLY THE RAILROADS UPON WHICH A LARGE SHARE OF CHEMICALS, EXPLOSIVES, FUELS, AND THE LIKE TRAVEL, MUST HAVE THE CAPACITY TO TRANSPORT THEM SAFELY. A TOP PRIORITY SHOULD BE THE COMPLETE EVALUATION OF ALL FACTORS RELATED TO THE TRANSPORTATION OF THESE COMMODITIES. PARTICULARLY, CONTAINER STANDARDS FOR HAZARDOUS MATERIALS MUST TAKE INTO ACCOUNT IMPACT AND STRESS REQUIREMENTS COMMENSURATE WITH TODAY'S LONGER, HEAVIER, AND FASTER TRAINS.

THE MOTORING PUBLIC IS PART OF THE SAFETY PROBLEM AT THE GRADE CROSSING. DRIVERS MUST BE EDUCATED TO ACCEPT THE MEANING OF WARNING DEVICES AND BE REQUIRED TO HEED THEM. COMPLIANCE MUST BE ENFORCED. BECAUSE THIS IS A MATTER OF PUBLIC SAFETY, PUBLIC PROGRAMS MUST BE IMMEDIATELY INITIATED AND PROPERLY FUNDED TO PROVIDE THE MOTORIST WITH POSITIVE, UNIFORM, AND ADEQUATE INFORMATION ABOUT THE HAZARD AT THE CROSSING. MORE EMPHATICALLY, FIRM AND PROMPT CONSIDERATION MUST BE GIVEN TO BETTER USE OF EXISTING FUNDS AND THE MAKING AVAILABLE OF ADDITIONAL PUBLIC FUNDS TO MEET THE INCREASING COSTS OF CROSSING PROTECTION AND GRADE SEPARATION, AND TO INCREASE THE NUMBER OF GRADE CROSSINGS WITH AUTOMATIC PROTECTION. THERE SHOULD BE A LONG-RANGE PUBLIC COMMITMENT TO ELIMINATE THIS UNNECESSARY AND TRAGIC LOSS OF LIFE.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

OTHER IMPROVEMENTS IN RAILROAD SAFETY MUST NECESSARILY INVOLVE SUBSTANTIAL COMMITMENT OF PUBLIC AND PRIVATE RESOURCES. FOR GOVERNMENT, A MAJOR COMMITMENT SHOULD BE TOWARD RESEARCH; FOR INDUSTRY, UPGRADING AND MAINTENANCE OF PLANT SHOULD BE FOREMOST. MANAGEMENT AND LABOR SHOULD COOPERATE TO REDUCE HUMAN ERROR. THE ECONOMIC RESTRAINTS ON THE RAILROAD INDUSTRY MAKE IT ESSENTIAL THAT PUBLIC POLICY BE DIRECTED TOWARD THE DEVELOPMENT OF FINANCIAL INCENTIVES TO SUPPORT RAIL SAFETY.

## SUMMARY CONCLUSIONS

RECOGNIZING THAT THERE HAVE BEEN LONGSTANDING DIFFERENCES AMONG THE THREE GROUPS REPRESENTED ON THE TASK FORCE, THE PARTIES SOUGHT TO EMPHASIZE*4129 AREAS OF AGREEMENT RATHER THAN DISAGREEMENT PLUS THEIR MUTUALITY OF INTEREST IN RAILROAD SAFETY. THE CONSENSUS VIEW OF THE TASK FORCE IS AS FOLLOWS:

RAILROAD SAFETY IS A PROBLEM, NATIONAL IN SCOPE, OF CONCERN TO FEDERAL AND STATE GOVERNMENTS, AS WELL AS LABOR AND MANAGEMENT AND WHICH HAS BEEN ACCENTED IN RECENT YEARS BY THE INCREASE IN THE NUMBER OF TRAIN ACCIDENTS, PARTICULARLY DERAILMENTS.

FATALITIES RESULTING FROM RAILROAD ACCIDENTS OCCUR MOSTLY AT GRADE CROSSINGS. TRESPASSERS RANK SECOND IN THE NUMBER OF FATALITIES, AND EMPLOYEES THIRD. ACCIDENTS CREATES A NEW DIMENSION OF PUBLIC CONCERN OVER RAILROAD SAFETY.

REPORTED CAUSES OF TRAIN ACCIDENTS ARE ALMOST EVENLY DIVIDED AMONG DEFECTS IN OR FAILURE OF TRACK AND ROADBED, DEFECTS IN OR FAILURE OF EQUIPMENT, AND HUMAN ERROR.

EXISTING FEDERAL AND STATE RAIL SAFETY REGULATIONS DO NOT, IN MOST INSTANCES, PROVIDE STANDARDS, FOR TRACK, ROADBED, EQUIPMENT, EMPLOYEE TRAINING, AND QUALIFICATIONS, OR RULES GOVERNING SAFE RAILROAD OPERATIONS.

ACCIDENT REPORTING AND INVESTIGATION PRACTICES ARE INADEQUATE. AVAILABLE STATISTICS DO NOT RELATE SUFFICIENTLY TO DETERMINATION OF PRIMARY AND CONTRIBUTORY CAUSES.

RESEARCH INTO FACTORS AFFECTING RAILROAD SAFETY IS INADEQUATE BECAUSE IT HAS BEEN SPORADIC AND NOT COORDINATED.

PRESENT FEDERAL, STATE, AND INDUSTRY PROGRAMS TO REDUCE HAZARDS AT RAILWAY-HIGHWAY GRADE CROSSINGS ARE EXTREMELY NARROW AND INADEQUATELY FUNDED.

## RECOMMENDATIONS

REGARDLESS OF THE DIFFERENCE IN THE VIEWS OF THE PARTIES, IT IS RECOGNIZED THAT THE SAFETY EXPERIENCE OF THE AMERICAN RAILROADS DURING THE PAST FEW YEARS IS AT A POINT WHERE SOME EFFECTIVE STEPS MUST BE TAKEN TO BRING THE PROBLEM UNDER CONTROL. IT IS ALSO RECOGNIZED THAT THE PUBLIC AND CONGRESS WILL DEMAND DEFINITE ASSURANCE THAT SAFETY WILL BE IMPROVED. SOLUTIONS SHORT OF BROAD FEDERAL REGULATION MAY NOT ADEQUATELY MEET THE SITUATION. THEREFORE, EVEN THOUGH FURTHER REGULATION CREATES SOME PROBLEMS FOR EACH OF THE PARTIES, THE TASK FORCE AGREES THAT LEGISLATION AUTHORIZING BROAD FEDERAL REGULATORY POWERS SHOULD BE ENACTED WITH CERTAIN SAFEGUARDS. IT IS FURTHER RECOMMENDED THAT A PERMAN-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ENT ADVISORY COMMITTEE BE ESTABLISHED, BY LAW, REPRESENTING MANAGEMENT, LABOR, AND STATE REGULATORY COMMISSIONS, TO GUIDE AND ASSIST IN THE DEVELOPMENT OF SAFETY STANDARDS AND OTHER RELATED MATTERS. THE SPECIFIC RECOMMENDATIONS OF THIS TASK FORCE ARE:

1. THAT THE SECRETARY OF TRANSPORTATION, THROUGH THE FEDERAL RAILROAD ADMINISTRATION, HAVE AUTHORITY TO PROMULGATE REASONABLE AND NECESSARY RULES AND REGULATIONS ESTABLISHING SAFETY STANDARDS IN ALL AREAS OF RAILROAD SAFETY, THROUGH SUCH NOTICE, HEARING, AND REVIEW PROCEDURES AS WILL PROTECT THE RIGHTS OF ALL INTERESTED PARTIES.

*4130 2. IN ORDER TO STRENGTHEN THE ADMINISTRATION OF FEDERAL RAIL SAFETY REGULATIONS, THERE SHOULD BE ESTABLISHED A NATIONAL RAILROAD SAFETY ADVISORY COMMITTEE TO ADVISE, CONSULT WITH, AND MAKE RECOMMENDATIONS TO THE SECRETARY ON MATTERS RELATING TO THE ACTIVITIES AND FUNCTIONS OF THE DEPARTMENT IN THE FIELD OF RAILROAD SAFETY. THE COMMITTEE WOULD BE CHAIRED BY THE FEDERAL RAILROAD ADMINISTRATOR WITH THE REMAINING MEMBERS APPOINTED BY THE SECRETARY TO REPRESENT EQUALLY THE STATE REGULATORY COMMISSIONS, RAILROAD MANAGEMENT, AND LABOR. THE SECRETARY WOULD SUBMIT TO THE COMMITTEE PROPOSED SAFETY STANDARDS AND AMENDMENTS AND AFFORD IT A REASONABLE OPPORTUNITY TO PREPARE A REPORT ON THE TECHNICAL FEASIBILITY, REASONABLENESS, AND PRACTICABILITY OF EACH SUCH PROPOSAL PRIOR TO ADOPTION. THE COMMITTEE MAY PROPOSE SAFETY STANDARDS TO THE SECRETARY FOR HIS CONSIDERATION.

3. EXISTING STATE RAIL SAFETY STATUTES AND REGULATIONS REMAIN IN FORCE UNTIL AND UNLESS PREEMPTED BY FEDERAL REGULATION. ADMINISTRATION OF THE PROGRAM SHOULD BE THROUGH A FEDERAL-STATE PARTNERSHIP, INCLUDING STATE CERTIFICATION SIMILAR TO THE CERTIFICATION PRINCIPLES SET FORTH IN THE FEDERAL NATURAL GAS PIPELINE SAFETY ACT OF 1968.

4. THE ADVISORY COMMITTEE BE DIRECTED TO STUDY THE PRESENT DELEGATION OF AUTHORITY TO THE ASSOCIATION OF AMERICAN RAILROADS' BUREAU OF EXPLOSIVES IN CERTAIN AREAS OF THE TRANSPORTATION OF EXPLOSIVES AND OTHER DANGEROUS ARTICLES ACT.

5. A RESEARCH PROGRAM BE INITIATED BY GOVERNMENT AND INDUSTRY INTO RAILROAD SAFETY TECHNOLOGY, WHICH SHOULD BE FUNDED IMMEDIATELY FOR AN INITIAL 3-YEAR PERIOD, OVER AND ABOVE EXISTING RESEARCH PROGRAMS.

6. FORMAL EMPLOYEE TRAINING PROGRAMS BE EXPANDED BY RAILROAD MANAGEMENT, WITH THE COOPERATION OF LABOR AND GOVERNMENT, FOR THE PURPOSE OF INSURING COMPLIANCE WITH SAFE OPERATING PRACTICES AND REDUCING THE IMPACT OF HUMAN ERROR IN THE ACCIDENT EXPERIENCE.

7. AN EXPANDED, CONCERTED PROGRAM OF GRADE-CROSSING SAFETY BE UNDERTAKEN UTILIZING ESTABLISHED FEDERAL AND STATE AGENCIES AND ADVISORY GROUPS TO SET UNIFORM PROCEDURES AND STANDARDS. EARLY ATTENTION MUST BE GIVEN TO THE DEVELOPMENT OF IMPROVED CROSSING PROTECTION AT LOWER COST PLUS GREATER EMPHASIS PLACED ON DRIVER EDUCATION AND TRAFFIC ENFORCEMENT. IN ADDITION TO MORE EXTENSIVE USE OF EXISTING FEDERAL FUNDS NOW ALLOCABLE TO PRESENT HIGHWAY SAFETY PROGRAMS, THERE MUST BE NEW SOURCES OF FUNDING TO FINANCE AN EXPANDED GRADE-CROSSING PROGRAM.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

8. THE FEDERAL RAILROAD ADMINISTRATION SHOULD REVISE, IN CONSULTATION WITH RAILROAD MANAGEMENT, LABOR, AND STATE REGULATORY COMMISSIONS, ITS RULES FOR REPORTING OF ACCIDENTS. THE AIM SHOULD BE TO MAKE THE DATA MORE CURRENT, MORE UNIFORM, AND TO IDENTIFY CAUSES MORE ACCURATELY.

9. THE SECRETARY OF TRANSPORTATION IN CONSULTATION WITH AND ASSISTANCE OF THE TASK FORCE AND APPROPRIATE CONGRESSIONAL COMMITTEES SHOULD DRAFT PROPOSED LEGISLATION TO IMPLEMENT THESE RECOMMENDATIONS.

R.N. WHITMAN, CHAIRMAN, FEDERAL RAILROAD ADMINISTRATOR; GEORGE E. LEIGHTY, SUBCHAIRMAN, CHAIRMAN, RAILWAY LABOR EXECUTIVES' ASSOCIATION; AL H. CHESSER, VICE PRESIDENT, NATIONAL LEGISLATIVE REPRESENTATIVE, UNITED TRANSPORTATION UNION; DONALD S. BEATTIE, EXECUTIVE SECRETARY, RAILWAY LABOR EXECUTIVES'**4131** ASSOCIATION; WILLIAM E. SKUTT, ASSISTANT GRAND CHIEF ENGINEER, BROTHERHOOD OF LOCOMOTIVE ENGINEERS; CHARLES J. FAIN, SUBCHAIRMAN, COMMISSIONER, MISSOURI PUBLIC SERVICE COMMISSION; WILLIS F. WARD, CHAIRMAN, MICHIGAN PUBLIC SERVICE COMMISSION; JOHN P. VUKASIN, JR., COMMISSIONER, CALIFORNIA PUBLIC UTILITIES COMMISSION; THOMAS M. GOODFELLOW, SUBCHAIRMAN, PRESIDENT, ASSOCIATION OF AMERICAN RAILROADS; WILLIAM D. LAMPRECHT, VICE PRESIDENT, SYSTEMS OPERATIONS, SOUTHERN PACIFIC CO.; JAMES R. THORNE, VICE PRESIDENT, OPERATING DEPARTMENT, SEABOARD COAST LINE RAILROAD; C.V. COWAN, VICE PRESIDENT, OPERATING GROUP, BALTIMORE & OHIO, CHESAPEAKE & OHIO RAILROAD CO.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

H.R. REP. 91-1194, H.R. Rep. No. 1194, 91ST Cong., 2ND Sess. 1970, 1970 U.S.C.C.A.N. 4104, 1970 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

5692 (Leg.Hist.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



**U.S. Department
of Transportation**

**Federal Railroad
Administration**

# Locomotive Crashworthiness
and Cab Working Conditions

**Report to Congress**

Office of Safety Assurance and Compliance                     September 1996



EXHIBIT

5

   

**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, D.C. 20590

September 18, 1996

The Honorable Albert Gore, Jr.
President of the Senate
Washington, D.C.  20515

Dear Mr. President:

I am pleased to submit the enclosed report prepared by the Federal Railroad Administration (FRA) on "Locomotive Crashworthiness and Cab Working Conditions," as requested by the Rail Safety Enforcement and Review Act, Public Law 102-365.  This report responds to the congressional mandate to report on issues related to:

- health and safety of locomotive cab working conditions;
- effectiveness of Association of American Railroads (AAR) Specification S-580; and
- benefits and cost of additional locomotive crashworthiness features.

The report summarizes the findings of FRA's study, which included research on locomotive crashworthiness features, extensive consultations with a wide range of interested parties; and a field survey of actual locomotive working conditions.  These findings indicate that a number of the crashworthiness features and working condition improvements identified in the Act merit further action by FRA in cooperation with the private sector.  Identified priority safety improvements include implementation of stronger collision posts and full height corner posts, incorporation of a crash refuge, improved fuel tank design, and improved methods to control noise and temperature levels inside the locomotive cab.

Consistent with FRA's emphasis on promoting a collaborative approach to railroad safety, FRA will seek the participation of railroads, employee representatives, manufacturers and suppliers, and other interested persons in determining the specific actions that may be appropriate to advance the safety and health of railroad crew members, based on the results of this study and other information that the parties may make available.  FRA expects to refer locomotive crashworthiness issues to the newly constructed Railroad Safety Advisory Committee.  That committee will make recommendations on the best course of action to implement the recommendations of this report, including voluntary initiatives, and regulatory standards where appropriate.



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, D.C.   20590

September 18, 1996

The Honorable Newt Gingrich
Speaker of the House of Representatives
Washington, D.C.  20515

Dear Mr. Speaker:

I am pleased to submit the enclosed report prepared by the Federal Railroad Administration (FRA) on "Locomotive Crashworthiness and Cab Working Conditions," as requested by the Rail Safety Enforcement and Review Act, Public Law 102-365.  This report responds to the congressional mandate to report on issues related to:

- health and safety of locomotive cab working conditions;
- effectiveness of Association of American Railroads (AAR) Specification S-580; and
- benefits and cost of additional locomotive crashworthiness features.

The report summarizes the findings of FRA's study, which included research on locomotive crashworthiness features, extensive consultations with a wide range of interested parties, and a field survey of actual locomotive working conditions.  These findings indicate that a number of the crashworthiness features and working condition improvements identified in the Act merit further action by FRA in cooperation with the private sector.  Identified priority safety improvements include implementation of stronger collision posts and full height corner posts, incorporation of a crash refuge, improved fuel tank design, and improved methods to control noise and temperature levels inside the locomotive cab.

Consistent with FRA's emphasis on promoting a collaborative approach to railroad safety, FRA will seek the participation of railroads, employee representatives, manufacturers and suppliers, and other interested persons in determining the specific actions that may be appropriate to advance the safety and health of railroad crew members, based on the results of this study and other information that the parties may make available.  FRA expects to refer locomotive crashworthiness issues to the newly constructed Railroad Safety Advisory Committee.  That committee will make recommendations on the best course of action to implement the recommendations of this report, including voluntary initiatives, and regulatory standards where appropriate.

o      conduct vibration measurements and studies[10];

o      determine whether vibration may physiologically and/or psychologically harm
        the locomotive crew over an extended period of time;

o      evaluate whether new cab designs successfully address reduced vibration levels
        in locomotive cabs; and

o      develop applicable vibration guidelines.

## Asbestos

### Review of Existing Asbestos Research and Literature[11]

Asbestos is a filamentous mineral useful because of its resistance to heat.  Its primary use
earlier in this century was as an insulating material, but in more recent years it has found
widespread use in a number of other industries.

When asbestos is inhaled and deposited in the alveoli[12], it is ingested by macrophages[13],
and via mechanisms that are not currently clear, lead to the development of diffuse lung
damage and the formation of fibrosis.  Asbestos can lead to the development of a malignant
tumor of the lining of the chest cavity and lung surface called mesothelioma, and, in
association with cigarette smoking, can lead to an increased incidence of bronchogenic
carcinoma.

The diagnosis of asbestosis depends upon a well-documented history of exposure, an accurate
estimate of the degree of exposure, and a characteristic clinical picture.  The patterns of
impairment seen with asbestos exposure usually take 20 to 40 years to develop.  There is
evidence that lower exposure can lead to the development of mesothelioma.  Individuals who
develop moderate to severe degrees of asbestosis have a poor prognosis,  and those who

---

[10] Measurements of operational vibrations on all three axes, including those in the 1 to 10
Hz range, are needed to determine actual vibration conditions in the cab.  Once these levels are
known, the need and potential benefit of more extensive—and expensive—control can be
determined.

[11] Industrial Toxicology: Safety and Health Applications in the Workplace; Edited by Phillip
L. Williams & James L. Burson, 1985

[12] Alveoli is an air sac of the lungs at the termination of a bronchiole.

[13] Macrophage is a large phagocytic cell of the reticuloendothelial system.

10-10

develop malignant mesothelioma have an exceedingly poor outlook in that mesothelioma cannot be removed surgically, nor is it amenable to irradiation therapy or chemotherapy. The outlook for those individuals who develop associated bronchogenic carcinoma is the same for those who develop lung cancer and who have not been exposed to asbestos—that is, the 5-year survival rate is about 5 to 10 percent.

The long-term health consequences of this exposure are unknown. It is highly unlikely that this small degree of exposure could lead to the development of the interstitial fibrotic pattern of impairment, but there is a possibility that such exposure could lead to an increased incidence of mesothelioma and, in smokers, to an increased incidence of bronchogenic carcinoma.

**OSHA: Final Asbestos Rules[14]**

In the August 10, 1994 Federal Register, OSHA published final regulations to protect workers from exposure to asbestos. The rules, which cover four million workers and are estimated to cost $361.2 million annually, went into effect on October 11, 1994. This OSHA rule applies to railroad operating employees.

At a press conference at OSHA headquarters, Assistant Secretary of Labor (OSHA), Joseph A. Dear said the rules will ensure effective long-term management of asbestos. OSHA has reduced the permissible exposure limit (PEL) from 0.2 fibers per cubic centimeter of air as an 8-hour time-weighted average to 0.1 fibers per cubic centimeter.

**Asbestos in the Locomotive Cab**

When steam generators were used on locomotives in passenger service, asbestos cement was used to insulate the heater coils to prevent loss of heat and contain the fire. Whenever the steam generator was disassembled and the coils had to be removed, the asbestos cement was broken up and removed, releasing asbestos particles which could be inhaled into the lungs. This source of asbestos was eliminated in the 1970's, when the head end power system was developed for the heating of passenger trains with electricity.

GE and EMD, the two primary manufacturers of current locomotives, made the following statements regarding asbestos in their locomotives:

    o    GE[15] stated that asbestos has not been permitted in any facet of their locomotive production since October 1979. In addition, GE stated that there is no record of asbestos ever being used in the cab environment of its

---

[14] Occupational Hazards, Sept 1994, OSHA: Final Asbestos Rule Covers 4 Million Workers

[15] Mr. R. Shults, Manager-Product & Environment Impact, General Electric Company (GE)

10-11

locomotives. Further, GE informed each of their outside suppliers in mid-1987 that all sub-assemblies provided for the production of locomotives must be free of asbestos.

o    EMD[16] stated that of their 12 specifications for sound and thermal insulation applications, only one contained asbestos as a filler with a resin bonded fiberglass and only fiberglass was used as a loose insulating material. An EMD service bulletin was issued on April 6, 1984, prohibiting the use of asbestos for any purpose in locomotive construction. This restriction also is applied to outside contractors supplying sub-assemblies for the production of locomotives. In the 1970's, EMD began to curtail the use of asbestos in locomotive construction depending upon the location. EMD had identified 60 pages of part numbers which contained asbestos in some form in previous locomotive construction; however, these parts have been discontinued.

## Conclusions

FRA has reviewed literature outlining the known health and safety effects of asbestos exposure, and contacted representatives from both primary locomotive manufacturers regarding the present and past use of asbestos in the construction of locomotives. While previous locomotive design incorporated the use of asbestos, and older locomotives remaining in service may still contain limited amounts of asbestos, there is no evidence that the presence of asbestos poses a problem to humans or the environment. The use of asbestos in locomotive production was terminated many years ago, and both primary manufacturers currently have policy statements prohibiting the use of asbestos in locomotive construction. Based on the above, FRA does not feel that further action with respect to the presence of asbestos in locomotive cabs is warranted at this time.

---

[16] Mr. Widdman, Electro Motive Division (EMD)

10-12

**No Action**

FRA recommends no action be taken on the issue of asbestos in locomotives, except to the extent any new information requires that the issue be reopened.  FRA found that friable asbestos has not been used as a material in the construction of locomotives for ten years or more.  Locomotive builders are careful to avoid the use of asbestos in new and rebuilt locomotives.  Asbestos remaining in older units is believed to be encapsulated in individual components or systems.  FRA could find no evidence of asbestos being a health problem for crews of older locomotives.